EXHIBIT 1

<u>**EXHIBIT 1**</u>

**STATEMENT OF UNCONTESTED FACTS**

The parties hereby agree the following facts are undisputed and do not require proof at trial.  Each party reserves the right to challenge the relevancy or weight of any of these facts in the resolution of this action.

**I.     The Patent-In-Suit**

1.      U.S. Patent No. 9,539,218 ("the '218 patent"), entitled "Prevention and Treatment of Thromboembolic Disorders," naming on its face Frank Misselwitz, Dagmar Kubitza, Son-Mi Park, and Klaus Wehling as inventors, issued on January 10, 2017.  According to the Orange Book, the expiration date of the '218 patent is February 17, 2034.

2.      The priority date of the '218 patent is January 31, 2005.

3.      On its face, the '218 patent is assigned to Bayer Intellectual Property GmbH ("BIP").

4.      Plaintiffs assert infringement of claims 1-4 of the '218 patent.

5.      Claim 1 of the '218 patent recites "[a] method of treating a thromboembolic disorder comprising administering [rivaroxaban] no more than once daily for at least five days in a rapid-release tablet to a patient in need thereof, wherein the thromboembolic disorder is selected from the group consisting of pulmonary embolisms, deep vein thromboses, and stroke."

6.      Claim 2 of the '218 patent recites "[t]he method of claim 1, wherein the thromboembolic disorder is pulmonary embolisms."

7.      Claim 3 of the '218 patent recites "[t]he method of claim 1, wherein the thromboembolic disorder is deep vein thromboses."

8.      Claim 4 of the '218 patent recites "[t]he method of claim 1, wherein the

thromboembolic disorder is stroke."

## II.      Plaintiffs and Xarelto®

9.      Plaintiff BIP is a corporation organized and existing under the laws of the Federal Republic of Germany, with a place of business at Alfred-Nobel-Strasse 10, 40789 Monheim am Rhein, Germany.

10.      Plaintiff Bayer AG is a corporation organized and existing under the laws of the Federal Republic of Germany, with a place of business at Kaiser-Wilhelm-Allee 1, 51368 Leverkusen, Germany.

11.      Plaintiff Janssen is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with a place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey.

12.      Janssen, which is an exclusive sublicensee under the '218 patent, is the holder of approved New Drug Application ("NDA") No. 22406 for 10 mg, 15 mg, and 20 mg oral tablets containing the active ingredient rivaroxaban, which are marketed and sold in the United States under the brand name Xarelto®.  Rivaroxaban is a direct, oral factor Xa inhibitor (a type of blood-thinner).

13.      As reflected in the labeling for the product, Xarelto® is indicated:  (i) to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation (a heart condition); (ii) for the treatment of deep vein thrombosis (DVT); (iii) for the treatment of pulmonary embolism (PE); (iv) for the reduction in the risk of recurrence of DVT and/or PE in patients at continued risk for recurrent DVT and/or PE after completion of initial treatment lasting at least 6 months; and (v) for the prophylaxis (i.e., prevention) of DVT, which may lead to PE in patients undergoing knee or hip replacement surgery.

### III.   Mylan and ANDA No. 208561

14.     Defendant Mylan Pharmaceuticals Inc. ("Mylan") is a corporation organized and existing under the laws of the State of West Virginia, with a place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia.

15.     By letter dated April 6, 2017 ("Mylan's Notice Letter"), Mylan notified Janssen and BIP that it had submitted ANDA No. 208561 to the FDA, seeking approval of rivaroxaban tablets.

16.     Mylan's Notice Letter also notified Janssen and BIP that its ANDA contained a Paragraph IV Certification that the claims of the '218 patent are invalid, unenforceable, and/or will not be infringed by the commercial manufacture, use, or sale of Mylan's proposed rivaroxaban tablets.

17.     Within 45 days of receiving Mylan's Notice Letter, Plaintiffs filed a complaint alleging infringement by Mylan of the '218 patent.

### V.   Prior Art

18.     The following documents are prior art to the '218 patent under 35 U.S.C. § 102 based on their publication dates:

a.     Abrahmsén Alami, et al., WO 03/101423 A1 ("Abrahmsén")

b.     Acova Label (2000) (MYL_RIV00074689 – MYL_RIV00074707) ("Acova")

c.     Ageno, W. & M.V. Huisman, "Low-molecular-weight heparins in the treatment of venous thromboembolism," Curr. Control Trials Cardiovasc. Med., 1:102-106 (2000) (JOINT_RIV0000655 – JOINT_RIV0000659)("Ageno")

d.     Alderborn, G., "Tablets and compaction" Pharmaceutics: The Science of Dosage Form Design," Second Edition (M.E. Aulton Ed., Churchill Livingstone), Ch. 27 (2002) (JOINT_RIV0000128 – JOINT_RIV0000173)("Aulton")

e.     Al-Yaseen, et al., "The safety of dosing dalteparin based on actual body weight for the treatment of acute venous thromboembolism in obese patients," J. Thromb. Haeost., 3:100-102 (2005) (JOINT_RIV0000660 – JOINT_RIV0000662)("Al-Yaseen")

f.     Andrassy and Eschenfelder, *Are the Pharmacokinetic Parameters of Low Molecular Weight Heparins Predictive of their Clinical Efficacy?,* Thrombosis Research 81 (2S) S29-S38 (1996) (BAYX218-0244325 – BAYX218-0244334)("Andrassy")

g.     Angiomax Label (2000) (MYL_RIV00074708 – MYL_RIV00074718)

h.     Bauer, et al., "Fondaparinux, a Synthetic Pentasaccharide: The First in a New Class of Antithrombotic Agents – The Selective Factor Xa Inhibitors," Cardiovascular Drug Reviews, 20(1):37-52 (2002) (MYL_RIV00074757 – MYL_RIV00074772)

i.     Benet, L.Z. and Sheiner, L.B., "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution, and Elimination," *Goodman & Gilman's The Pharmacological Basis of Therapeutics*, 7th Ed. (Macmillan), Ch. 1 (1985) (BAYX218-0244229 – BAYX218-0244266)("Benet")

j.     Benet, L.Z. et. al, "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution, and Elimination," *Goodman & Gilman's The Pharmacological Basis of Therapeutics*, 8th Ed. (Pergamon Press), Ch. 1 (1990) (BAYX218-0244100 – BAYX218-0244135)("Goodman & Gilman's")

k.     Birkett, Chapter 11, "Pharmacokinetics – The Concentration-Effect Relationship," in *Pharmacokinetics Made Easy* (2004) (BAXY218-0244352 – BAXY218-0244361)("Birkett Ch. 11")

l.     Birkett, D.J., "Designing dose regimens," *Pharmacokinetics Made Easy*, Revised (McGraw-Hill) Ch. 12 (2002) (BAYX218-0244195 – BAYX218-0244204)("Birkett Ch. 12")

m.     Bueller, et al., "Antithrombotic Therapy for Venous Thromboembolic Disease, The Seventh ACCP Conference on Antithrombotic and Thrombolytic Therapy," Chest, 126:401S-428S (2004) (JOINT_RIV0000692 – JOINT_RIV0000719)

n.     Camerlingo, et al., "Immediate Anticoagulation With Heparin for First-Ever Ischemic Stroke in the Carotid Artery Territories Observed Within 5 Hours of Onset," Arch. Neurol., 51:462-467 (1994) (JOINT_RIV0000720 – JOINT_RIV0000725) ("Camerlingo")

4

o.  Carville, et al., "Thrombus precursor protein (TpP™): marker of thrombosis early in the pathogenesis of myocardial infarction," Clin. Chem., 42(9):1537-1541 (1996) (JOINT_RIV0000726 - JOINT_RIV0000730)

p.  Crowther et al., *A Randomized Trial Comparing 5-mg and 10-mg Warfarin Loading Doses*, 159 Arch. Internal Med. 46-48 (1999) (BAYX-03592396–BAYX-03592398)("Crowther")

q.  Coumadin Approval Letter and Label (2000) (BAYX218-0244070 – BAYX218-0244099)

r.  Eriksson, et al., "Pharmacokinetics and pharmacodynamics of ximelagatran, a novel oral direct thrombin inhibitor, in young healthy male subjects," Eur. J. Clin. Pharmacol., 59:35-43 (2003) (BAYX218-0243475 - BAYX218-0243483) ("Eriksson")

s.  "Fachinformation" for Exanta 24 mg Filmtabletten from AstraZeneca (BAYX218-0243338 - BAYX218-0243342)

t.  Fareed, et al., "Pharmacodynamic and Pharmacokinetic Properties of Enoxaparin, Implications for Clinical Practice" Clinical Pharmacokinetics, 42(12):1043-1057 (2003) (JOINT_RIV0000174 – JOINT_RIV0000190) ("Fareed")

u.  Fareed, et al., "Studies on the mechanism of action of BAY 59-7939 - an oral, direct Factor Xa inhibitor," Pathophysiol. Haemost. Thromb., 33(supp12):97, Abstr. No. PO077 (2003) (BAYX218-0243365)

v.  Fragmin (Pharmacia and Upjohn) 03/30/1999 Supplemental Approval [Prophylaxis of Deep Vein Thrombosis]: S8 Approval Letter; Final Labeling– FOI Document #5243139A (1999) ("Fragmin Label")

w.  Gao, et al., "Fluid bed granulation of a poorly water soluble, low density, micronized drug: comparison with high shear granulation," Int. J. Pharm., 237:1-14 (2002) (JOINT_RIV0000191 – JOINT_RIV0000204) ("Gao")

x.  Goldhaber, S.Z., "Pulmonary embolism," Lancet, 363:1295-1305 (Apr. 2004) (JOINT_RIV0000770 – JOINT_RIV0000780) ("Goldhaber")

y.  Golub, et al., "Physiologic considerations in drug absorption from the gastrointestinal tract," J. Allergy Clin. Immunol., 78:689-694 (1986) (JOINT_RIV0000781 – JOINT_RIV0000786) ("Golub")

z.  Harder, et al., "Effects of BAY 59-7939, an innovative, oral, direct factor

5

Xa inhibitor, on thrombin generation in healthy volunteers," Pathophysiol. Haemost. Thromb., 33(suppl. 2):97, Abstr. No. PO078 (2003) (JOINT_RIV0000205) ("Harder" / "Harder 1")

aa.     Harder, et al., "Effects of BAY 59-7939, an Oral, Direct Factor Xa Inhibitor, on Thrombin Generation in Healthy Volunteers," Blood 102(11):811a, Abstr. No. 3003 (2003) (JOINT_RIV0000206) ("Kubitza 4" / "Harder 2")

bb.     Herbert, et al., "SR 901107A/Org 31540, a Novel Anti-Factor Xa Antithrombotic Agent," Cardiovascular Drug Reviews, 15(1):1-26 (1997) (MYL_RIV00074952 – MYL_RIV00074977)

cc.     Hirsh et al., *Oral Anticoagulants: Mechanism of Action, Clinical Effectiveness, and Optimal Therapeutic Range*, 114 CHEST 445S-469S (1998) (BAYX-03591910–BAYX-03591934)("Hirsh I")

dd.     Hirsh et al., *Heparin and Low-Molecular Weight Heparin: Mechanisms of Action, Pharmacokinetics, Dosing Considerations, Monitoring, Efficacy, and Safety*, 114 CHEST 489S-510S (1998) (BAYX-03591888–BAYX-03591909)("Hirsh II")

ee.     Hyers et al., *Antithrombotic Therapy for Venous Thromboembolic Disease,* 114 CHEST 561S-78S, 561-62S (1998) (BAYX-03591935 – BAYX-03591952)

ff.     International Publication No. WO 2000/013671 ("Forsman")

gg.     Kubitza, *et al.*, "Multiple Dose Escalation Study Investigating the Pharmacodynamics, Safety, and Pharmacokinetics of Bay 59-7939, an Oral, Direct Factor Xa Inhibitor, in Healthy Male Subjects," Blood, 102(11):811a, Abstr. No. 3004 (2003) (JOINT_RIV0000206) ("Kubitza 1")

hh.     Kubitza, et al., "Single Dose Escalation Study Investigating the Pharmacodynamics, Safety, and Pharmacokinetics of BAY 59-7939 an Oral Direct Factor Xa Inhibitor in Healthy Male Subjects," Blood 102(11):813a, Abstr. No. 3010 (2003) (JOINT_RIV0000207 – JOINT_RIV0000208) ("Kubitza 2")

ii.     Kubitza, et al., "Single dose escalation study of BAY 59-7939 - an oral, direct factor Xa inhibitor - in healthy male subjects" Pathophysiol. Haemost. Thromb., 33(suppl2):98, Abstr. No. PO081 (2003) (JOINT_RIV0000209) ("Kubitza 3")

jj.     Kubitza, et al., "Multiple dose escalation study investigating BAY 59-

7939 - an oral, direct factor Xa inhibitor - in healthy male subjects"
Pathophysiol. Haemost. Thromb., 33(suppl2):98 (2003), PO080
(JOINT_RIV0000209) ("Kubitza 5")

kk.     Lassen, et al. "A phase II randomized, double-blind, five-arm, parallel-
group, dose-response study of a new oral directly-acting Factor-Xa
inhibitor, Razaxaban, for prevention of deep vein thrombosis in knee
replacement surgery—on behalf of the Razaxaban Investigators"
[abstract]. Blood 102(11):15a, Abstr. No. 41 (2003) (BAYX218-0244218
– BAYX218-0244220)("Lassen")

ll.     Leadley, Jr., R.J., "Coagulation Factor Xa Inhibition: Biological
Background and Rationale," Current Topics in Medicinal Chem.,
1(2):151-159 (2001) (JOINT_RIV0000210 –
JOINT_RIV0000218)("Leadley")

mm.     Linkins, L.A., "New Anticoagulant Therapy", Annu. Rev. Med. 56:63-77
(2005) (BAYX218-0244145 – BAYX218-0244159)

nn.     "Lovenox," 1996 Physician's Desk Reference (50th Ed.), pp. 329, 2020-
2022 (MYL_RIV00075054 – MYL_RIV00075058)("Linkins")

oo.     Lovenox Label (1993) (MYL_RIV00074989 – MYL_RIV00074995)

pp.     Lovenox Label (1998) (MYL_RIV00074996 – MYL_RIV00075011)

qq.     Lovenox Injection (Aventis) 11/27/2000 Supplemental Approval [New
Indication], S36 Approval Letter; Approvable Letter; Final Labeling – FOI
Document #5243106A (2000) (MYL_RIV_218_00019572 –
MYL_RIV_218_00019605)("Lovenox® 2000")

rr.     Lowe, G.D.O., "Venous and arterial thrombosis: epidemiology and risk
factors at various ages," Maturitas, 47:259-263 (2004)
(JOINT_RIV0000892 – JOINT_RIV0000896)

ss.     Majerus, P and Tollefsen, D, "Anticoagulant, Thrombolytic, and
Antiplatelet Drugs," *Goodman & Gilman's The Pharmacological Basis of
Therapeutics*, 10th Ed. (McGraw-Hill), Ch. 55 (2001) (BAYX218-
0244160 – BAYX218-0244184)("Majerus")

tt.     Martineau, P. & N. Tawil, "Low-Molecular-Weight Heparins in the
Treatment of Deep-Vein Thrombosis," Ann. Pharmacother., 32:588-598,
601 (1998) (JOINT_RIV0000908 – JOINT_RIV0000919) ("Martineau")

uu.     Moonis, M. & M. Fisher, "Considering the Role of Heparin and Low
Molecular Weight Heparins in Acute Ischemic Stroke," Stroke, 33:1927-

1933 (2002) (JOINT_RIV0000920 – JOINT_RIV0000926) ("Moonis")

vv.    Myers, "Ch. 2: The FDA Drug Approval Process" in Hartzema, ed. PharmacoEpidemiology (1998) (BAYX218-0244335 – BAYX218-0244351)

ww.    Pathophysiology of Haemostasis and Thrombosis, 18th International Congress on Thrombosis Abstracts, 33(suppl2):24, 76, 91, 97-98 (2003) (BAYX218-0012223 - BAYX218-0012228)

xx.    Perzborn, et al., "In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939—an oral, direct Factor Xa inhibitor," J. Thromb. Haemostasis, 3(3):514-521 (2005) (JOINT_RIV0000219 - JOINT_RIV0000244) ("Perzborn")

yy.    Refludan Approval Letter (3/6/1998) (MYL_RIV00075132 – MYL_RIV00075136)

zz.    Refludan Label (10/2004) (MYL_RIV00075137 – MYL_RIV00075158)

aaa.    Ronfeld, R.A. & L.Z. Benet, "Interpretation of Plasma Concentration-Time Curves after Oral Dosing," J. Pharma. Sci., 66(2):178-180 (1977) (MYL_RIV_218_00019631 - MYL_RIV_218_00019633)

bbb.    Rowland, M. & T.N. Tozer, "Multiple-Dose Regimens," Clinical Pharmacokinetics, Concepts And Applications, 3rd Edition (Williams & Wilkins), Chapter 7 (1995) (JOINT_RIV0000968 – JOINT_RIV0000998) ("Rowland")

ccc.    Swaminathan, A, et al., "Pharmacokinetic and Pharmacodynamic Characteristics in Healthy Volunteers of Razaxaban, an Orally-Active, Potent, Selective Inhibitor of Factor Xa", Am. Soc. Clin. Pharm. & Ther. 74 (2004) P6 (Abstract PI-12) (BAYX218-0244194)("Swaminathan")

ddd.    Thompson, Gary A., *Dosage Regimen Design: A Pharmacokinetic Approach*, 32 J. Clin. Pharmacol. 210-214, 210 (1992) (BAYX218-0244205 – BAYX218-0244209)("Thompson")

eee.    U.S. Patent App. Pub. No. 2003/0153610 ("Straub")

fff.    United States Pharmacopeia, Vol. 24, pp. 1941-1946, 2051-2098 (JOINT_RIV0000516 – JOINT_RIV0000570) ("USP 24")

ggg.    United States Pharmacopeia, Vol. 26, pp. 2155-2156 (JOINT_RIV0000571 – JOINT_RIV0000572) ("USP 26")

hhh.   United States Pharmacopeia, 28th Edition/National Formulary, 23rd Edition (2005), pp. 2412-2421 (BAYX218-0243941 – BAYX218-0243953) ("USP 28")

iii.   United States Pharmacopeia, 28th Edition/National Formulary, 23rd Edition (2005), pp. 2636-2641 (BAYX218-0244221 – BAYX218-0244228) ("USP 28")

jjj.   Wiebe, "Mechanism of Catalysis of Inhibition of Factor IXa by Antithrombin in the Presence of Heparin or Pentasaccharide," 278(37) J. Bio. Chem. 35767-35774 (2003) (BAYX218-0244185 – BAYX218-0244193)

kkk.   Weitz, J., "New Anticoagulants for Treatment of Venous Thromboembolism," Circulation 110 (Suppl. I) I-19-I-26 (2004) (BAYX218-0244210 – BAYX218-0244217) ("Weitz")

lll.   Weitz, et al., "Thrombophilia and New Anticoagulant Drugs," Hematology, 424-436 (2004) (BAYX218-0244362 - BAYX218-0244376) ("Weitz 2004")

mmm.   Weitz and Crowther, Direct Thrombin Inhibitors, Thrombosis Research 106 (2002) V275-V284 (BAYX218-0011311 – BAYX218-0011320) ("Weitz & Crowther")

nnn.   Wilkinson, G.R., "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution, and Elimination," Goodman & Gilman's The Pharmacological Basis of Therapeutics, 10th Ed. (McGraw-Hill Professional), Ch. 1 (2001) (JOINT_RIV0000573 – JOINT_RIV0000601) ("Wilkinson")

ooo.   Yeager, B.F. & S.C. Matheny, "Low-Molecular-Weight Heparin in Outpatient Treatment of DVT," Am. Fam. Physician, 59(4):945-952 (Feb. 1999) (JOINT_RIV0001033 – JOINT_RIV0001040) ("Yeager")

# EXHIBIT 2

CONFIDENTIAL

<u>**EXHIBIT 2**</u>

<u>**PLAINTIFFS' STATEMENT OF CONTESTED FACTS**</u>

**Table of Contents**

I.      Introduction ............................................................................................................1

II.     U.S. Patent No. 9,539,218 ......................................................................................2

III.    Background of the Invention Claimed in the '218 Patent ......................................3

IV.     The Person of Ordinary Skill in the Art ................................................................5

V.      Claim Construction ................................................................................................6

VI.     Infringement ...........................................................................................................7

       A.      Mylan's ANDA No. 208561 ........................................................................7

            1.      Mylan's Proposed Labeling ...............................................................8

            2.      Tablet Dissolution ...........................................................................12

       B.      Literal Infringement ..................................................................................13

            1.      "A method of treating a thromboembolic disorder," "to a patient in need thereof," and "wherein the thromboembolic disorder is selected from the group consisting of pulmonary embolisms, deep vein thromboses, and stroke" ....................................................................14

            2.      "a direct factor Xa inhibitor that is 5-Chloro-N- ({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)phenyl]-1,3-oxazolidin-5-yl}methyl)-2-thiophenecarboxamide" ...................................................................15

            3.      "in a rapid release tablet" ................................................................15

            4.      "no more than once-daily" ...............................................................19

            5.      "for at least five consecutive days" .................................................20

       C.      Doctrine of Equivalents .............................................................................22

       D.      Inducement of and Contribution to Infringement .....................................23

VII.    Validity .................................................................................................................24

       A.      Summary ....................................................................................................24

       B.      Scope and Content of the Prior Art ...........................................................25

       C.      Differences between the Claimed Invention and the Prior Art ..................28

            1.      The POSA Developing a Dosing Regimen for a New Anticoagulant Would have Started with its Half-Life ..............................28

            2.      Rivaroxaban's Half-Life Taught Away from Once-Daily Dosing ...........28

            3.      The POSA Would Not Have Increased the Dose of Rivaroxaban to Offset its Short Half Life Due to Safety and Practical Concerns .............29

4.  Rivaroxaban's Therapeutic Window was Unknown as of January 31, 2005.................................................................................31

5.  Razaxaban Taught Away from Increasing Rivaroxaban Doses Based on Phase I Data.................................................................39

6.  The Prior Art Neither Disclosed Nor Provided a Reason to Use Rivaroxaban in a Rapid-Release Tablet....................................40

7.  The Prior Art Would Not Have Provided the POSA With a Reason to Administer Rivaroxaban Once-Daily In a Rapid-Release Tablet..........44

8.  The Prior Art Instead Suggested the Use of an Extended Release Tablet in Light of Rivaroxaban's Short Half Life .....................48

9.  Dosing Regimens of LMWHs Did Not Provide a Reasonable Expectation of Success that Rivaroxaban Could be Dosed Once-Daily.....................................................................................49

10. Razaxaban and Ximelagatran's Clinical Studies Suggested A Twice-Daily Dosing Regimen for Rivaroxaban .....................52

D.  Objective Evidence Supports Nonobviousness ....................................54

1.  Rivaroxaban Exhibits Surprising and Unexpected Results as Compared to the Closest Prior Art.............................................54

2.  Skepticism................................................................................56

3.  There is a Nexus Between the Aforementioned Objective Evidence and the Asserted Claims....................................................57

E.  The '218 Patent Satisfies the Written Description Requirement.........................58

VIII.  REMEDIES.................................................................................................59

CONFIDENTIAL

Plaintiffs Bayer Intellectual Property GmbH, Bayer AG, and Janssen Pharmaceuticals, Inc. ("Plaintiffs") submit the following Statement of Contested Facts.  This statement is based on information presently known to Plaintiffs, and Plaintiffs reserve all rights to supplement and/or modify these facts.  By including a fact herein, Plaintiffs do not assume the burden of proof or production with regard to that fact.  For example, the facts contained within this statement that are directed to issues on which Mylan bears the burden of proof, *e.g.*, validity, are based on information presently known to Plaintiffs, including through Mylan's discovery responses, invalidity contentions, and expert discovery.  Although Plaintiffs have attempted to anticipate these issues to the extent possible, Mylan may not raise all of these issues at trial and/or may seek to modify these issues or raise additional issues.  In addition, some of Mylan's arguments or evidence may be objectionable.  Plaintiffs also intend to offer evidence as to the issues of fact and issues of law identified in this pretrial order.  Plaintiffs also intend to offer evidence to rebut evidence offered by Mylan.

Plaintiffs submit this statement pursuant to Local Rule 16.3(c)(4).  By submitting this statement, Plaintiffs are in no way waiving their rights to amend or supplement their submission after considering Mylan's submissions, whether made as part of this Pretrial Order or otherwise made apparent in pretrial proceedings, the trial itself, or post-trial briefing.  To the extent this exhibit contains issues of law, those issues are incorporated by reference into Plaintiffs' Statement of Contested Issues of Law (Exhibit 4).  Conversely, to the extent Plaintiffs' Statement of Contested Issues of Law contains issues of fact, those issues are incorporated by reference into this exhibit.

## I.    Introduction

1.     The claims of U.S. Patent No. 9,539,218 ("the '218 patent") are directed to methods of treating and/or preventing particular thromboembolic disorders by administering

rivaroxaban in a rapid-release tablet once-daily for at least five consecutive days to a patient in need thereof.  As defenses, Mylan asserts noninfringement and also contends that the claims of the '218 patent are invalid for obviousness and lack of written description.  As discussed below, Mylan is liable for infringement of each claim in the '218 patent, and Mylan's invalidity defenses should be rejected.

## II.      U.S. Patent No. 9,539,218

2.      The '218 patent, entitled "Prevention and Treatment of Thromboembolic Disorders," issued on January 10, 2017.

3.      The priority date of the '218 patent is January 31, 2005.

4.      Mylan is liable for infringement of all four claims of the '218 patent.

5.      Claim 1 of the '218 patent is an independent claim.

6.      Each of claims 2 through 4 of the '218 patent depends from claim 1.

7.      Claim 1 of the '218 patent recites:  "A method of treating a thromboembolic disorder comprising administering a direct factor Xa inhibitor that is 5-Chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)phenyl]-1,3-oxazolidin-5-yl}methyl)-2-thiophenecarboxamide no more than once daily for at least five consecutive days in a rapid-release tablet to a patient in need thereof, wherein the thromboembolic disorder is selected from the group consisting of pulmonary embolisms, deep vein thromboses, and stroke."

8.      Claim 2 of the '218 patent recites:  "The method of claim 1, wherein the thromboembolic disorder is pulmonary embolisms."

9.      Claim 3 of the '218 patent recites:  "The method of claim 1, wherein the thromboembolic disorder is deep vein thromboses."

10.      Claim 4 of the '218 patent recites:  "The method of claim 1, wherein the thromboembolic disorder is stroke."

2

### III.     Background of the Invention Claimed in the '218 Patent

11.     Rivaroxaban, a factor Xa inhibitor, was first synthesized by Bayer scientists in 2000.  Rivaroxaban prevents blood clots from forming by inhibiting factor Xa, which is part of the blood coagulation cascade.

12.     Based on the available preclinical data in January 2002 when Bayer decided to pursue a clinical development program for rivaroxaban, scientists at Bayer believed that rivaroxaban would have to be dosed at least twice-daily due in part to its rapid elimination from plasma in animal studies.

13.     Bayer scientists continued to believe that rivaroxaban would have to be dosed two or three times daily after they received the results of its phase I clinical studies.  Those studies indicated that rivaroxaban had a short half-life in humans that would not allow once-daily dosing.  Indeed, the concern at the time was that, unless an extended-release formulation was successfully developed, rivaroxaban might have to be dosed three times a day.  Three times a day dosing was expected to detract from patient compliance, and in turn, efficacy.

14.     Bayer conducted phase I studies which evaluated rivaroxaban's safety in healthy volunteers who did not have a thromboembolic disorder nor any known risk of a thromboembolic disorder—*i.e.*, individuals who were not patients in need of rivaroxaban. Accordingly, these phase I studies were not designed to, and did not, evaluate efficacy.

15.     Regarding toxicity, the most significant safety risk of anticoagulants such as rivaroxaban is bleeding.  Coagulation is the body's natural mechanism of stopping and/or preventing bleeding, and thus any drug that inhibits coagulation necessarily puts the patient at risk for bleeding.  Because, for a variety of reasons, the risk of bleeding is much greater for patients in need of an anticoagulant than for healthy volunteers, phase I studies conducted in healthy volunteers provided little to no information about rivaroxaban's safety in its target

3

patient population.  Instead, the fact that the healthy volunteers in Bayer's phase I studies did not experience adverse bleeding effects merely permitted Bayer to proceed to phase II trials.

16.      The inventors understood that the fact that a drug does not show an adverse effect in healthy volunteers does not mean that it will be similarly non-toxic when tested in phase II trials in patients.  For example, the inventors were aware that the only other oral, direct, and selective factor Xa inhibitor to have undergone clinical trials as of the priority date was a compound called razaxaban.  Razaxaban looked promising and did not cause bleeding in phase I studies of healthy volunteers.  However, certain doses that appeared "safe" in phase I studies of razaxaban had to be discontinued during phase II because of bleeding.  Aware of this, the inventors understood that the phase I rivaroxaban studies, like the phase I razaxaban studies, could not provide them with information about the doses at which rivaroxaban would be safe in patients.

17.      Because rivaroxaban's phase I studies could not reveal to the inventors the doses at which rivaroxaban would be safe and effective in patients, these studies did not reveal rivaroxaban's "therapeutic window."  A drug's therapeutic window is the range of doses at which a drug is both safe and effective.  At doses below the therapeutic window, an anticoagulant would not provide sufficient anticoagulation to protect patients from thrombosis.  And at doses above the therapeutic window, an anticoagulant would create an unacceptable risk of bleeding.

18.      Due to rivaroxaban's short half-life, and in the absence of any meaningful data defining rivaroxaban's therapeutic window, the inventors and Bayer designed rivaroxaban's initial phase II clinical studies using twice and three times daily dosing.  Based on the short half-life revealed by rivaroxaban's phase I studies, once-daily dosing was not expected to be possible

4

unless an extended-release tablet was used.  Indeed, Bayer was concerned that even twice-daily

dosing would not be sufficient, and that three-times daily dosing might be necessary.  In an effort

to avoid three-times-daily dosing, Bayer attempted to formulate an extended-release tablet that

would increase rivaroxaban's effective half-life.  Efforts to develop an extended-release tablet

ultimately proved unsuccessful.

19.     Surprisingly and unexpectedly, however, the inventors discovered that even the

lowest doses of rivaroxaban given twice-daily to patients during the initial dose steps of the first

phase II clinical study (doses of 5 mg, 10 mg, and 20 mg) showed efficacy.  The inventors had

not expected these low doses of rivaroxaban to be effective—even when given twice-daily—and

this surprising finding (which was confidential and not public at the relevant priority date)

caused the inventors to reevaluate some phase I data and wonder whether it would be possible to

achieve therapeutic outcomes through once-daily dosing of rivaroxaban.

20.     Even with the benefit of the non-public results of the initial phase II trials in

patients, the inventors' suggestion to try once-daily dosing was initially met by both internal

skepticism at Bayer, as well as external skepticism from outside experts who were advising

Bayer and governmental agencies, including the FDA.  Ultimately, however, the inventors of the

'218 patent prevailed in adding a once-daily dosing regimen to rivaroxaban's first phase II

clinical study.  Surprisingly, that dosing regimen led to outcomes in patients that were as safe

and effective as twice-daily dosing regimens.  Subsequent phase II and III clinical trials included

once-daily dosing regimens.

## IV.     The Person of Ordinary Skill in the Art

21.     The person of ordinary skill in the art ("POSA") is a hypothetical person, and thus

can possess the skills and experience of multiple individuals working together as a team.

5

22.     Research teams working on the development of dosing regimens for oral anticoagulants often involve at least (i) one or more clinicians with experience in the treatment and prevention of thrombosis, experience with clinical trials, and knowledge concerning the pharmacology (including pharmacokinetics and pharmacodynamics) of anticoagulants, working together with (ii) individuals with experience in pharmaceutical formulations.  Therefore, the POSA to whom the invention disclosed and claimed in the '218 patent is addressed would have at least the relevant skills of such a clinician, and would also have the skills of an individual with experience in pharmaceutical formulation.

## V.     Claim Construction

23.     As agreed by the parties, the word "treating" in the phrase "treating a thromboembolic disorder" in claim 1 encompasses both therapeutic and prophylactic treatment. D.I. 58 at 5 (Exhibit 1).

24.     The phrase "rapid-release tablet" in claim 1 has been construed to mean "a tablet which, according to the USP release method using apparatus 2 (paddle), has a Q value (30 minutes) of 75%."  D.I. 91 at 1.

25.     The POSA would have understood the term "Q value", as used in the '218 patent, to mean the *minimum* percentage of the active ingredient (here 75%) that must be released within the specified time period (here 30 minutes).  Thus, the POSA would have understood the definition of "rapid-release tablet" to set forth a tablet specification which would be satisfied by a tablet that released 75% of its active ingredient in 30 minutes or less; or, put another way, by a tablet that released at least 75% of its active ingredient in 30 minutes.  An example of such a "rapid-release tablet"—a tablet that releases 75% of its active ingredient in less than 30 minutes—is provided in a patent application that is specifically referred to in the specification of

the '218 patent, is part of the '218 patent file history, and which is incorporated by reference into the '218 patent specification (as discussed in further detail below).

26.     Mylan admitted in *inter partes* review proceedings involving the '218 patent that a tablet which results in at least 75% dissolution within 30 minutes satisfies the requirement of a tablet that had a "Q value (30 minutes) of 75%" according to the USP release method using apparatus 2 (paddle), *i.e.*, a rapid-release tablet according to the '218 patent.

## VI.     Infringement

### A.     Mylan's ANDA No. 208561

27.     Mylan's ANDA No. 208561 seeks approval to engage in the commercial manufacture, use, or sale of its 10 mg, 15 mg, and 20 mg generic versions of Xarelto® ("Mylan's ANDA Products") before the expiration of the '218 patent.  Mylan's ANDA includes a copy of the proposed labeling of its ANDA Products, as well as information relating to the physical characteristics of its ANDA Products, such as the dissolution specification for Mylan's proposed 10 mg, 15 mg, and 20 mg rivaroxaban tablets.

28.     The proposed labeling for Mylan's ANDA Products instructs the use of Mylan's ANDA Products to prevent stroke and to treat and prevent deep vein thromboses and pulmonary embolisms by administering rivaroxaban tablets once daily for at least five consecutive days to a patient in need thereof.  Indeed, Mylan has never contested that these limitations are satisfied or that its label directs their performance.

29.     The only dispute Mylan has raised concerning infringement regards whether its ANDA Products satisfy the "rapid-release tablet" limitation in claim 1 of the '218 patent, as that term has been construed by the Court.  In other words, Mylan does not contest that the use of its ANDA Products in accordance with their labeling would meet each and every limitation of the asserted claims of the '218 patent other than the "rapid-release tablet" limitation.

7

30.     Mylan's ANDA Products release 75% of their active rivaroxaban ingredient within 30 minutes.  In other words, Mylan's ANDA Products release at least 75% of their active rivaroxaban ingredient in 30 minutes.  Accordingly, Mylan's ANDA Products satisfy the "rapid-release" tablet limitation of the asserted claims.

31.     Mylan's view that the "rapid-release tablet" limitation is only satisfied by a tablet that releases *exactly* 75% of its active ingredient at 30 minutes is incorrect, and is inconsistent with its own statements, the teachings of the art, and the knowledge of the skilled person.

### 1.     Mylan's Proposed Labeling

32.     Mylan's ANDA includes proposed labeling for Mylan's ANDA Products.  *See* MYL_RIV_218_00019196-239 (cited herein as "Label").

33.     Mylan's proposed labeling describes its ANDA Products as "rivaroxaban tablets" and the Description portion of the proposed labeling states that "[r]ivaroxaban, a factor Xa (FXa) inhibitor, is the active ingredient in rivaroxaban tablets."  *Id.* at 1, 20.  The label for Xarelto® provides the same information.

34.     Mylan's proposed labeling includes indications for the prevention of stroke, the treatment of deep vein thrombosis, the treatment of pulmonary embolisms, the prevention of deep vein thrombosis, and the prevention of pulmonary embolisms.  *Id.* at 1, 3-4.  The label for Xarelto® contains the same indications.

35.     Mylan's proposed labeling also contains dosage and administration instructions which direct both the frequency and duration of dosing:



*Id.* at 1.



*Id.* at 4.



*Id.* at 5.  The label for Xarelto® contains nearly identical dosage and administration instructions.

36.     Mylan's proposed labeling also contains information about various rivaroxaban phase III clinical studies conducted by Bayer and Janssen.  The description of these studies in Mylan's proposed labeling includes the duration of time that rivaroxaban was administered to the study participants.  The proposed labeling explains, for example, that patients in the ROCKET AF study (related to stroke prevention in patients with nonvalvular atrial fibrillation) received rivaroxaban treatment for a median of 590 days.  *Id.* at 27.  The proposed labeling also explains that patients in the EINSTEIN DVT and EINSTEIN PE studies (related to treatment of deep vein thrombosis and treatment of pulmonary embolism, respectively), underwent treatment for 3, 6, or 12 months, for a mean duration of 208 days.  *Id.* at 31.  The proposed labeling further explains that patients in the EINSTEIN Extension study (related to the reduction of the risk of recurrence of DVT and PE) underwent 6 to 12 months of additional treatment after an initial 6-month

treatment period, for a mean of 190 days' additional treatment.  *Id.* at 34. The label for Xarelto®

contains the same information about rivaroxaban's clinical trials.

37.     Other portions of Mylan's proposed labeling provide further instructions on how

to use its ANDA Products.  The "Patient Counseling Information" section of Mylan's proposed

labeling states, for example, "Advise patient to take rivaroxaban tablets only as directed," and

"Remind patients to not discontinue rivaroxaban tablets without first talking to their healthcare

professional."  *Id.* at 39.  The same section also refers to the "*FDA-approved patient labeling

(Medication Guide)*," which is part of Mylan's proposed labeling and is to be provided to

patients.  *Id.*  The Medication Guide provides:





*Id.* at 42-43.  The Medication Guide further instructs patients to "[t]ake rivaroxaban tablets [Mylan's ANDA Products] exactly as provided by your doctor."  *Id.* at 42.  The label for Xarelto® contains essentially the same information for Xarelto®.

### 2. Tablet Dissolution

38.   Mylan's ANDA No. 208561 provides information about the dissolution testing conditions and the dissolution rate of Mylan's ANDA Products.  That information shows, and Mylan does not dispute, that Mylan's ANDA Products release at least 75% of their active ingredient within 30 minutes according to the USP paddle stirrer test.

39.   Mylan's ANDA sets forth dissolution specifications for each of Mylan's ANDA Products:



MYL_RIV_218_00001353-1358 at -1353 (10 mg), -1355 (15 mg), and -1357 (20 mg).  If approved by the FDA, Mylan's ANDA Products must comply with these specifications.

40.     Mylan's ANDA includes data showing that Mylan's ANDA Products comply with these specifications.  MYL_RIV00001105-1131 at -1105 (10 mg), -1106 (15 mg), -1107 (20 mg).

**B.     Literal Infringement**

41.     The use of Mylan's ANDA Products by physicians in accordance with Mylan's proposed labeling for those products would infringe each claim of the '218 patent.  Likewise, the use of Mylan's ANDA Products by patients in accordance with Mylan's proposed labeling for those products would infringe each claim of the '218 patent.

42.     Mylan's proposed labeling directs and encourages the use of Mylan's ANDA Products in a manner that meets each limitation of each claim of the '218 patent.  Moreover, by providing such direction and encouragement, Mylan's proposed labeling for Mylan's ANDA Products induces the use of Mylan's ANDA Products by physicians in a manner that satisfies each limitation of each claim of the '218 patent.  Likewise, by providing such direction and encouragement, Mylan's proposed labeling for Mylan's ANDA Products induces the use of Mylan's ANDA Products by patients in a manner that satisfies each limitation of each claim of the '218 patent.

      **1.     "A method of treating a thromboembolic disorder," "to a patient in need thereof," and "wherein the thromboembolic disorder is selected from the group consisting of pulmonary embolisms, deep vein thromboses, and stroke"**

43.     The proposed labeling for Mylan's ANDA Products directs and encourages the use of Mylan's ANDA Products for indications in a manner that satisfies the claim 1 limitations "[a] method of treating a thromboembolic disorder," "to a patient in need thereof," and "wherein the thromboembolic disorder is selected from the group consisting of pulmonary embolisms, deep vein thromboses, and stroke."

44.     The proposed labeling for Mylan's ANDA products directs and encourages the use of (i) the 15 mg and 20 mg strengths of Mylan's ANDA Products "to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation," *i.e.*, for the prophylactic treatment of stroke, Label at 3-5; (ii) the 20 mg strength "for the treatment of deep vein thrombosis (DVT)," *i.e.*, for the therapeutic treatment of DVT, Label at 4-5; (iii) the 20 mg strength "for the treatment of pulmonary embolism (PE)," *i.e.* for the therapeutic treatment of PE, Label at 4-5.; (iv) the 20 mg strength "for the reduction in the risk of recurrence of [DVT] and of [PE] following an initial 6 months treatment for DVT and/or PE," *i.e.*, the "secondary"

14

prevention or prophylactic treatment of DVT and PE, Label at 4-5.; and (v) the 10 mg dose for the "prophylaxis of DVT, which may lead to PE in patients undergoing knee or hip replacement surgery," *i.e.*, the "primary" prevention or prophylactic treatment of DVT and PE, Label at 4-5

45.    The proposed labeling for Mylan's ANDA Products directs and encourages the use of Mylan's ANDA Products in a manner that infringes each of the additional limitations of dependent claims 2-4, which narrow the list of thromboembolic disorders from the list in claim 1 to pulmonary embolisms (claim 2), deep vein thromboses (claim 3), and stroke (claim 4).

### 2.    "a direct factor Xa inhibitor that is 5-Chloro-N- ({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)phenyl]-1,3-oxazolidin-5-yl}methyl)-2-thiophenecarboxamide"

46.    Rivaroxaban is "5-Chloro-N- ({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)phenyl]-1,3-oxazolidin-5-yl}methyl)-2- thiophenecarboxamide."

47.    Rivaroxaban is a direct factor Xa inhibitor.  *See* '218 patent at 3:18-43.

48.    Each of Mylan's ANDA Products contains rivaroxaban.  Label at 20-21.

### 3.    "in a rapid release tablet"

49.    Mylan's ANDA Products contain rivaroxaban in the form of an oral tablet.  Label at 1.

50.    The POSA would understand the Court's construction of the term "rapid-release tablet" to be satisfied where, according to the USP paddle stirrer test, a tablet releases 75% of the active ingredient in less than 30 minutes or, put another way, where a tablet releases more than 75% of the active ingredient at 30 minutes.  That understanding is consistent with and supported by the tablet referenced as an example of a "rapid-release tablet" in the '218 patent specification, which is part of the file history of the '218 patent and which is incorporated by reference into the '218 patent specification.

51.     The '218 patent specification incorporates by reference an example of a "rapid-release tablet" that released 75% of its active ingredient in 30 minutes or less; or, put another way, by a tablet that released at least 75% of its active ingredient in 30 minutes.  The '218 patent states:

> Very particularly preferred are *rapid-release tablets* containing 5-Chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)-phenyl]-1,3-oxazolidin-5-yl}-methyl)-2-thiophenecarboxamide [*i.e.*, rivaroxaban] as active ingredient.  *Preparation of such tablets is for example described in PCT/04/01289, whose disclosure is hereby included by way of reference*.

'218 patent at 8:25-30 (emphasis added).  The POSA would understand the reference to PCT/04/01289 to refer to PCT/04/012897[1] (published as WO 2005/060940 (the "'940 publication")), which discloses rapid-release tablets containing rivaroxaban and methods of preparing them (and, as noted above, is part of the file history of the '218 patent).

52.     The POSA would recognize that the '940 publication refers to section 5.2.2 of that publication as providing an example of what constitutes a "rapid-release tablet."  '940 publication (English translation) at 5 (emphasis added); Canadian Patent Publication No. CA 2

---

[1]  For a number of reasons, the POSA would understand the reference to PCT/04/01289 to refer to PCT/04/012897 (published as WO 2005/060940 (the "'940 publication")).  First, there is no application PCT/04/01289, so a POSA would be aware there was a typographical error; (2) the '940 publication is disclosed on the face of the '218 patent (and is therefore part of the file history), and a POSA would understand from the '940 publication that it is a published version of application PCT 04/012897 (or more specifically, PCT/EP2004/012897); (3) also listed on the face of the '218 patent is U.S. Patent Application Publication No. 2008/0026057, which identifies the PCT 04/012897 application on its face, and also refers to both "rapid-release tablets" and "5-Chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)-phenyl]-1,3-oxazolidin-5-yl}-methyl)-2-thiophenecarboxamide" (the chemical name for rivaroxaban), *see* [0033], [0034]; and (4) a POSA could conduct a search for the relevant application and locate it—for example, looking at the appropriate paragraph in the '218 patent, a POSA could search for "rapid-release tablet" and "5-Chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)-phenyl]-1,3-oxazolidin-5-yl}-methyl)-2-thiophenecarboxamide" and find the PCT 04/012897 application.

547 113 ("the '113 publication") at 5:4-7; US Patent Publication No. US 2008/0026057 ("the '057 publication") at [0034].  That section provides as follows:

### 5.2.2   In-vitro release

The amounts of active compound released based on the declared total content of the tablets are shown in Table 1 below:

*Table 1: In-vitro release*

|          | 15 min | 30 min | 45 min | 60 min |
|----------|--------|--------|--------|--------|
| Tablet A | 87%    | 92%    | 93%    | 94%    |
| Tablet B | 94%    | 95%    | 96%    | 96%    |

(USP paddle, 900 ml of acetate buffer pH 4.5 + 0.5% sodium lauryl sulphate, 75 rpm)

'940 publication (English translation) at 11 & Table 1; '113 publication at 10 & Table 1; '053 publication at [0052].  As such, the POSA would recognize that chapter 5.2.2 of the '940 publication provides dissolution data for tablets that were evaluated according to the USP release method using apparatus 2 (paddle).  The POSA would further recognize that chapter 5.2.2 reflects that release of 92% in 30 minutes or release of 95% in 30 minutes satisfies the requirement for a "rapid-release tablet" of "a Q value (30 minutes) of 75%."

53.     That a tablet which releases more than 90% of its active ingredient at 30 minutes satisfies the requirement for "a Q value (30 minutes) of 75%" is consistent with the general understanding of the POSA that, in the context of specifying the dissolution criteria for a tablet, reference to a particular "Q" value together with a single specified point in time (*e.g.*, 30 minutes) in a dissolution test refers to the minimum amount of active pharmaceutical ingredient that must be released by that point in time.

17

54.     That understanding is reflected in the USP itself.  For example, the USP specifies that "[w]here a single time specification is given, the test may be concluded in a shorter period if the requirement for minimum amount dissolved is met."  USP 28 at 2413.  The POSA would thus understand that the Court's construction of "rapid-release tablet"—which contains a single time specification (30 minutes)—would be satisfied by a tablet that releases 75% of the active ingredient prior to 30 minutes and then continues to dissolve.

55.     That understanding was also advanced by Mylan in its Petition for *inter partes* review of the '218 patent, which was filed before Mylan served its responsive claim construction brief in this case.  Mylan's petition stated that a tablet which released 94% of its active ingredient at 30 minutes necessarily released 75% within 30 minutes as well, and therefore than an example of such a tablet "had a Q value (30 minutes) of 75% according to the USP release method using apparatus 2 (paddle) because it resulted in at least 75% dissolution within 30 minutes."  IPR2018-1143, Petition at 47-48.  Mylan made that admission in the context of applying the claim construction that was adopted by the district court, which was the same construction that had been applied by the Patent Office during prosecution of the '218 patent.

56.     That understanding is also evident from correspondence between the FDA and Mylan in connection with Mylan's ANDA.  The FDA informed Mylan that because ███

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

MYL_RIV_218_00000231-240 at -238.  This correspondence shows that the FDA regarded tablets which release more than 80% of the active ingredient at 15 minutes as supporting "an acceptance criterion of Q = 80%."

18

57.     Mylan does not dispute that its ANDA Products release at least 75% of their active ingredient at 30 minutes.  Thus, Mylan's ANDA Products literally infringe the "rapid-release tablet" limitation in the '218 patent.

### 4.     "no more than once-daily"

58.     The proposed labeling for Mylan's ANDA Products directs and encourages use of Mylan's ANDA Products "no more than once daily."

59.     The proposed labeling for Mylan's ANDA Products directs and encourages the use of the 20 mg dose or the 15 mg dose "once daily" for the prophylactic treatment of stroke.  Label at 4-5.  The proposed labeling specifies that whether the 15 mg or the 20 mg dose should be used depends on a patient's creatinine clearance ("CrCl").  Specifically where the CrCl is greater than 50 mL/min, the proposed labeling directs and encourages the use of the 20 mg dose once daily with the evening meal.  Where the CrCl is 15 to 50 mL/min, the label directs and encourages the use of the 15 mg dose once daily with the evening meal.  *Id.*

60.     The proposed labeling for Mylan's ANDA Products directs and encourages the use of the 20 mg dose "once daily for remaining treatment" for the therapeutic treatment of DVT and the therapeutic treatment of PE (following an initial treatment of the 15 mg dose twice daily for the first 21 days).  *Id.*

61.     The proposed labeling for Mylan's ANDA Products directs and encourages the use of the 20 mg dose "once daily" for prophylactic treatment of DVT and PE.  *Id.*

62.     The proposed labeling for Mylan's ANDA Products directs and encourages the use of the 10 mg dose "once daily . . . for 35 days" for the prophylactic treatment of DVT and PE following hip replacement surgery.  *Id.*

63.     The proposed labeling for Mylan's ANDA Products directs and encourages the use of the 10 mg dose "once daily . . . for 12 days" for the prophylactic treatment of DVT and PE following knee replacement surgery.  *Id.*

### 5.     "for at least five consecutive days"

64.     The proposed labeling for Mylan's ANDA Products directs and encourages their use "for at least five consecutive days."  For the 10 mg dose for the prevention of DVT and PE following hip or knee replacement surgery, the proposed labeling directs and encourages the use of Mylan's ANDA Products once daily "for 35 days" following hip replacement and "for 12 days" following knee replacement.  Label at 4, 5.

65.     For the 15 mg and 20 mg doses for the prevention of stroke, the proposed labeling directs and encourages the use of Mylan's ANDA Products in patients who have nonvalvular atrial fibrillation, a chronic condition where the risk of stroke is present for as long as the patient has atrial fibrillation, which is usually for the remainder of the patient's life.  The proposed labeling thus directs and encourages physicians to prescribe and patients to take the 15 mg or 20 mg doses for the stroke indication once daily for at least five consecutive days.  Label at 27; *see also* Label at 27 (reporting median duration of treatment in the ROCKET AF clinical trial of 590 days).

66.     Physicians treating patients with atrial fibrillation for the prevention of stroke turn to the 2014 AHA/ACC/HRS Guidelines for the standard of care.  The 2014 AHA/ACC/HRS Guidelines support the need for lifelong anticoagulant therapy in patients with atrial fibrillation. 2014 AHA/ACC/HRS Guidelines at e19.

67.     Physicians routinely prescribe Xarelto® for this indication once-daily for more than five days based on information and instructions nearly identical (if not identical) to the information and instructions provided in Mylan's proposed labeling for its ANDA Products.

20

68.     For the 20 mg dose for the treatment of DVT and treatment of PE, the proposed

labeling directs and encourages the use of Mylan's ANDA Products "for the remaining

treatment" following an initial treatment of the 15 mg dose "twice daily" for 21 days.  Treatment

for DVT and PE is given for at least three months, and Mylan's proposed labeling therefore

directs and encourages physicians to prescribe and patients to take Mylan's 20 mg ANDA

Product once daily for well beyond five consecutive days.  *See, e.g.*, Label at 31 (reporting that

the intended treatment duration for the EINSTEIN DVT and EINSTEIN PE studies was 3, 6 or

12 months based on the investigator's assessment prior to randomization, and that the mean

duration of treatment with rivaroxaban was 208 days).

69.     Physicians treating patients with DVT and/or PE turn to the guidelines published

by the American College of CHEST physicians in 2016 ("VTE Guidelines") for the standard of

care.  The VTE Guidelines recommend a treatment duration of at least three months for patients

with proximal DVT or PE.  VTE Guidelines at 317 ("In patients with proximal DVT or

pulmonary embolism (PE), we recommend long-term (3 months) anticoagulant therapy over no

such therapy (Grade 1B).").

70.     Physicians routinely prescribe Xarelto® for these indications once-daily for more

than five days based on information and instructions nearly identical (if not identical) to the

information and instructions provided in Mylan's proposed labeling for its ANDA Products.

71.     Finally, for the 20 mg dose for the reduction in the risk of recurrence of DVT and

PE, Mylan's proposed labeling directs and encourages the use of Mylan's 20 mg ANDA Product

in patients with DVT or PE who have completed at least six months of anticoagulant treatment.

In such patients, appropriate treatment extends well beyond five days.  The proposed labeling

thus directs and encourages physicians to prescribe and patients to take the 20 mg dose for this

indication once daily for at least five consecutive days.  *See also* Label at 34 (specifying that the intended treatment duration for the EINSTEIN Extension Study was 6 or 12 months based on the investigator's assessment prior to randomization, and that the mean duration of treatment was 190 days).

72.     Physicians treating patients for the reduction in the risk of recurrence of DVT and PE turn to the VTE Guidelines for the standard of care.  The VTE Guidelines suggest that in many patients (such as those experiencing their first or second unprovoked proximal DVT or PE), therapy should be "extended" with "no scheduled stop date."  VTE Guidelines at 317.

73.     Physicians routinely prescribe Xarelto® for this indication once-daily for more than five days based on information and instructions nearly identical (if not identical) to the information and instructions provided in Mylan's proposed labeling for its ANDA Products.

### C.     Doctrine of Equivalents

74.     Any difference between the use of Mylan's ANDA Products in accordance with their proposed labeling and the claims is a minor and insubstantial difference.

75.     Moreover, the use of Mylan's ANDA Products in accordance with their proposed labeling performs substantially the same (if not the identical) function, in substantially the same (if not the identical) way, to achieve substantially the same (if not the identical) result.

76.     For each limitation of the asserted claims, other than the rapid release limitation, the same portions of the Mylan's proposed label that demonstrate literal infringement also demonstrate infringement under the doctrine of equivalents.

77.     Mylan argues that the Court's construction of "rapid-release tablet" is only satisfied by a tablet that releases exactly 75% of its active ingredient at 30 minutes.  Even if that were true, the POSA would recognize that Mylan's ANDA Products satisfy the "rapid-release tablet" limitation under the doctrine of equivalents.

78. The POSA would recognize that the purpose of the claimed invention is that the tablets in question release most of their active ingredient within a defined, short time period.  The POSA would further recognize that tablets that release their active ingredient more rapidly than exactly 75% at 30 minutes—such as Mylan's ANDA Products—perform the same function (releasing most of the active ingredient within a short period of time), in substantially the same way (use of a tablet formulation that allows quick release of the active ingredient), to achieve substantially the same result (tablets releasing most of the active ingredient within a short period of time) as the claimed invention.  In sum, the POSA would recognize that there is no substantial difference between a tablet that reaches 75% dissolution of its active ingredient in less than 30 minutes and a tablet that reaches 75% dissolution of its active ingredient in exactly 30 minutes.  Mylan's ANDA Products thus satisfy the "rapid-release tablet" limitation under the doctrine of equivalents.

79. None of the defenses that Mylan has asserted in response to Plaintiffs' allegations under the doctrine of equivalents has any merit.

**D.    Inducement of and Contribution to Infringement**

80. By selling Mylan's ANDA Products, Mylan will induce infringement of each claim of the '218 patent by physicians and by patients.

81. Mylan is aware of the '218 patent, as indicated by its filings with the FDA as part of its ANDA.  *See, e.g.,* MYL_RIV_218_00018503-18505.

82. The proposed labeling for Mylan's ANDA Products directs and encourages that the products be administered by physicians and administered by patients in a manner that infringes each claim of the '218 patent.  This indicates that Mylan intends for Mylan's ANDA Products to be used in a manner that infringes each claim of the '218 patent.

83. By selling Mylan's ANDA Products with their proposed labeling, Mylan will contribute to the infringement of each claim of the '218 patent by physicians and by patients.

84. Mylan has knowledge of the '218 patent, *see, e.g.,* MYL_RIV_218_00018503-18505, as well as the contents of the proposed labeling for Mylan's ANDA Products. Those facts indicate that Mylan has knowledge that Mylan's ANDA Products with their proposed labeling are especially designed for use in a patented invention, *i.e.*, that the use of Mylan's ANDA Products in accordance with the proposed labeling that Mylan has chosen for those products will infringe each claim of the '218 patent.

85. Mylan's ANDA Products (which will be distributed in the United States with their label) are not a staple article of commerce suitable for substantial non-infringing use, as Mylan's proposed labeling shows that the only way to make any substantial use of Mylan's ANDA Products is to use them in a manner that infringes each claim of the '218 patent.

## VII. Validity

### A. Summary

86. Mylan has failed to prove by clear and convincing evidence that the claims of the '218 patent would have been obvious to one of ordinary skill in the art as of January 31, 2005.

87. The POSA would not have had a reason to administer rivaroxaban once-daily in a rapid-release tablet for five consecutive days to treat or prevent a thromboembolic disorder in a patient in need thereof, and would not have had a reasonable expectation of success in doing so.

88. To the contrary, the prior art, including rivaroxaban's reported short half-life and other failed factor Xa inhibitors, taught away from once-daily dosing, due to the risk of drug concentrations that fluctuated between doses too low to be effective and too high to be safe.

89. Objective evidence of nonobviousness, and in particular unexpected properties and skepticism, supports the nonobviousness of the inventions claimed in the '218 patent.

**B.      Scope and Content of the Prior Art**

90.      In January 31, 2005—the time of the claimed invention—the POSA developing a dosing regimen for a novel anticoagulant like rivaroxaban would have been familiar with various clinical trial fundamentals and pharmacokinetic principles as described below, and would have been aware of the features and problems associated with various anticoagulants in the prior art.

91.      Phase I trials are designed to determine whether a relatively small number of healthy people can tolerate a study drug without suffering serious side effects.  Healthy human volunteers are used in phase I trials, rather than patients, because healthy volunteers will be better able to tolerate and recover from side effects than patients.

92.      The POSA would have recognized that while success in phase I trials allows drugs to proceed to phase II trials, a study drug that is well tolerated by healthy volunteers can cause intolerable side effects in patients in phase II or phase III clinical trials.  That is especially true where, as here, the incidence of the toxicity of concern (here major bleeding) would be expected to be much greater in patients in need of the drug treatment than in healthy individuals.

93.      Phase II trials are designed to assess safety and efficacy of a study drug in a few hundred patients.

94.      Phase III trials are designed to evaluate the safety and efficacy of a drug as compared to the standard of care.  Phase III trials frequently involve thousands of patients, some of whom receive the study drug and others of whom receive the standard of care for "control" or comparison purposes.

**a.      Drug Dosing Design Begins With Half-Life**

95.      As of January 31, 2005, the POSA would have understood that dosing intervals of drugs are usually based on their elimination half-life—*i.e.*, the length of time it takes for the

25

amount of drug in the bloodstream to be reduced to 50% of the starting concentration[2]—in combination with any knowledge of the therapeutic window of the drug, which determines "the allowable degree of fluctuation in the serum concentration-time profile."  Thompson 210.  The POSA would have known that fluctuations in drug concentrations can be problematic, because they may result in drug concentrations outside the therapeutic window—that is, concentrations too low to be effective or too high to be safe.  The POSA would have understood that "marked fluctuations in drug concentrations between doses are not desirable," and thus would have sought to avoid dosing regimens that resulted in large fluctuations in drug concentration.  Wilkinson 26; *see* Benet 31; Goodman & Gilman's 29.

96.     When the dosing interval is equal to the elimination half-life, fluctuations in plasma concertation are two-fold—which the POSA would have viewed as usually "a tolerable variation."  Wilkinson 26; *see* Benet 31; Goodman & Gilman's 29.  The farther beyond the half-life that a dosing interval of an anticoagulant is stretched, the greater the variation in the serum concentration over the course of therapy.  *See* Thompson 210; Benet 31; Goodman & Gilman's 29; Wilkinson 26.  Accordingly, the POSA would have been wary of extending a drug's dosing interval beyond one or two half-lives without knowledge that large serum concentration fluctuations could be tolerated.

---

[2] For example, after one half-life, approximately 50% of the starting concentration of drug will be present, after two half-lives approximately 25% of the starting concentration of the drug will be present, after three half-lives approximately 12.5% of the starting concentration will be present, etc.

### b.    Anticoagulants

97.    As their name suggests, anticoagulants interfere with the natural coagulation process, which is the body's mechanism of stopping and/or preventing bleeding.  Accordingly, any drug that inhibits coagulation necessarily puts the patient at risk for bleeding.

98.    Because the primary adverse effect of anticoagulants (bleeding) works through the same mechanism as that which provides for their therapeutic efficacy, many anticoagulants have narrow therapeutic windows.  This was particularly true of the prior art drugs warfarin and heparin.  Hirsh II 491S; Crowther 46.

99.    Rivaroxaban was one of a new class of direct-acting oral anticoagulants. Unlike low molecular weight heparins ("LMWHs"), direct-acting oral anticoagulants like rivaroxaban are small molecule drugs administered orally, which selectively and directly bind to a single molecule in the coagulation cascade.  Rivaroxaban is a direct-acting oral anticoagulant that inhibits factor Xa in a stoichiometric fashion (*i.e.*, one molecule of rivaroxaban binds to and inhibits one molecule of factor Xa).  At the time of rivaroxaban's development, trials were ongoing for two other direct-acting oral anticoagulants:  razaxaban, which also inhibits factor Xa, and ximegalatran, which inhibits factor IIa (also called thrombin).

100.    In contrast, LMWHs like enoxaparin (marketed as of January 31, 2005 as Lovenox®) are large, heterogeneous polymers that affect anticoagulation in multiple ways, including by indirectly inhibiting both factor Xa and factor IIa, by releasing tissue factor pathway inhibitor, and potentially by virtue of other mechanisms.  LMWHs must be administered by injection, and their indirect mechanism of action is catalytic, such that one molecule of LMWH indirectly causes inhibition of more than one molecule of factor Xa or IIa.

27

### C.    Differences between the Claimed Invention and the Prior Art

#### 1.    The POSA Developing a Dosing Regimen for a New Anticoagulant Would have Started with its Half-Life

101.    The POSA would have adhered to the principle that "[i]nitially, the elimination half-life can be used as the approximate dosing interval," and that the dosing interval can be adjusted to account for a drug's therapeutic window when it becomes known.  Thompson 210. Because rivaroxaban's therapeutic window was unknown as of January 31, 2005, the POSA would not have had reason to deviate from a dosing interval that approximated rivaroxaban's half-life.

102.    The prior art taught that rivaroxaban's half-life was 3-6 hours.  *See* Kubitza 2 (reporting a half-life of 3-4 hours); Kubitza 3 (same); Kubitza 1 (reporting a half-life of 4-6 hours); Kubitza 5 (same).

#### 2.    Rivaroxaban's Half-Life Taught Away from Once-Daily Dosing

103.    Given the teaching to avoid large fluctuations in drug concentrations, the POSA would have viewed rivaroxaban's half-life as too short to permit once-daily dosing, and instead would have expected that twice- or even three-times-daily dosing would be necessary.

104.    The prior art would have taught the POSA away from once-daily administration of rivaroxaban in a rapid-release tablet due to fear of generating fluctuations in drug concentration outside rivaroxaban's therapeutic window, *i.e.*, concentrations too low to be effective and concentrations so high as to cause unacceptable bleeding risk.

105.    As demonstrated in Figure 7-6 of Rowland, the POSA would have understood that shorter dosing intervals (as depicted in Panel B) would result in lower peak drug concentrations, higher trough drug concentrations, and thus reduced overall fluctuation in plasma concentration, than would once-daily administration of the same drug (as depicted in Panel A).

28



**Fig. 7–6.** From a kinetic perspective, the impact of a missed dose is greater the larger the dose and the less frequent the administration. Consider steady-state multi-dose conditions for a drug with a therapeutic window of 7 to 20 mg/L (color screened), a volume of distribution of 23.1 L, and a half-life of 15.9 hr. **Panel A:** When a 300-mg dose is given once daily to maintain therapeutic concentrations, a missed dose results in a trough concentration of 2.5 mg/L, a value well below the lower limit of the therapeutic window. **Panel B:** When a 100-mg dose is given every 8 hr (colored long dashed line), the lowest concentration achieved after a single missed dose is 7.3 mg/L, a value within the therapeutic concentration range. If 3 consecutive doses are missed (colored short-dashed line) the minimum concentration (3.7 mg/L) is still above that observed when a single daily dose of 300-mg is missed. The figure was adapted from concepts presented by Levy G., A pharmacokinetic perspective on medicament noncompliance. Clin. Pharmacol. Ther. 54:242-244, 1993.

### 3. The POSA Would Not Have Increased the Dose of Rivaroxaban to Offset its Short Half Life Due to Safety and Practical Concerns

106.    Mylan suggests that the POSA would have believed higher doses of rivaroxaban could be used to permit administration less frequently than once every half-life. Mylan is incorrect.

107.    While the POSA would have understood that for relatively nontoxic drugs like penicillin, "doses can be large and the dosing interval can be much longer than the elimination half-life (for convenience)," Benet 31; Wilkinson 25, the POSA would not have understood the same to be true for an anticoagulant like rivaroxaban. The POSA would have understood that, far from being nontoxic, rivaroxaban has an expected bleeding toxicity. The POSA would therefore not have attempted to increase the dose of rivaroxaban in an effort to elongate its dosing interval.

108.    The POSA would have also avoided a strategy of increasing the dose of

rivaroxaban to overcome its short half-life because of prior art data showing that rivaroxaban had

less than dose-proportionate increases in AUC and $C_{max}$ at higher tablet doses,[3] "probably due to

incomplete absorption as a consequence of low solubility of the drug."  Kubitza 2.  Accordingly,

the POSA would have understood that increasing the amount of rivaroxaban in a pill would not

necessarily increase the amount of drug to which the patient was exposed, and thus larger doses

of rivaroxaban would not have been expected to overcome rivaroxaban's short half-life, even

aside from the safety concerns.  Moreover, the art taught that increasing the dose was ineffective

in increasing the duration of anti-factor Xa activity beyond 12 hours, which the POSA would

have understood was far too short a time period for once daily dosing.  *See* discussion *infra*,

¶¶ 123-124.

109.    Mylan nevertheless suggests that Fareed teaches the use of a high dose of a factor

Xa inhibitor administered at an interval much greater than its half-life.  The POSA would

disagree.  Fareed does not contain any such teaching.  First, Fareed does not discuss any

selective factor Xa inhibitors—only heparins and LMWHs (such as enoxaparin), which

indirectly inhibit both factor Xa and factor IIa, Fareed at 1045, as well as tissue factor, *id.* at

1046.  The POSA would not regard enoxaparin to be a "factor Xa" inhibitor in the same sense as

rivaroxaban because they work through completely different mechanisms.  Second, while Fareed

does indicate that enoxaparin enjoys "the convenience and reduced costs of once-daily

---

[3] $C_{max}$ represents the maximum or peak concentration of the drug in plasma.  "AUC" or "area
under the curve" is a measure of the total amount of drug in the patient's bloodstream after
administration of a dose of the drug.  It is determined by calculating the area underneath a drug
concentration vs. time curve.  The area under the curve is dependent on the dose administered,
the amount of the dose that reaches the bloodstream, and the rate of elimination of the drug from
the body.

administration," *id.* at 1054, nothing in Fareed indicates that the properties of enoxaparin which permit a dosing interval greater than its half-life would apply to rivaroxaban.

### 4.     Rivaroxaban's Therapeutic Window was Unknown as of January 31, 2005

110.    Mylan suggests that six abstracts (Kubitza 1, Kubitza 2, Kubitza 3, Kubitza 5, Harder 1, and Harder 2) reporting the results of certain phase I studies involving rivaroxaban were sufficient to suggest to the POSA that rivaroxaban had a wide-enough therapeutic window to permit once-daily dosing in a rapid-release tablet.  The POSA would disagree.

111.    As of January 31, 2005, no results from phase II or phase III studies of the use of rivaroxaban in patients had been published; accordingly, there was no published information from which to determine rivaroxaban's therapeutic window.  While the published abstracts Mylan points to report the results of phase I studies of rivaroxaban, the POSA would have understood that these studies involved healthy volunteers who would have been screened to ensure they did not have a thromboembolic disorder nor a known risk for one.  A drug's therapeutic window can only be clinically determined in patients.  Because these phase I studies were conducted in healthy volunteers and reported only pharmacokinetic and pharmacodynamic parameters rather than clinical outcomes, the POSA would have understood the studies did not establish the breadth of rivaroxaban's therapeutic window.

112.    Furthermore, as the POSA would have understood, the pharmacokinetic and pharmacodynamic parameters reported in the phase I studies had not been correlated with clinical efficacy.  Thus, the pharmacokinetic and pharmacodynamic data generated by these phase I studies would not have provided the POSA with a reasonable expectation of success in determining which doses of rivaroxaban would prove clinically effective at what time points after administration.

31

113.    The upper bound of rivaroxaban's therapeutic window is determined by the

maximum doses at which patients do not experience unacceptable bleeding events.  As the

POSA would have understood, healthy volunteers have a lower bleeding risk than patients in

need of anticoagulation therapy.  Accordingly, the POSA would have viewed phase I studies as

insufficient to determine whether a given dose of rivaroxaban would prove safe and effective in

patients.

**a.      The Kubitza and Harder Abstracts do Not Disclose to the
POSA the Ceiling or the Floor of the Therapeutic Window**

114.    The first of the phase I rivaroxaban studies reported in abstracts cited by Mylan

studied the pharmacodynamics, safety, and pharmacokinetics of single doses of rivaroxaban in

healthy male subjects.  Kubitza 2; Kubitza 3.  The volunteers who received rivaroxaban in this

single dose escalation study received 1.25 to 80 mg of rivaroxaban as a tablet, or a 5 or 10 mg

dose as an oral solution.

115.    The POSA would have understood that the results of the assays reported in

Kubitza 2 and 3 (factor Xa inhibition, PT, PTT, and HepTest) had not been correlated with

clinical outcomes for rivaroxaban using a particular dosing regimen.  Indeed, the art taught that

even factor Xa inhibition had not been correlated to clinical efficacy for prior art anticoagulants.

Martineau at 590 (stating, in the context of LMWHs, that "a clear relationship between anti-Xa

activity and clinical efficacy or bleeding has not been defined and anti-Xa activity monitoring is

probably unnecessary."); Weitz 2004 at 431 ("[T]here is very little information relating anti-Xa

levels to clinical outcomes (thrombosis prevention or bleeding) for any anticoagulant.").  In other

words, the POSA would not have known, and the prior art did not teach, which values of factor

Xa inhibition, PT, PTT, and HepTest corresponded to a clinical efficacy in patients.

Accordingly, Kubitza 2 and Kubitza 3 do not report the efficacy of rivaroxaban at a given dose.

116.    Furthermore, to the extent Kubitza 2 and 3 provide any data about rivaroxaban's duration of action, they suggest that it is not long enough to permit once-daily dosing.  Nothing in Kubitza 2 or 3 would have suggested to the POSA that a particular dose of rivaroxaban would exert a clinically-relevant antithrombotic effect of a sufficient duration in patients to permit once-daily dosing.

117.    As Kubitza 3 explains, "the inhibitory effect of [rivaroxaban] was almost completely reversed after 24 hours, and Factor Xa activity returned to within the normal range . . . for doses up to 40 mg.  PT prolongations also reverted to baseline after 24 hours."  The POSA would have understood Kubitza 3 to be stating that, as measured by the listed tests, the effect of rivaroxaban was completely eliminated by 24 hours, suggesting to the POSA that even if at an earlier time point the drug had reached a therapeutic level (and the POSA would not have been able to ascertain whether this was true), rivaroxaban was certainly not present at therapeutic levels after 24 hours.

118.    A second phase I study reported in abstracts relied upon by Mylan investigated the pharmacodynamics, safety, and pharmacokinetics of multiple-doses in healthy male subjects. Kubitza 1; Kubitza 5.  The volunteers in this study who received rivaroxaban (rather than a placebo) received one of six doses of rivaroxaban for five days: 5 mg once daily, twice daily, or three times per day, 10 mg twice daily, 20 mg twice daily, or 30 mg twice daily.

119.    The assays reported in Kubitza 1 and 5 are the same as those reported in Kubitza 2 and 3, and thus had not been correlated with clinical outcomes for rivaroxaban using a particular dosing regimen.  Accordingly, Kubitza 1 and Kubitza 5 do not report on the efficacy of rivaroxaban.

120.    Furthermore, to the extent Kubitza 1 and 5 provide any data about rivaroxaban's duration of action, they suggest that it is not long enough to permit once-daily dosing.  Nothing in Kubitza 1 or 5 would have suggested to the POSA that a particular dose of rivaroxaban would exert a clinically-relevant antithrombotic effect of a sufficient duration in patients to permit once-daily dosing.

121.    To the contrary, Kubitza 1 and 5 teach away from once-daily dosing.  Kubitza 5 reports that factor Xa "[e]ffects were maintained for 8-12 hours at the 5 mg dose, and ~12 hours at the 10, 20, and 30 mg doses."  Kubitza 5 therefore teaches the POSA that, when measured using a factor Xa assay—which the POSA would have regarded as the most significant coagulation assay used in any of the phase I studies—the length of the effect was approximately 12 hours, and importantly, increasing the dose did not increase the duration of the effect.

122.    When combined with the knowledge that rivaroxaban has a short half-life, this statement in Kubitza 5 would reinforce the POSA's understanding that more frequent dosing than once-daily would be required, and teaches away from once-daily dosing.

123.    A third phase I study published in abstracts relied upon by Mylan studied the "Effects of BAY 59-7939, an Oral, Direct Factor Xa Inhibitor, on Thrombin Generation in Healthy Volunteers."  Kubitza 4/Harder 2; Harder/Harder 1.

124.    This study involved only 12 healthy volunteers and several experimental assays reported to be measures of thrombin generation:  endogenous thrombin potential (ETP), platelet-induced thrombin-generation time (PITT), and platelet-induced clotting time (PICT).  The POSA would not have regarded any of these assays to be customary or well-established in the art.

125.    The POSA would therefore have understood the assays to be experimental in nature, and of only academic interest.  The POSA would have further understood that none of

these results could be correlated with clinical efficacy or safety of a particular dosing regimen of rivaroxaban in patients, both because of their experimental nature and because the study was conducted in healthy volunteers, not patients.

126.   Accordingly, the POSA would not have been able to assign any clinical relevance to the tests reported in these abstracts.  In other words, the POSA would not have known what results, if any, in the experimental ETP, PITT, and PICT tests represented clinically relevant effects for rivaroxaban. Thus, the POSA would have recognized that no particular result in any particular assay could provide a reasonable expectation that any dose of rivaroxaban would be clinically effective in patients.

127.   The POSA therefore would not have attached much, if any, significance to a statement Mylan points to in Harder that "[a] single 30 mg dose [of rivaroxaban] exerted a sustained effect on [thrombin generation] for up to 24 hours," and would not have relied on that statement as providing a reason to use a once-daily dosing regimen with rivaroxaban or a reasonable expectation of success.  Notably, there is no information given about the magnitude of any such sustained effect.  The POSA would not have understood from either Harder 1 or Harder 2 which assay or assays showed sustained effect on thrombin generation for up to 24 hours, and the POSA would have had no basis in the prior art to expect that whatever non-baseline values were observed after 24 hours were associated with clinical efficacy of rivaroxaban.  For example, assuming that rivaroxaban had a six hour half-life (the upper end of the range), at 24 hours there would still be approximately 6.25% of the original maximum blood level left in the blood (100% halved four times).  The POSA would have expected that while this remaining amount of rivaroxaban in the blood could potentially have some residual effect in a pharmacodynamic assay at 24 hours, it would not have a clinically relevant effect in a patient.

35

128.    Harder 2 provides a chart containing data showing the results of the various assays for both the 5 mg and 30 mg doses at 2 hours and 12 hours after rivaroxaban administration, but contains no data showing assay results at 24 hours.  The POSA would not have believed these results could be extrapolated to 24 hours, except to understand that the values for each of them would likely continue to fall toward baseline.  The POSA would also have noted that no prior art suggested any of the assay results at 12 hours reflected clinically relevant values, and that in fact most results were nearly within a standard deviation of baseline values, except in the ETP (collagen) and PICT assays.  The POSA would have been especially skeptical of those results in terms of providing information that would be useful for determining a dosing regimen for rivaroxaban, because neither collagen (used in the ETP assays) nor Russell's viper venom (snake venom used in the PICT assays) would be understood by the POSA to be relevant physiologic activators of coagulation in humans.

129.    Mylan has pointed to no other clinical data for rivaroxaban in the prior art.  In the absence of clinical data in patients, the POSA would not have possessed sufficient knowledge regarding rivaroxaban's therapeutic window to be motivated to administer rivaroxaban once-daily in a rapid-release tablet with a reasonable expectation of success.

130.    Indeed, the POSA would have understood that administration of a drug to patients in a manner not expected to be safe or therapeutically effective would have been unethical.  Because the prior art did not suggest that once-daily administration of rivaroxaban would be safe or effective (indeed, it suggested the opposite), the POSA would not have even attempted such a dosing regimen—let alone have attempted one with a reasonable expectation of success.  That Bayer ultimately did test once-daily administration of rivaroxaban in a rapid-release tablet does not contradict this fact.  Bayer had available to it multiple sources of non-public information

from its early phase II clinical trials which suggested, surprisingly, that once-daily administration of rivaroxaban might be safe and effective, and thus enabling it to ethically undertake trials of such a dosing regimen in human patients.  Indeed, the fact that with the phase I data relied on by Mylan in hand, Bayer's initial protocol for its phase II clinical trials were twice- and three-times-daily, with no once-daily trials proposed, evidences that Mylan's reliance on this phase I information from the Kubitza and Harder abstracts is misplaced.

131.    Mylan relies on references reciting animal data to suggest that the POSA would have expected all factor Xa inhibitors to have a wide therapeutic window.  The POSA would not have agreed.  The POSA would not have found animal data or data regarding the therapeutic window of other drugs sufficient to provide a reason to use rivaroxaban once-daily in a rapid release tablet.  As the POSA would have understood, even in the context of prior art LMWHs, animal models were considered "too different" and thus "not helpful for predicting the clinical efficacy of the various LMWH fragments."  Andrassy at S34.

132.    For example, Leadley was published before any oral, selective factor Xa inhibitor had been approved by the FDA, and thus could only speak prospectively about the aspirations for this developing class of drugs.  Leadley does not discuss rivaroxaban at all.

133.    Leadley provides only animal data suggesting that one particular factor Xa inhibitor, tick anticoagulant peptide, produced "sustained antithrombotic protection."  The POSA would not have believed animal testing of one drug to be sufficient to characterize an entire class of drugs, and would not have believed this data sufficient to predict the pharmacodynamic behavior in patients of rivaroxaban (*i.e.*, a completely different drug) in particular.

134.    In light of the paucity of data, the POSA would therefore have regarded Leadley's statement that "one of the most intriguing advantages of direct fXa inhibitors over conventional

37

therapy is the relatively large therapeutic window between antithrombotic efficacy and bleeding tendency," Leadley at 154, to be an aspirational generalization only, and not applicable to any factor Xa inhibitor in particular.

135.    Moreover, the POSA would have interpreted this statement in light of the narrow therapeutic windows of prior art anticoagulants like warfarin and heparin, and understood that Leadley was hypothesizing only a "*relatively* large therapeutic window"—*i.e.*, one larger than warfarin, a "narrow therapeutic index drug"—rather than a therapeutic window that was large in any absolute sense (such as that of penicillin).  Leadley at 155.

136.    Bearing in mind that Leadley's statement was based on animal data, the POSA would not have placed greater value on Leadley's aspirational and relative statements than on the available data for rivaroxaban itself.

137.    Similarly, Perzborn reports the results of in vitro and in vivo studies of rivaroxaban.  In particular, Perzborn's statements that (1) factor Xa inhibition with rivaroxaban "is a highly effective strategy for the prevention of both arterial and venous thrombosis," *see* Perzborn 519; and (2) "it is conceivable that a minimal amount of thrombin could be produced even when FXa is strongly inhibited" with rivaroxaban are supported only by preclinical data. And Perzborn's statement "[n]umerous studies have demonstrated antithrombotic efficacy with FXa inhibitors at doses that have little or no effect on template bleeding times, tail-bleeding time, or cuticle–bleeding times (for review, see Leadley *et al.*), suggesting a *relatively* wide therapeutic window between antithrombotic efficacy and bleeding tendency," *id.* at 520 (emphasis added), is based on Leadley.

138.    Accordingly, while the POSA would have understood Perzborn to be expressing optimism for the future of factor Xa inhibitors, the POSA would not have drawn the conclusion

that rivaroxaban (which was as yet untested in patients for clinical efficacy or safety) would have a wide therapeutic window based merely on preclinical or animal data.  At best, the POSA would have hoped that rivaroxaban could have, just as Perzborn stated, a "relatively" large therapeutic window—in comparison to prior art anticoagulants with very narrow therapeutic windows like warfarin or heparin.

139.    The same is true of Straub, which describes rivaroxaban among a genus of many other compounds.  Straub's statement that, "[i]n the case of the administration of relatively large amounts, it may be advisable to divide these into several individual administrations over the course of the day" would not have suggested to the POSA that rivaroxaban could be safely and effectively administered once-daily.  Instead, the POSA would regard this statement, at best, as a generic recommendation to avoid giving a patient too large a dose of an anticoagulant, which as noted previously could lead to a bleeding risk.

140.    In addition, while Straub indicates that the compounds in the application were expected to achieve a "greater therapeutic range . . . by the selective inhibition of factor Xa" as compared with "conventional preparations for treating thromboembolic disorders," Straub [0373], Straub does not indicate that the "therapeutic range" of these compounds was expected to be wide in an absolute sense.

### 5.    Razaxaban Taught Away from Increasing Rivaroxaban Doses Based on Phase I Data

141.    Razaxaban was, like rivaroxaban, an oral, direct factor Xa inhibitor.  The prior art provided results from a phase II study of razaxaban, in which four multiple-dose strengths of razaxaban (25 mg, 50 mg, 75 mg, and 100 mg, each bid) were evaluated in patients.  All four doses had been found to be "well-tolerated" in a phase I clinical trial.  Swaminathan.  However,

39

in a phase II study, the three highest doses had to be discontinued prematurely due to increased bleeding.  Linkins at 69; *see also* Lassen.

142.    The razaxaban example would have reinforced for the POSA that one could not simply increase the dose of an oral factor Xa inhibitor based on phase I results in order overcome a short half-life.  To the contrary, razaxaban taught away from such an approach, as the POSA would have expected it to lead to dangerous bleeding risks.

143.    Likewise, the razaxaban example would have reinforced for the POSA that doses which did not produce adverse effects in healthy volunteers in phase I studies might nonetheless prove unsafe in patients, and thus that the abstracts reporting rivaroxaban phase I studies cannot be used to determine rivaroxaban's therapeutic window.

### 6.    The Prior Art Neither Disclosed Nor Provided a Reason to Use Rivaroxaban in a Rapid-Release Tablet

144.    Mylan suggests that the six abstracts reporting the phase I studies of rivaroxaban disclose the use of rivaroxaban in a "rapid-release" tablet.  The POSA would disagree.

145.    Kubitza 2 and 3 provide no information regarding the dissolution profiles of the tablets which were administered to the study's volunteers, and the POSA would have understood that different types of tablets existed.  The fact that Kubitza 2 reports that "[rivaroxaban] showed a rapid onset of action with maximal effects being observed after 2 hours" does not indicate to the POSA what type of tablet produced that effect.  A drug's "onset of action" marks the beginning of the drug's pharmacological response, and the POSA would have understood that different tablet types could each have led to the maximal effect occurring at the same time.

146.    Mylan suggests that Kubitza 2 discloses a "rapid-release" liquid formulation of rivaroxaban.  The POSA would disagree.  Nothing in Kubitza 2 discloses the "rapid-release" aspect of a "rapid-release tablet" in terms of the required dissolution profile using the USP

paddle stirrer test.  In other words, nothing in Kubitza 2 discloses a Q value (30 minutes) of 75% according to the USP release method using apparatus 2 (paddle).  The POSA would recognize that Kubitza 2 does not address the USP paddle stirrer or the rate of release from any pharmaceutical formulation.

147.    Likewise, Kubitza 1 and Kubitza 5 provide no information regarding the form in which the 5 mg or 30 mg doses were administered to the study's volunteers, except to say that the doses were oral.  The POSA would have understood that many different oral forms, including oral solutions and/or extended release tablets, were possibilities.  The fact that Kubitza 1 reports "$C_{max}$ was reached after 2.5-4 hours" would not have indicated to the POSA that a rapid-release formulation of rivaroxaban was used in Kubitza 1's study.  The POSA would have understood that the time to $C_{max}$ refers to the time until the maximum plasma concentration was reached, but that a short time to $C_{max}$ does not imply that a rapid-release tablet was used.  Instead, the POSA would be well aware that different formulation types could have led to $C_{max}$ occurring after 2.5-4 hours.

148.    Similarly, Harder 1 and Harder 2 provide no information regarding the dosage form in which the 5 mg or 30 mg doses were administered to the study's volunteers, and the POSA would have understood that different forms (including solutions and/or different tablet types) were possible.  The statement in Harder 1 and 2 that maximum inhibition of factor Xa activity occurred 2 hours after administration of rivaroxaban does not indicate to the POSA what type of dosage form produced that effect, and the POSA would have understood that different formulation types (including different tablet types) could each have led to the maximal effect occurring at the same time.

41

149.    The POSA would recognize that "rapid onset of action"[4] is not synonymous with administration in a "rapid-release tablet"—for example, warfarin has a delayed onset of action despite not being administered in a delayed-release tablet.  Immediate-release and controlled- or extended-release tablets are designed to release (*i.e.* dissolve) at least some API immediately, and thus can have a quick onset of action even if they are not "rapid-release tablets."  In addition, a short $T_{max}$ (time to maximum plasma concentration—*i.e.*, time to $C_{max}$) does not mean that a drug will have a rapid onset of action.  Again, like warfarin, a drug may quickly accumulate to its maximal concentration in the plasma, but due to its pharmacological mechanism of action have a lag time until it becomes effective.  Such a drug would have a short $T_{max}$ but a delayed onset of action.  Further, the POSA would not agree that a rapid-release tablet is required to effectuate a short $T_{max}$.  The POSA would understand that extended release tablets can have the same $T_{max}$ as rapid-release tablets, even though the dissolution profiles of the tablets may differ after that point.

150.    Similarly, Straub does not address "rapid-release tablets" in particular, let alone "rapid-release tablets" containing rivaroxaban.  Straub describes one advantage of its oral factor Xa inhibitors as being that their mechanism results in a rapid onset of action.  Straub [0373].  The POSA would not understand this statement to be a suggestion that rivaroxaban should be formulated as a rapid-release tablet, even if taken in combination with the disclosure in Straub that the compounds can be formulated as tablets.  The POSA would recognize that rapid-release tablets and rapid onset of action are different concepts, the former relating to the nature of the tablet formulation, and the latter relating to the pharmacological properties of the active ingredient.

---

[4] Again, a drug's "onset of action" marks the beginning of the drug's pharmacological response.

151.    No prior art other than the Kubitza and Harder abstracts and Straub describes the administration of rivaroxaban in any form, let alone in a "rapid-release" tablet.  To the extent Mylan relies on a reference as purportedly disclosing an "immediate-release tablet" or "conventional tablet," the POSA would recognize from the definition in the '218 patent that a "rapid-release tablet" is a different category of tablet than "immediate-release" or "conventional" tablets.  Put differently, the POSA would not understand that an "immediate-release tablet" is the same thing as a "rapid release tablet."  The USP, for example, recognized that an immediate-release tablet can release as little as 70% of the active ingredient in as slow a timeframe as 60 minutes.  USP 24 at 2051-52; USP 28 at 2637.  The POSA would therefore not regard a disclosure of an "immediate-release tablet" or a "conventional tablet" to be the same thing as a disclosure of a "rapid-release tablet," as the rate of release for an immediate-release tablet can be slower than for a "rapid-release tablet."

152.    In support of its obviousness theory, and in particular in support of its allegations related to the "rapid-release tablet" limitation, Mylan relies on several references that are not prior art.  It is Mylan's burden to prove by clear and convincing evidence that the references it relies upon for its obviousness theory are prior art.  Mylan has failed to meet its burden and, without assuming any burden, Plaintiffs have shown that these references do not qualify as prior art.  The Court should ignore these references for the purpose of determining the scope and content of the prior art.

153.    For example, Mylan relies on U.S. Patent No. 7,157,456 ("the '456 patent"), which is not prior art. The '456 patent issued from U.S. Patent Application No. 10/181,051 ("the '051 application"), which is the U.S. national stage application of PCT/EP00/12492, which was

filed on December 11, 2000.  WO 2001/47919, the WIPO Publication of PCT/EP00/12492, was published in German, not English.

154.    Mylan also relies on U.S. Patent No. 7,592,339 ("the '339 patent"), which is not prior art.  The '339 patent issued from U.S. Patent Application No. 11/460,529, which is a division of U.S. Application No. 10/181,051 ("the '051 application"), which is the U.S. national stage application of PCT/EP00/12492, which was filed on December 11, 2000.  WO 2001/47919, the WIPO Publication of PCT/EP00/12492, was published in German, not English.

155.    Mylan also relies on U.S. Patent No. 9,402,851 ("the '851 patent"), which is not prior art.  The '851 patent issued from U.S. Patent Application No. 14/202,481, filed on March 10, 2014, which is a continuation of U.S. Patent Application No. 10/580,711 ("the '711 application"), which is the U.S. national stage application of PCT/EP2004/012897, filed on November 13, 2004.  WO 2005/060940, the WIPO Publication of PCT/EP2004/012897, was published in German, not English.

156.    Finally, Mylan relies on U.S. Patent No. 9,415,053 ("the '053 patent"), which is not prior art.  The '851 patent issued from issued from U.S. Patent Application No. 14/250,863, which is a continuation of the '711 application, which is the U.S. national stage application of PCT/EP2004/012897, filed on November 13, 2004.  WO 2005/060940, the WIPO Publication of PCT/EP2004/012897, was published in German, not English.

### 7.    The Prior Art Would Not Have Provided the POSA With a Reason to Administer Rivaroxaban Once-Daily In a Rapid-Release Tablet

157.    Mylan cites various additional references which allegedly would have provided the POSA with a reason to formulate rivaroxaban in a rapid-release tablet for once-daily administration.  Mylan is incorrect.  None of these references discuss factor Xa inhibition, nor do any even suggest the use of a rapid-release tablet with a drug administered once-daily.  Nor

44

would any of these references have provided the POSA with a reason to formulate rivaroxaban in a rapid-release tablet.  At most, they teach that rapid-release tablets were available.  But the POSA would not be motivated to use such a tablet with rivaroxaban if the POSA was interested in once-daily dosing.  To the contrary, the POSA would be concerned because of the short half-life of rivaroxaban that three-times-a-day dosing might be necessary.  If the POSA considered once-daily dosing at all (and as explained above the POSA would not have considered once-daily dosing), the POSA would have recognized that this would be possible, if at all, only by extending the duration of the active ingredient by using an extended release formulation.  *See* discussion *infra*, ¶¶ 172-175.  The POSA thus would not have had a reason to attempt once-daily dosing of rivaroxaban with a rapid release tablet.  The individual references relied on by Mylan also would not have provided the POSA with a reason to use a rapid-release tablet with rivaroxaban for the following additional reasons.

158.  Abrahmsén describes an "immediate release pharmaceutical formulation that provides for the delivery of particular pharmaceuticals," but does not disclose "rapid-release tablets" as a category of tablets.  Nor do the pharmaceuticals described in Abrahmsén include rivaroxaban or even factor Xa inhibitors.

159.  Abrahmsén would not have given the POSA a reason to formulate rivaroxaban in a rapid-release tablet for once-daily administration with a reasonable expectation of success.  In particular, the POSA would have found Abrahmsén's statement that "Immediate release formulations are superior when multiple doses are not required and where it is not necessary to keep the plasma concentration at a constant level for an extended period of time" to teach away from the use of rapid-release tablets for rivaroxaban.

160.    First, the POSA would have presumed that Abrahmsén's ambiguous reference to "multiple doses" refers to multiple doses per day, and therefore would have disregarded Abrahmsén's suggestion, because the POSA would have believed that the prior art taught away from once-daily dosing of rivaroxaban.

161.    Second, the POSA would have interpreted Abrahmsén's ambiguous reference to "keep[ing] the plasma concentration at a constant level for an extended period of time" to mean minimizing fluctuations in the drug plasma concentrations, and thus the POSA would have understood Abrahmsén to teach away both from once-daily dosing and the use of a "rapid-release tablet" for rivaroxaban.  The POSA would have expected that the safety and efficacy of rivaroxaban would depend upon maintaining a stable plasma concentration of the drug.  The POSA would have feared that failure to maintain a steady concentration of rivaroxaban in plasma could result in vacillation between concentrations too low to be effective, or amounts so high as to cause bleeding.

162.    Third, the POSA would note that Abrahmsén does not disclose whether the pharmaceuticals it describes are dosed once-daily or more than once daily.

163.    Forsman describes formulations of various low-molecular-weight direct thrombin inhibitors, which include melagatran and ximelagatran.  Forsman 3:8-14.  Melagatran (the active metabolite of ximelagatran) had a nearly identical half-life to rivaroxaban, and ximelagatran was administered twice daily.  Linkins 70.  Ximelagatran was also known to have a wide therapeutic window as well as a rapid onset of action.  *Id.* at 71.  Accordingly, to the extent the POSA viewed Forsman as relevant to the dosing regimen of rivaroxaban, Forsman would have led the POSA to administer rivaroxaban twice daily, not once daily.

164.    Mylan also suggests that the United States Pharmacopeia provides a basis to infer that short $T_{max}$ times equate to the use of rapid release tablets based on information regarding bumetanid.  The United States Pharmacopeia reports dissolution testing specifications for various compounds, including bumetanid.  USP 24 at 2063.  Bumetanid tablets must release at least 85% of their active ingredient within 30 minutes.  *Id.* at 2064.  The USP also reports that bumetanide has a Tmax of 0.5-2 hours.  *Id.* at 2063.  The POSA would recognize that one value does not dictate the other—that is, rate of drug release from a tablet, time to maximum drug concentration in the plasma, and time to onset of the pharmacological effect of the drug are three separate concepts.

165.    Aulton does not mention or otherwise relate to anticoagulant drugs or factor Xa inhibitors in particular.  While Aulton describes several types of tablets, including an "immediate release" tablet, Aulton does not discuss "rapid-release tablets."  Aulton therefore would not have motivated the POSA to formulate rivaroxaban in a rapid-release tablet for once-daily administration with a reasonable expectation of success.

166.    Goldhaber discusses the use of LMWHs, which are injectable anticoagulants. The POSA would therefore not have understood discussion of the speed with which adequate anticoagulation was obtained to be applicable to a tablet formulation of rivaroxaban, let alone a rapid-release tablet formulation.

167.    Camerlingo discusses the use of the injectable anticoagulant heparin. Accordingly, the POSA would not have understood the "immediate anticoagulation" discussed in Camerlingo to apply to a tablet formulation of rivaroxaban, let alone a rapid-release tablet formulation.

168.    Gao does not address "rapid-release tablets" as a category, nor does it explain their dissolution profile.  Gao also does not discuss thrombosis generally or factor Xa inhibitors or rivaroxaban specifically.

169.    Remington[5] describes the formulation and manufacture of oral solid dosage forms, but does not discuss thrombosis generally, factor Xa inhibitors, or rivaroxaban specifically.

170.    No prior art reference offered by Mylan would have motivated the POSA to formulate rivaroxaban in a rapid-release tablet for administration once daily.  Indeed, no reference offered by Mylan even suggests the use of a rapid-release tablet in a drug administered once daily.

### 8.    The Prior Art Instead Suggested the Use of an Extended Release Tablet in Light of Rivaroxaban's Short Half Life

171.    In light of rivaroxaban's short half-life and the POSA's goal of minimizing plasma concentrations, the POSA would have pursued a sustained or extended release tablet formulation instead of a rapid-release one, in hopes of dosing rivaroxaban less frequently than once every 3-6 hours.

172.    Sustained release tablets can increase the effective half-life of a drug, and also have a "smoothing effect" on "the plasma concentration profile so that fluctuation over the dosing interval is less than with intravenous bolus dosing."  Birkett Ch. 12 at 118.  Extended release formulations "decrease the incidence and/or intensity of undesired effects by elimination of the peaks in drug concentrations that often occur after administration of immediate-release dosage forms."  Wilkinson at 6.

---

[5] Rudnic, E.M. & J.B. Schwartz, "Oral Solid Dosage Forms," Remington, The Science and Practice of Pharmacy, 21st Ed. (Lippincott Williams & Wikins), Ch. 45 (2005) (JOINT_RIV0000938 – JOINT_RIV0000963) ("Remington")

173.    Indeed, the POSA would have expected that the "use of a sustained release formulation w[ould] be necessary" since rivaroxaban had a short half-life and was expected to require that "plasma concentrations . . be maintained in a narrow therapeutic range."  Birkett Ch. 12 at 115, 121 ("Oral sustained release formulations may be appropriate for drugs with short half-lives and narrow therapeutic indices.").

174.    Thus, if the POSA considered once-daily dosing of rivaroxaban at all (which the POSA would not), the POSA would have pursued an extended or sustained release formulation and not a rapid release formulation.

### 9.    Dosing Regimens of LMWHs Did Not Provide a Reasonable Expectation of Success that Rivaroxaban Could be Dosed Once-Daily

175.    Mylan suggests that the POSA would have had a reasonable expectation of success in dosing rivaroxaban once-daily in a rapid-release tablet due to the prior art, once-daily administration of certain LMWHs.  The POSA would disagree.

176.    Some LMWHs such as enoxaparin have half-lives similar to that reported in the prior art for rivaroxaban, and are dosed once daily for some (but not all) indications.  However, the POSA would have expected the differences between LMWHs and rivaroxaban to be too extensive for the established dosing regimens of the former to inform the appropriate dosing regimen for the latter.

177.    First and foremost, the half-life of enoxaparin is measured differently than the half-life for rivaroxaban.  Because enoxaparin consists of a heterogeneous mixture of heparin chains of varying lengths, which can vary in their mechanisms of action, measuring a half-life based on drug concentration in the plasma is difficult.  Instead, factor Xa inhibition of enoxaparin is typically measured as a proxy for plasma concentration, and the half-life of the factor Xa inhibitory effect is reported as enoxaparin's half-life.  But that half-life does not

address the effect of enoxaparin on inhibiting factor IIa or tissue factor pathway inhibition.  In contrast, rivaroxaban's half-life is measured directly via plasma concentration.  The POSA would have understood that, "the situation is complicated" as regards enoxaparin's elimination half-life, Fareed at 1051, and would not look to LMWHs such as enoxaparin when deciding on a dosing regimen for rivaroxaban or compare rivaroxaban's plasma concentration half-life with enoxaparin's factor Xa half-life for purposes of determining a dosing regimen for rivaroxaban.

178.    Moreover, LMWHs differ from rivaroxaban in a number of other important ways which the POSA would have viewed as critical to identifying an appropriate dosing regimen. First, rivaroxaban is administered orally, whereas LMWHs are administered by injection. Second, rivaroxaban is a small molecule, whereas each LMWH drug is a heterogeneous mixture of large molecule polymers of slightly different lengths.  Third, rivaroxaban is a selective inhibitor of factor Xa—that is, it does not act on other factors in the coagulation pathway. LMWHs inhibit both factor Xa and thrombin, and also promote the release of tissue factor pathway inhibitor in addition to other potential mechanisms.  Fourth, rivaroxaban is a direct inhibitor of factor Xa—it acts by binding directly to the factor Xa molecule in a stoichiometric fashion.  LMWHs are indirect inhibitors which act through antithrombin and have a catalytic mode of inhibition enabling one LMWH molecule to affect more than one factor Xa or thrombin molecule.

179.    The POSA would have viewed each of these characteristics of an anticoagulant as critical to the informed selection of a dosing regimen, and collectively the POSA would have viewed LMWHs and rivaroxaban as too different for LMWH dosing regimens to inform the dosing regimen of rivaroxaban.

180.     The POSA would have found the differences between rivaroxaban's selective effect and LMWH's non-selective effect to be particularly confounding.  The prior art did not explain why enoxaparin has a prolonged anticoagulant effect despite a relatively short factor-Xa-inhibition-based half-life.  The POSA would have believed that any one of LMWH's non-factor-Xa anticoagulation mechanisms (such as factor IIa inhibition, Fareed at 1045, the release of TFPI, Fareed at 1046, or the release of other hypothesized molecules, *see* Andrassy at S3; Fareed at 1051) might explain this prolonged duration of effect.  And the POSA would have understood that rivaroxaban did not possess these additional anticoagulant effects.

181.     Furthermore, the art taught that dosing regimens for one LMWH could not even be extrapolated to another LMWH.  Martineau 590-91 ("Because of a lack of appropriate studies, direct comparison of efficacy, safety, and *dosing regimens* among products is not possible, and the clinical results obtained with one LMWH should not be extrapolated to another." (emphasis added)); Fareed at 1054-55 ("It must be borne in mind that the findings of safety and efficacy cannot be extrapolated to other LMWHs, as each drug must undergo specific evaluation in the circumstances in which it is intended to be used.").  Given these teachings that extrapolation of dosing regimens from one LMWH to another could not be done, the POSA would not have extrapolated a dosing regimen from a LMWH to a selective, direct factor Xa inhibitor such as rivaroxaban, which comes from a different structural class, has a different mechanism of action, and involves a different route of administration.

182.     In addition, the POSA would have understood that not every LMWH is administered once-daily for every indication.  For example, the Lovenox® label available in the prior art reflects that many of Lovenox's indications do not permit once-daily dosing, and instead

51

require twice-daily dosing.  Lovenox® (2000) 21.  That would reinforce for the POSA that the situation concerning enoxaparin's half-life and its dosing is not straightforward.

183.    With respect to claim 4 of the '218 patent in particular, Lovenox® does not have a specific indication for the treatment or prevention of stroke, but the closest indication is the enoxaparin indication "for the prophylaxis of ischemic complications or unstable angina and non-Q-wave myocardial infarction, when concurrently administered with aspirin," Lovenox® (2000) 21, because the POSA would recognize that one potential ischemic complication of such cardiac events is a stroke.  However, for that indication, the dosing regimen for enoxaparin was twice daily, not once daily.  Thus, even if the POSA were to rely on enoxaparin for purposes of selecting a once-daily dosing regimen (which the POSA would not do), the POSA would find enoxaparin's dosing regimen suggestive a of a twice-daily regimen for the treatment and prevention of stroke, not a once-daily regimen.  That is an additional reason why claim 4, which is limited to treatment or prevention of stroke, would not have been obvious to the POSA.

184.    Other references suggest that LMWHs were examined in clinical trials with twice-daily dosing regimens.  For example, Yeager reports a half-life for nadroparin of 132 to 162 minutes, but shows that nadroparin was examined for the treatment of deep vein thrombosis in clinical trials as a twice-daily drug.  Indeed, Yeager suggests that the LMWHs dalteparin, enoxaparin, nadroparin, reviparin, and danaparoid II were all used as twice-daily drugs in clinical trials for the treatment of deep vein thrombosis.

### 10.    Razaxaban and Ximelagatran's Clinical Studies Suggested A Twice-Daily Dosing Regimen for Rivaroxaban

185.    The POSA would have been familiar with the ongoing clinical trials of ximelagatran and razaxaban.  Ximelagatran, like rivaroxaban, is an oral small molecule anticoagulant that acts specifically and directly on a single factor in the coagulation cascade

(except inhibiting thrombin rather than factor Xa). Ximelagatran was disclosed in the prior art as having a "[w]ide therapeutic window," as well as a "[r]apid onset of action." Linkins 71, Table 2. However, melagatran (the form of ximelagatran that exists after rapid biotransformation of the prodrug ximelagatran following absorption) has a half-life of 4-5 hours in patients, which is similar to that reported for rivaroxaban. *Id.* at 70. The prior art explained that "[b]ecause of this relatively short half-life, ximelagatran is given twice daily." *Id.*

186.    Ximelagatran was of as January 31, 2005 known to cause a transient increase in liver enzymes that restricted the drug's use to those with normal hepatic function. Weitz I-24. However, that does not mean that the drug was not understood to have a wide therapeutic index. The POSA would recognize that various drugs are restricted in individuals who do not have normal liver or kidney function, as impaired liver or kidney function can impede the metabolism and/or excretion of a drug from the body, and thus increase drug-induced toxicity. That ximelagatran had restrictions in patients with abnormal liver function would by no means indicate to the POSA that the drug did not have a wide therapeutic index for purposes of implementing a dosing regimen that was less frequent than every half-life.

187.    Therefore, even if rivaroxaban were expected by the POSA to have a wide therapeutic window (which would not have been the case), the ximelagatran example and in particular its relatively short half-life of 4-5 hours (which was almost identical to the 3-6 hour half-life range for rivaroxaban) would teach the POSA that dosing should be more frequent than once daily.

188.    In addition, razaxaban had a half-life similar to that of ximelagatran (reported as 3-5 hours; discussed further below), and therefore similar to that reported in the prior art for rivaroxaban (3-6 hours). Weitz & Crowther at V282; Linkins at 70. The POSA would have

53

recognized that razaxaban was dosed twice daily in its phase II clinical trials.  Razaxaban's

clinical studies would therefore have suggested to the POSA that a twice-daily dosing regimen

was appropriate for rivaroxaban.  *Id.* ("With a half-life similar to that of ximelagatran, DPC 906

[razaxaban] must be given twice daily."); Weitz 2004 at 431 (DPC 906 is razaxaban).

189.    As described above, *see supra* ¶ 141, razaxaban is a specific and direct factor Xa

inhibitor.  Thus, ximelagatran and razaxaban have many characteristics in common with

rivaroxaban:  all three drugs are small-molecule, oral, direct and selectively acting

anticoagulants.  In contrast, LMWHs are heterogeneous mixtures of large molecules,

administered by injection, with an indirect and non-selective mechanism of action.  The POSA

would therefore have considered razaxaban and ximelagatran to be superior comparators to

rivaroxaban for purposes of identifying an appropriate dosing regimen.

190.    Indeed, the POSA would find the ximelagatran example to be far more relevant to

dosing interval than the LMWH examples.

### D.    Objective Evidence Supports Nonobviousness

#### 1.    Rivaroxaban Exhibits Surprising and Unexpected Results as Compared to the Closest Prior Art

191.    The POSA would view the use of the claimed once-daily dosing regimen as

having unexpected properties compared with the closest prior art.

192.    The POSA would regard the multiple-dose Kubitza abstracts (Kubitza 1 and

Kubitza 5) to be the closest prior art, as they disclose the use of oral doses of rivaroxaban in

humans over the course of multiple consecutive days.

193.    Based on the information in Kubitza 1 and Kubitza 5, the POSA would not have

reasonably expected that rivaroxaban in the form of a rapid-release tablet could be used in a

once-daily dosing regimen as claimed by the '218 patent; given rivaroxaban's short half-life, the POSA would expect that more frequent dosing would be required.

194.    The POSA would have interpreted Kubitza 1 and Kubitza 5 to teach away from a once-daily dosing regimen. Surprisingly and unexpectedly, however, rivaroxaban in the form of Xarelto® is FDA-approved in a once-daily dosing regimen for multiple different thromboembolic indications, and in particular indications for treatment and/or prevention of stroke, deep-vein thrombosis, and pulmonary embolism that are covered by the '218 patent claims. *See* Xarelto® Label (2017); Xarelto® Label (2018).

195.    Mylan suggests that the POSA would have expected rivaroxaban's half-life to be longer in older patients because the POSA would have known that compounds generally have longer half-lives in older patients. Mylan is incorrect. To the contrary, the POSA would have understood that whether a drug has a longer half-life in older patients depends on the particular drug at issue. Indeed, many anticoagulants have the same pharmacokinetic properties in older patients as in younger ones. For example, in Lovenox®, "[a]pparent clearance and $A_{max}$ derived from anti-Factor Xa values following single and multiple [subcutaneous] dosing in elderly subjects were close to those observed in young subjects." Lovenox® (2000) at MYL RIV00074997. The same is true for the direct thrombin inhibitor Acova®, which has "no clinically significant effects of age or gender on the pharmacokinetics or pharmacodynamics (e.g., aPTT) of argatroban.

196.    While the POSA would have expected from the phase 1 studies in Kubitza 1 and Kubitza 5 that more than once-daily dosing would be required, surprisingly and unexpectedly, phase II studies with rivaroxaban revealed that a once-daily regimen could provide efficacy and safety that was similar to a twice-daily regimen. *See, e.g.*, '218 patent 8:47-10:54; *see also*

Eriksson I[6] (reporting results of twice-daily rivaroxaban regimens in ODIXa-HIP trial); Erikson II[7] (reporting results of once-daily rivaroxaban regimens in ODIXa-OD-HIP trial);  Erikkson III[8]; BAYX-03381038 at BAYX-03381038 to BAYX-03381064 (discussing results of once-daily dosing versus twice-daily dosing and, based on a comparison of the efficacy and bleeding, concluding that a once-daily regimen should be carried forward into the phase III trials).

197.    Even today, the explanation for rivaroxaban's ability to be safely and effectively dosed once-daily in a rapid-release tablet is not entirely clear.  But the most likely explanation is that, due to rivaroxaban's low solubility, the drug is slowly absorbed as it passes through the gastrointestinal tract, and thus approximates a dosage form akin to an extended-release tablet, even though Xarelto tablets are themselves rapid-release tablets.  Nothing in the prior art suggested this would occur.

### 2.    Skepticism

198.    Even knowing the early phase IIa results which were not public or prior art, the inventors' proposal to administer rivaroxaban in a once-daily dosing regimen was met with skepticism from physicians and regulatory agencies in light of the available phase I data concerning rivaroxaban's half-life.

---

[6] Eriksson, B. I. et al., "Oral, direct Factor Xa inhibition with BAY 59-7939 for the prevention of venous thromboembolism after total hip replacement", J. Thromb. Haemost. 4:121-8 (2006) ("Eriksson I")

[7] Eriksson, B. I., et al., "A Once-Daily, Oral, Direct Factor Xa Inhibitor, Rivaroxaban (BAY 59-7939), for Thromboprophylaxis After Total Hip Replacement," Circulation, 114: 2374-2381 (2006) ("Eriksson II")

[8] Eriksson et al., Dose-escalation study of rivaroxaban (BAY 59-7939)- an oral, direct Factor Xa inhibitor for the prevention of venous thromboembolism in patients undergoing total hip replacement, Thrombosis Research (2007) 120, 685-693 ("Eriksson III")

199.    Kreutz[9], evidences this skepticism when it explains, *inter alia*, that physicians and researchers were skeptical of the proposed once-daily dosing regimen for rivaroxaban, because "[b]ased on a half-life of 5–13 h[10], it is expected that the Factor Xa inhibitor rivaroxaban would be best suited to a twice-daily rather than a once-daily dose regimen."  Kreutz at 138.

200.    In addition, the inventors of rivaroxaban were met with skepticism from internal Bayer scientists, from outside consulting experts and from regulatory agencies when they first proposed once-daily dosing of rivaroxaban.

201.    The failure of certain razaxaban clinical trials contributed to and reinforced the industry skepticism surrounding rivaroxaban's safe and effective once daily dosing regimen in a rapid-release tablet.  The fact that razaxaban dose arms had to be discontinued during phase II clinical trials for unacceptable bleeding emphasized the narrow therapeutic window of anticoagulants, including factor Xa inhibitor such as razaxaban, which reinforced the need to keep fluctuations in drug plasma levels to a minimum, such as by using twice-daily dosing or an extended-release tablet.  Rivaroxaban's safe and effective administration once-daily in a rapid-release tablet was thus unexpected.

### 3.    There is a Nexus Between the Aforementioned Objective Evidence and the Asserted Claims

202.    There is a nexus between claims 1-4 and the use of Xarelto® in accordance with its labeling.

---

[9] Kreutz, "A clinical and pharmacologic assessment of once-daily versus twice-daily dosing for rivaroxaban," J. Thomb. Thromolysis (2014) 38:137-149 ("Kreutz")

[10] This post-priority article reflects later research which determined that the half-life for rivaroxaban was longer than expected based on publications of phase I trials.  Kreutz reflects that, even once this longer half-life range became known, the industry was nonetheless skeptical that once-daily dosing of rivaroxaban in a rapid-release tablet would be safe and effective.

203.     The portions of the Mylan labeling which demonstrate that the use of Mylan's ANDA Product in accordance with its proposed labeling will infringe claims 1-4 of the '218 patent are substantially similar if not identical to the corresponding portions of the Xarelto® labeling.  The Xarelto® labeling satisfies those claim limitations as well for the same reasons that Mylan's proposed labeling satisfies those limitations.

204.     Mylan's ANDA contains data comparing the dissolution of Mylan's ANDA Products to Xarelto® tablets.  Based on the information in those documents, a POSA would conclude that 10 mg, 15 mg, and 20 mg Xarelto® tablets are "rapid-release tablets" as defined by the '218 patent and as construed by the Court.  See MYL_RIV00001332, -1336 (10 mg), -1340 (15 mg), -1344 (20 mg); XARELTO_00025672.

### E.     The '218 Patent Satisfies the Written Description Requirement

205.     Mylan asserts that the '218 patent fails to satisfy the written description requirement because the specification does not adequately describe "rapid-release tablet."  The POSA would disagree.

206.     The specification defines "rapid-release tablet" as "a tablet which, according to the USP release method using apparatus 2 (paddle), has a Q value (30 minutes) of 75%."  That description provides the POSA with sufficient information to understand that the inventors were in possession of the invention, and in particular of tablets with the specified Q value according to the USP paddle stirrer test.

207.     The POSA would be familiar with dissolution testing, and would understand that "apparatus 2 (paddle)" refers to the paddle stirrer test in chapter <711> related to dissolution.  *See* USP 24 at 1941-43; USP 26 at 2155-56; USP 28 at 2412-14.  Setting additional parameters such as the pH of the dissolution medium, the concentration of surfactant, and the paddle speed are well within the skill of a POSA.  These parameters are not complex—once a POSA had the

58

disclosure in the '218 patent, a POSA would understand that the inventors were in possession of the invention.

## VIII.  REMEDIES

208.    Judgment should be entered that Mylan has infringed the '218 patent.

209.    Judgment should be entered ordering that the effective date of any FDA approval of Mylan's ANDA No. 208561 be no earlier than the expiration of the '218 patent (February 17, 2034), as well as any extensions thereto.

210.    Plaintiffs should be awarded such other relief as the court deems proper.

# EXHIBIT 3

CONFIDENTIAL

## EXHIBIT 3

## MYLAN'S STATEMENT OF CONTESTED FACTS

To the extent Mylan's Statement of Issues of Law set forth in Exhibit 5 contains issues of fact, those issues are incorporated herein by reference. Should the Court determine that any issue identified in this Exhibit as an issue of fact is more appropriately considered an issue of law, Mylan incorporates such issues by reference into its statement of issues of law. By including a fact herein, Mylan does not assume the burden of proof or production with regard to that fact.

Mylan's identification of issues of fact that remain to be litigated is based on Mylan's understanding of Plaintiffs' arguments regarding their infringement and validity positions, which are based on Plaintiffs' interrogatory responses and expert reports regarding infringement and validity. Mylan believes that any claims that Plaintiffs did not raise in its expert reports or its responses to Mylan's interrogatories seeking Plaintiffs' allegations have been waived and Mylan will not address those issues.

## I.   THE ASSERTED CLAIMS OF THE '218 PATENT ARE NOT INFRINGED BY MYLAN'S ANDA PRODUCTS

### A.   Claim Construction

1.      On April 16, 2018, the parties submitted a Joint Claim Construction Chart with respect to claim 1 of the '218 patent. D.I. 58. The parties agreed that the term "treating" encompasses both therapeutic and prophylactic treatment. The sole disputed term was "rapid-release tablet."

2.      The Court adopted Plaintiffs' lexicographic definition of "rapid-release tablet," construing it to mean ""a tablet which, according to the USP release method using apparatus 2

(paddle), has a Q value (30 minutes) of 75%," stating that the patentees gave a very precise explanation of what they mean by the term.  D.I. 91 at 1-2.

3.      Plaintiffs sought to have the Court further construe their lexicographic definition of the term "rapid-release tablet."  D.I. 121.  The Court denied Plaintiffs' request, stating "I gave Plaintiffs exactly what they asked for, and, indeed, what Plaintiffs told me I had no choice but to give them, and now they want something different."  D.I. 128.

**B.      Background**

4.      The United Stated Pharmacopeia ("USP") describes multiple methods for dissolution testing for tablets and capsules.  FDA requires dissolution testing of drug products, and such testing is typically performed using one of the USP methods.

5.      One method described in the USP uses apparatus 2: paddle as described below:



6.      The USP defines the quantity Q, as "the amount of dissolved active ingredient specified in the individual monograph, expressed as a percentage of the labeled content."

7.      The oral route of administration is the most common route of administration when it comes to pharmaceutical preparations.

8.      Solid oral formulations have a number of well-known advantages over other routes of administration and other oral formulations (e.g., solutions and suspensions).  Some of these well-known advantages of solid oral formulations include ease of administration, better stability than other formulations (e.g., solutions and suspensions), and ease of transport.

9.      There are a number of well-known factors that impact the selection of the final formulation to be taken to market.  Some of these factors include the solubility of the drug in different parts of the GI tract, stability of the drug in different parts of the GI tract, where a drug is absorbed at in the GI tract, the pharmacokinetics of the drug, therapeutic duration, and the targeted patient population.

**C.      Mylan's ANDA Products Do Not Meet the Rapid-Release Tablet Limitation of the Asserted Claims**

10.      Mylan does not literally infringe the claims of the '218 patent because Mylan's ANDA Products are not rapid-release tablets, as construed by the Court.

11.      The Court stated that "Plaintiffs argue[d] for a lexicographic definition" in their claim construction briefing.  Plaintiffs' claim construction position was that the express definition of "rapid-release tablet" in the '218 patent is "a tablet which, according to the USP release method using apparatus 2 (paddle), has a Q value (30 minutes) of 75%."

12.      The Court's *Markman* Order clarified that Plaintiffs gave "a very precise explanation of what they mean by a 'rapid-release tablet.'"

13.     Plaintiffs' claim construction briefing argued no less than 25 separate times that their construction was the "express definition" of "rapid-release tablet."

14.     Plaintiffs did not argue during claim construction "of 75%" means "at least" or "more than."  The Court similarly did not construe "of 75%" to mean "at least" or "more than."

15.     Based on the express definition adopted by the Court, a POSA would understand that the patentees claimed a rapid release tablet with a Q value (30 minutes) of 75%.

16.     Mylan's ANDA Products do not have a Q value (30 minutes) of 75% according to USP release method using apparatus 2 (paddle).

17.     The USP may state the Q value as "not less than" a certain percentage.  This is distinguished from a Q value of a specified percentage.  For example, a POSA would understand that when the USP lists a Q value of not less than 85% in 30 minutes, that is different than a Q value of 85% in 30 minutes.  The former specifying a range, the lower limit of which is 85%, the latter delineating a specific and exact percentage at the specified time.  A POSA would understand this distinction.

18.     Mylan's ANDA Products have a Q value of "not less than 80%" in 15 minutes.

19.     Mylan's ANDA Products' dissolution data shows that the dissolution of the drug product was greater than 85% in 15 minutes.  For example, some lots of 10mg strength Mylan tablets dissolved 94% in 30 minutes.  And some lots of 15 mg and 20 mg strength Mylan tablets dissolved 98% and 99%, respectively, in 30 minutes.

20.     Thus, at 30 minutes, Mylan's ANDA product dissolution exceeded 90%, which is quite different from the 75% at 30 minutes required by the claims of the '218 patent.

21.     Mylan's ANDA Products do not infringe under the doctrine of equivalents because the patentee dedicated to the public tablets that do not have a Q value (30 minutes) of 75% according to USP release method using apparatus 2 (paddle).

22.     Plaintiffs are estopped from asserting infringement under the doctrine of equivalents because doing so would eliminate a required claim limitation, specifically a tablet which, according to the USP release method using apparatus 2 (paddle), has a Q value (30 minutes) of 75%.

23.     Plaintiffs have failed to prove that Mylan's ANDA products infringe any claim of the '218 patent.

24.     Because Mylan's ANDA products do not meet the required rapid-release tablets limitation claimed by the '218 patent, Mylan cannot induce infringement of the '218 patent.

25.     Because Mylan's ANDA products do not meet the required rapid-release tablets limitation claimed by the '218 patent, Mylan cannot contribute to the infringement of the '218 patent.

## II.   PERSON OF ORDINARY SKILL IN THE ART

26.     A person of ordinary skill in the art ("POSA") to which the '218 patent pertained at the time of the invention would include an individual or a team of individuals having a Ph.D. with experience in pharmaceutical science (*e.g.* pharmacology, pharmacokinetics, toxicology, formulation, etc.), or less education but considerable professional experience in one or more of these fields.  Said team may also comprise an M.D. or Ph.D. with experience researching or treating blood coagulation or thromboembolic disorders.

### III.   THE ASSERTED CLAIMS OF THE '218 PATENT ARE INVALID UNDER 35 U.S.C. §103 AS OBVIOUS

27.    All claims of the '218 patent would have been obvious to a POSA at the time of alleged invention of the claimed subject matter.

28.    Mylan has proven by clear and convincing evidence that the subject matter of the claims would have been obvious in view of the prior art.

29.    Mylan has proven by clear and convincing evidence that the subject matter of the claims would have been obvious to try in view of the prior art.

30.    A person of ordinary skill in the art would have been motivated to combine or modify the teachings of the specific combination of prior art identified by Mylan to obtain the alleged invention of the '218 patent and would have had a reasonable expectation of successfully achieving such invention.

### A.   Background

31.    Thromboembolic disorders involve a thrombus (blood clot) that obstructs blood flow.  A blood clot in the venous system is a venous thrombosis.  Venous thrombi generally form in the deep veins in the legs (deep vein thromboses or "DVT").  The thrombus can break off and travel to the pulmonary arteries in the lungs to form a pulmonary embolism.  When the thrombus blocks an artery to the brain, it causes a stroke.

32.    There are two types of thrombosis: arterial thrombosis and venous thrombosis. Venous thrombi form in conditions of slow or absent blood flow and result from either an excessive activation of the coagulation cascade (hypercoagulability) or from some disease process or venous pooling (stasis) of the blood.  Venous thrombosis in humans usually occurs in leg veins and often occurs from vascular trauma caused by damage to the vessel wall, especially after orthopedic surgery, specifically hip and knee replacement surgeries.

33.     Arterial thrombosis occurs in high flow systems.  The thrombus blocks arterial flow and the tissues normally supplied by the affected artery are damaged or die because of lack of oxygen.  Arterial thrombi cause (1) stroke when the thrombus develops in a brain vessel and (2) myocardial infarction (MI) or unstable angina—collectively known as acute coronary syndrome—when the thrombus develops in a coronary artery.

34.     Stroke can also occur in patients with atrial fibrillation.  Atrial fibrillation can lead to blood clots that form in heart cavities, particularly the left atrium.  These clots can break loose and embolize to the brain, where they cause a stroke.

35.     Anticoagulants are used to either prevent or treat thrombosis when the body's natural protective functions are not acting properly.  There are multiple anticoagulants that have been utilized for decades to either prevent or treat thrombosis.  Heparin, low molecular weight heparins ("LMWH") and vitamin K antagonists (i.e. warfarin) have all been used for the treatment and prophylaxis of thromboembolic disorders by reducing blood clotting.

36.     Prior to the priority date of the '218 patent, heparin, warfarin, and LMWHs were known to either directly or indirectly inhibit thrombin formation.

37.     There are several heparin products used in the United States.  LMWHs offer a more predictable dose-response curve than unfractionated heparin.  LMWHs are administered at a fixed dose based on total body weight and do not require tight regulation and monitoring, as is warranted with warfarin and unfractionated heparin.  There are several LMWH options available to prescribers such as: Enoxaparin (Lovenox and Clexane); Dalteparin (Fragmin); Ardeparin (Normiflo); Certoparin (Sandoparin); Parnaparin (Fluxum); Tinzaparin (Innohep and Logiparin); Reviparin (Clivarin); and Nadroparin (Fraxiparin).

7

38.     Enoxaparin (Lovenox) was approved in 1993 for prevention of DVT, which may lead to PE following hip replacement surgery.  Lovenox Label (1993) at "Indication and Usage". It was approved in 1998 for additional indications including:

    a.   prevention of DVT, which may lead to PE:

        i.   in patients undergoing hip replacement surgery, during and following hospitalization;

        ii.   in patients undergoing knee replacement surgery; and

        iii.   in patients undergoing abdominal surgery who are at risk for thromboembolic complications.  Patients at risk include patients who are over 40 years of age, obese, undergoing surgery under general anesthesia lasting longer than 30 minutes or who have additional risk factors such as malignancy or a history of DVT or PE;

    b.   the inpatient treatment of acute DVT with and without PE, when administered in conjunction with warfarin sodium;

    c.   the outpatient treatment of acute, DVT without PE when administered in conjunction with warfarin sodium; and

    d.   prevention of ischemic complications of unstable angina and non-Q-wave myocardial infarction, when concurrently administered with aspirin.

39.     Lovenox is available for subcutaneous administration in doses of 30 mg and 40 mg.  Routine monitoring of coagulation parameters is not required.  For treatment of acute ST-Elevation Myocardial Infarction (STEMI), the recommended dose of Lovenox is a single IV bolus of 30 mg, plus a 1 mg/kg subcutaneous dose followed by a 1 mg/kg subcutaneous dose

every 12 hours.  Patients are also given aspirin in doses of 75 to 325 mg, to be taken by mouth, daily.

40.     Prior to the priority date of the '218 patent, heparin and warfarin were known to cause bleeding as a significant side effect.

41.     Each of these anticoagulants previously described inhibits—either directly or indirectly—thrombin formation.  Thrombin is an enzyme that converts soluble fibrinogen into insoluble strands of fibrin and catalyzes other coagulation-related reactions.  These anticoagulants were also known to act in part by reducing the amount of factor Xa.  Factor Xa is an enzyme that, when in its active form, converts prothrombin to active thrombin.

42.     Direct thrombin inhibitors bind to thrombin (IIa) and block its interaction with substrates.  By 1998, at least two thrombin inhibitors were available—hirudin and lepirudin.  Both drugs were indicated for treatment of patients with heparin-induced thrombocytopenia (HIT).  HIT is a deficiency of platelets in the blood caused by administration of heparin.

43.     Factor Xa inhibitors bind and inhibit factor Xa of the coagulation cascade and prevent thrombin formation.  Currently, there are three factor Xa inhibitors that directly bind to the active site of factor Xa: rivaroxaban (Xarelto), apixaban (Eliquis), and edoxaban (Savaysa).  All three agents are orally administered.

44.     Factor Xa inhibitors were known prior to January 2005 as an anticoagulant that provided prophylaxis and treatment of thromboembolic disorders, without the increased bleeding risks that accompanied heparin, warfarin, and vitamin K antagonists.

45.     Prior to the priority date of the '218 patent, rapid release tablets of rivaroxaban were known in the prior art.

46.     Bayer performed several clinical trials involving rivaroxaban including a Phase I study numbered IMP 11140 which demonstrated that a single dose of 30 mg of rivaroxaban resulted in sustained inhibition of thrombin-generation lasting for more than 24 hours.

47.     In August of 2003, in a Clinical Study Protocol Amendment for a study entitled Oral Direct Factor Xa Inhibitor BAY 59-7939 (rivaroxaban) in the Prevention of VTE in Patients Undergoing Total Hip Replacement – a Phase IIa Dose Escalating Proof of Principal Trial, Bayer decided to explore once daily dosing regimen "[s]ince b.i.d. dosing resulted in very satisfactory clinical results both with regard to efficacy and safety" and the once daily "proposal [was] also backed by the observation in Phase I study (IMP 11140) that a single dose of 30 mg resulted in a sustained inhibition of thrombin-generation lasting for more than 24 hours."

48.     The results of the Phase I study IMP11140 were published in 2003 as the Harder reference, Abstract PO078.

49.     Thus, Bayer relied on the prior art Harder reference in part to try once daily dosing.

50.     BIP filed European patent EP 1 845 961 B1 on January 19, 2006, titled "Treatment of thromboembolic disorders with rivaroxaban."

51.     One of the named inventors of the '218 patent, Dr. Misselwitz, submitted a declaration in connection with opposition proceeding relating to EP 1 845 961 B1.  Dr. Misselwitz's expert opinion in this case is limited to the scope of his declaration in the opposition proceeding.

52.     Both the '218 patent and EP 1 845 961 B1 claim a method of treating a thromboembolic disorder by administering a rapid-release tablet of rivaroxaban no more than once daily for five consecutive days.

53.     Following opposition proceedings, the European Patent Office revoked EP 1 845 961 B1.

54.     The European Patent Office declared that a POSA would have had a motivation to try a once daily dosing regimen of 30 mg of rivaroxaban in Phase II trials for the treatment of thromboembolic disorders, with a reasonable expectation that the treatment would be safe and effective.

**B.      Scope and Content of the Prior Art**

55.     Abrahmsén teaches immediate release pharmaceutical formulations for the treatment or prevention of thrombosis.  Specifically, Abrahmsén discloses that, in the treatment or prophylaxis of thrombosis, immediate release formulations is necessary to ensure that a sufficient amount of drug is provided in plasma within a relatively short period of time to enable quick onset of action.  Additionally, Abrahmsén notes that immediate release formulations are typically simpler to develop than modified release formulations, and also provide more flexibility in relation to the variation of doses that are to be administered to patients.

56.     Aulton teaches, among other things, that a skilled person, would have been well aware of rapid-release tablet formulations.

57.     Fareed teaches, among other things, a high dose strategy for factor Xa inhibitors where the dosing interval is much longer than the elimination half-life of the active ingredient. For example, Fareed discloses that enoxaparin was dosed once per day despite having a half-life of 4-5 hours.

58.     Gao evaluated process variables in fluid bed granulation of tablets containing poorly water soluble and micronized drug.  The drug substance used for the Gao study was micronized and had a particle size distribution value (d90) of 12.9 μm.  Also, the drug chosen by

Gao was practically insoluble in water (9 μg/ml).  The process involved use of an aqueous solution of a cellulose based binder to granulate the dry components.  Gao also compared physical properties of granules prepared by fluid bed granulation to that of granules prepared by a high shear granulator.  Gao concluded that the dissolution rates of tablets of poorly water soluble and micronized drug produced by fluidized bed granulation and high shear granulation methods are comparable.

59.     Harder explains that "Factor Xa inhibitors exert their antithrombotic effects through inhibition of thrombin generation (TG)."  Harder evaluates the thrombin generation effect of rivaroxaban after administration of a single 5mg or 30mg dose to healthy volunteers. Harder concludes that "[a] single 30 mg dose exerted a sustained effect [in some assays of thrombin generation] for up to 24 hours."

60.     Kubitza 1 describes administering oral multi-dose regimens of rivaroxaban in amounts of 5 mg once daily (od), 5 mg twice daily (bid), 5 mg thrice daily (tid), 10 mg bid, 20 mg bid, and 30 mg bid for five days.  Kubitza 1 explains that "[f]ull profiles of all pharmacodynamic (PD) parameters (Factor Xa inhibition, PT, PTT, HepTest) were performed on days 1 and 7," and that "[p]harmacokinetics were assessed using standard parameters."

61.     Kubitza 1 evaluated the pharmacodynamic effect (i.e., thrombin generation effect) of rivaroxaban for over the 5-day dosing period.  Kubitza 1 discloses that:

> At steady state of the highest dose, maximal Factor Xa inhibition was 70% with maximal changes of PT up to 2.6 times the individual baseline value. Similarly, maximal changes from baseline peaked at 2.7 for HepTest and 1.7 for aPTT. **There were no differences between the PD effects on day 1 versus day 7 at any dose step.** Comparable profiles were observed for all PD parameters. Relevant changes in the PD parameters were still present after 12 hours. Comparable profiles were observed for all PD parameters. Relevant changes in the PD parameters were still present after 12 hours. Standard safety parameters were unaffected and no signs or symptoms of bleeding were observed across the dose range. In addition, BAY 59-7939 did not affect bleeding time at any dose. A

dose-proportional increase in AUC was seen after the first dose and at steady state. $C_{max}$ was reached after 2.5-4 hours; the terminal half life was 4-6 hours. There was no indication of undue accumulation of drug beyond steady state for all six dose regimens. This study demonstrated that BAY 59-7939 has predictable dose-dependent pharmacodynamics and pharmacokinetics without signs or symptoms of bleeding. In conclusion, **oral administration of BAY 59-7939 was safe and well tolerated in doses up to 30 mg bid.**

(Emphases added).  Kubitza 1 notes that no differences were observed for the pharmacodynamic effects on day 1 versus day 7 for any dose, including the 5 mg once daily dose.

62.     Kubitza 2 discusses the development of BAY 59-7939 (rivaroxaban; 5-Chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)phenyl]-1,3-oxazolidin-5-yl}methyl)-2-thiophenecarboxamide) for the prevention and treatment of thromboembolic diseases. Specifically, Kubitza 2 teaches that in a 24 hour period, administration of a single oral tablet of rivaroxaban was safe and well tolerated across a wide range of oral doses (1.25-80 mg), and discloses that rivaroxaban offers predictable anticoagulation with an excellent safety profile.

63.     Kubitza 3 discloses that:

BAY 59-7939 showed a rapid onset of action, with maximal inhibitory effects observed after 45 minutes with the solution and after 1-2 hours with the tablet…After administration of the oral solution, maximal plasma levels were observed after about 30 minutes, followed by a fairly rapid decline…Lower peak concentrations of approximately 50% were observed 2 hours after administration of the tablet, compared with the solution…These data suggest that BAY 59-7939 offers predictable anticoagulation with an excellent safety profile.

64.     Kubitza 4 discusses the development of BAY 59-7939 (rivaroxaban; 5-Chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-morpholinyl)phenyl]-1,3-oxazolidin-5-yl}methyl)-2-thiophenecarboxamide) for the prevention and treatment of thromboembolic diseases. Specifically, Kubitza 4 teaches that a single dose of rivaroxaban in a 5 mg or 30 mg dose was safe and well-tolerated, and discloses that rivaroxaban offers predictable anticoagulation with an excellent safety profile.  Kubitza 4 teaches that a single dose of rivaroxaban could have a

sustained effect for up to 24 hours and that maximum inhibition was observed 2 hours following administration.

65.     Leadley discloses background information regarding direct coagulation factor Xa (fXa) inhibitors.  Leadley discloses that factor Xa and its cofactor, factor Va, combine on phospholipid membranes to form the "'prothrombinase' complex, which activates prothrombin to thrombin" and thrombin, in turn, "by cleaving fibrinogen to fibrin, by activating platelets, and by converting factor XIII to factor XIIIa, is the principal enzyme involved in thrombus generation, growth, and stabilization."

66.     Leadley discloses that factor Xa appears to be primarily responsible for clot-associated procoagulant activity, and that short-term inhibition of factor Xa by thick anticoagulant peptide (TAP), a factor Xa inhibitor, provides sustained inhibition of clot-associated procoagulant activity *in vitro*.  Leadley discloses that such *in vitro* results demonstrating the short-term inhibition of factor Xa associating with sustained efficacy were also validated *in vivo.*

67.     Leadley further discloses:

Recent experiments indicate that short-term inhibition of fXa by TAP provides sustained inhibition of clot-associated procoagulant activity *in vitro* [ ]. These results were validated *in vivo* by examining platelet deposition on dacron vascular grafts in baboons during and after a 2 hour intravenous infusion of rTAP [ ]. TAP decreased platelet deposition during the infusion and for 2 and 53 hours after termination of low dose (10 pg/kg/min) and high dose (25 pg/kg/min) rTAP, respectively. In another experiment, CI-1031 (ZK-807834), a small molecule, direct inhibitor of fXa, was administered as adjunctive treatment during and for 1 hr post fibrinolytic therapy to dogs that had experimentally-induced occlusive coronary artery thrombosis [ ]. Compared to heparin plus aspirin, 24-hr vessel patency achieved with CI-1031 was markedly enhanced. These findings were also supported by a preliminary report on a study in which another small molecule inhibitor of fXa, FXV673, administered to canines over a few hours prevented thrombosis for three days following electrolytic injury-induced thrombosis in the carotid artery [ ]. These data suggest that the sustained antithrombotic effect after short-term drug exposure is not a feature of TAP alone, but is a unique and highly

desirable effect of direct fXa inhibition. This feature, sometimes referred to as "passivation," may be important to consider when designing clinical studies to evaluate novel fXa inhibitors in acute thrombotic diseases, especially in the current medical environment which mandates short hospital stays for interventions such a percuataneous coronary interventions.

68.     Perzborn reports that BAY 59-7939 is an oral, direct factor Xa inhibitor in development for the prevention and treatment of arterial and venous thrombosis.  Perzborn states that BAY 59-7939 competitively inhibits human factor Xa ($K_i$ 0.4 nM) with a selectivity greater than 10,000-fold compared to other serine proteases.  Perzborn identifies various properties that serve as the basis for its selection for clinical development.

69.     Perzborn identifies BAY 59-7939 by its chemical name (5-chloro-N-({(5S)-2-oxo-3-[4-(3-oxomorpholin-4-yl)phenyl]-1,3-oxazolidin-5-yl}methyl)thiophene-2-carboxamide) and by chemical structure.

70.     The USP includes information related to the evaluation of oral dosage forms (including rapid-release tablets) that includes Dissolution.

71.     For example, USP chapter <1090> evaluates pharmacokinetic and *in vitro* release profiles for a number of drug products, including, for example, bumetanide tablets.  The USP states that bumetanide "is reported to be readily absorbed from the gastrointestinal (GI) tract with a $T_{max}$ of 0.5 to 2 hours."  The USP also states that bumetanide tablets exhibit a Q value (30 minutes) of not less than 85% using apparatus 2 (paddle, 50 rpm) in 900 mL of water.

72.     Straub is directed to certain oxazolidinone derivatives.  Straub teaches that rivaroxaban is a preferred oxazolidinone derivative and also claims rivaroxaban and its pharmaceutically acceptable salts, hydrates and prodrugs.  Straub also teaches a synthesis procedure of rivaroxaban.  Straub further teaches pharmaceutical compositions, including tablets and pills, which contain the oxazolidinone derivative and excipients.  Additionally, Straub

15

discloses oxazolidinone derivatives, including rivaroxaban, for the treatment of thromboembolic

disorders, including stroke, pulmonary embolisms and deep vein thrombosis.

73.    Forsman teaches "low molecular weight thrombin inhibitor[s] formulated as

immediate release (IR) tablets" and the use of this "formulation in the prophylaxis and / or

treatment of thromboembolism."  Forsman teaches "immediate release formulation[s] based on

conventional manufacturing processes" that provide a "release [of] 85% or more of stated

amount within 30 min."  Forsman demonstrates that its immediate release tablets release 94% of

active ingredient at pH 1 and pH 6.8 within 30 minutes using the USP Apparatus 2.

74.    The '456 patent discloses and claims rivaroxaban and methods of treating

thromboembolic disorders using rivaroxaban.  The '456 patent teaches that rivaroxaban

formulated as a solid, orally administrable pharmaceutical composition (*e.g.* a tablet) is preferred

for treating thromboembolic disorders.

75.    The '339 patent discloses rivaroxaban for the prophylaxis and/or treatment in the

field of blood coagulation.  The '339 patent claims a method for the prevention, inhibition,

and/or treatment of thrombus formation by administering an effective amount of rivaroxaban to a

patient who has a thromboembolism including pulmonary embolism and deep vein thrombosis.

76.    The '851 patent claims a process resulting in a rivaroxaban rapid release tablet.

77.    By way of the Orange Book's "DP" patent code, Plaintiffs acknowledged that the

'053 patent includes at least one claim that covers the XARELTO drug products.  Additionally,

the Orange Book's patent use codes associated with the '053 patent are evidence of Plaintiffs'

acknowledgement that the '053 patent includes at least one claim that covers XARELTO

indications including: (i) prophylaxis of deep vein thrombosis (DVT) (U-1167), (ii) reducing the

risk of stroke and systemic embolism (U-1200), (iii) treatment of DVT (U-1301), (iv) treatment

of pulmonary embolism (PE) (U-1302), and (v) reduction in the risk of recurrence of DVT and

PE (U-1303).

78.    Claims 6, 14-15, and 17 of the '053 patent recite:

6. A solid, orally administrable pharmaceutical composition comprising an
active compound (I) that is 5-chloro-N-({(5S)-2-oxo-3-[4-(3-oxo-4-
morpholinyl)-phenyl]-1,3-oxazolidin-5-yl}-methyl)-2-thiophenecarboxamide
in hydrophilized form prepared by a process comprising the following steps:
    (a) first preparing granules comprising the active compound (I) in
    hydrophilized form using fluidized bed granulation for moist granulation;
    (b) and converting the granules into the pharmaceutical composition.

* * *

14. The pharmaceutical composition according to claim 6 that is in the form of
a tablet.


15. The pharmaceutical composition according to claim 14 that is in the form
of a rapid-release tablet.

* * *

17. A method for the prophylaxis and/or treatment of thromboembolic
diseases comprising administering an effective amount of the pharmaceutical
composition of claim 6 to a patient in need thereof.

79.    The '053 patent states that "[i]n the context of the present invention, rapid-release

tablets are in particular those which, according to the USP release method using apparatus 2

(paddle), such as described in the experimental section in chapter 5.2.2., have a Q value (30

minutes) of 75%."

80.    The '053 patent also states that "[t]he present invention further relates to the use

of the pharmaceutical composition according to the invention for the prophylaxis and/or

treatment of diseases, in particular of thromboembolic diseases such as cardiac infarct, angina

pectoris (including unstable angina), reocclusions and restenoses after an angioplasty or

aortocoronary bypass, cerebral infarct, transitory ischemic attacks, peripheral arterial occlusive diseases, pulmonary embolisms or deep venous thromboses."

81.     Benet teaches that "if a drug is relatively nontoxic, such that concentrations many times that necessary for therapy can easily be tolerated, doses can be large and the dosing interval can be much longer than the elimination half-life (for convenience).  The half-life of penicillin G is less than 1 hour, but it is given in very large doses every 6 or 12 hours."

82.     Moonis teaches that "effective anticoagulation…can be achieved in most cases within 5 to 7 days with once-daily dosing" of warfarin for prevention and treatment of stroke.

83.     Remington's teaches that "[d]rug substances most frequently are administered orally by means of solid dosage forms such as tablets and capsules…Tablets have been in widespread use since the latter part of the 19th century, and their popularity continues."

84.     Yeager reports that the terminal half-life of nadroparin is 2-3 hours.  Yeager teaches that the administration of UFH "for five to 10 days, followed by oral anticoagulation therapy for at least three months."  Yeager also teaches that treatment of antithrombotic therapy for DVT using LMWHs "should include at least five days of treatment[.]"

C.     **Claim 1 of the '218 Patent Is Obvious Under 35 U.S.C. §103 as of the Priority Date in Light of the Prior Art**

85.     As of January 31, 2005, claims 1-4 of the '218 patent would have been obvious to a POSA.

1.     **Method of Treating Thromboembolic Disorders, Including Pulmonary Embolism, Deep Vein Thromboses, and Stroke, Comprising Administering Rivaroxaban**

86.     Prior to January 31, 2005, it was known that factor Xa operated by catalyzing the conversion of prothrombin to thrombin.

87.     Prior to January 31, 2005, it was known that one molecule of factor Xa results in the generation of "more than 1000 thrombin molecules," suggesting that effective factor Xa inhibition could be more effective than inhibition of thrombin.  At the same time, direct inhibition of factor Xa was believed to be safer than using existing indirect factor Xa inhibitors (*e.g.*, heparins) or vitamin K antagonists (*e.g.*, warfarin), resulting in lower incidence of adverse bleeding events.

88.     Prior to January 31, 2005, Leadley taught that "[b]y inhibiting thrombus-bound fXa with high affinity, lower plasma concentrations may be required to provide antithrombotic efficacy."

89.     It would have been obvious to a POSA, as of January 31, 2005, to use a factor Xa inhibitor for the treatment and/or prophylaxis of thromboembolic disorders, specifically pulmonary embolism, DVT, and stroke.

90.     Prior to January 31, 2005, rivaroxaban was a known, oral, direct factor Xa inhibitor taught to be useful for treating and/or preventing thromboembolic disorders, including stroke, pulmonary embolism, and DVT.

91.     Perzborn conducted *in vitro* assays and teaches that BAY 59-7939 (rivaroxaban) inhibited human factor Xa and showed selectively of more than 10,000-fold over "other serine proteases" (*e.g.*, thrombin).  Perzborn also reports that kinetic studies demonstrated that rivaroxaban is a competitive inhibitor of human factor Xa and that rivaroxaban prolonged both prothrombin time (PT) and activated partial thromboplastin time (aPTT) with its effect on PT being more pronounced than on aPTT.  These results indicate that rivaroxaban was capable of inhibiting factor Xa bound to the prothrombinase complex.  Perzborn concluded that rivaroxaban is highly selective for factor Xa.

92.     Perzborn also teaches: "*In vivo* results indicate that direct inhibition of FXa with BAY 59-7939 is a highly effective strategy for the prevention of both arterial and venous thrombosis."  Because rivaroxaban was known to profoundly inhibit the propagation phase of anticoagulation without entirely eliminating clotting, it was expected to have a relatively wide therapeutic window between antithrombotic efficacy and bleeding.

93.     Prior to January 2005, rivaroxaban was known to be useful for therapy and prophylaxis of thromboembolic disorders.  For example, Straub discloses rivaroxaban as a direct factor Xa inhibitor and explains why direct factor Xa inhibition was useful for treating thromboembolic disorders.

94.     Straub specifically discloses rivaroxaban as a direct factor Xa inhibitor.  Straub teaches that factor Xa inhibition is effective for treating thromboembolic disorders because factor Xa "plays a key role" in coagulation by connecting the two coagulation paths and cleaving prothrombin to thrombin, the latter acting to cleave "fibrinogen to fibrin, a fibrous/gelatinous coagulant."

95.     As explained by Straub, "[u]ncontrolled activation of the coagulant system or defective inhibition of the activation processes may cause formations of local thrombi or embolisms in vessels (arteries, veins) or in heart cavities," and the formation of thrombi may lead to a variety of thromboembolic disorders, including, specifically, stroke, pulmonary embolisms, and DVT.

96.     Straub thus teaches "a novel therapeutic approach for the treatment and prophylaxis of thromboembolic disorders has been described…[which] aims to inhibit factor Xa." Referring to the factor Xa inhibitors disclosed therein, including rivaroxaban, Straub teaches that the "novel substances for controlling disorders…have a wide therapeutic spectrum"

and are "suitable for a more efficient prophylaxis and/or treatment of thromboembolic disorders" than existing anticoagulants. Straub thus specifically discloses methods of treating thromboembolic disorders, including pulmonary emboli, DVT, and stroke, through oral administration of its factor Xa inhibitors.

97.     A POSA prior to January 31, 2005 would have been motivated to combine the teachings of Straub with the prior art references disclosing clinical administration of rivaroxaban to humans.

98.     Soon after the publication of Straub in August of 2003, researchers from the same company presented three posters on the safety and efficacy of rivaroxaban following administration to humans at the 45th Annual Conference of the American Society of Hematology in San Diego, California.

99.     Kubitza 1 teaches rivaroxaban, referred to as BAY 59-7939, as "an innovative, oral, direct Factor Xa inhibitor in development for the prevention and treatment of thromboembolic diseases."  A POSA would have known that BAY 59-7939 is rivaroxaban.

100.     As explained by the Kubitza abstracts, rivaroxaban exerts its antithrombotic effects through the inhibition of Factor Xa.  Kubitza 4 states that rivaroxaban "effectively inhibits thrombin generation via both intrinsic and extrinsic pathways."  Kubitza 1 concludes that oral administration of rivaroxaban "was safe and well tolerated in doses up to 30 mg bid," and Kubitza 2 notes that rivaroxaban "offers predictable anticoagulation with an excellent safety profile."

101.     A POSA would have selected rivaroxaban when looking for a treatment and/or prophylaxis for thromboembolic disorders.

### 2.      Once Daily Administration For Five Consecutive Days

102.      FDA-approved anticoagulants available before January 31, 2005 were administered once daily and were known to have short half-lives.  Enoxaparin (sold as Lovenox[®] and Clexane[®]) nadroparin, and dalteparin are a few examples.

103.      In discussing treatment regimens, Goldhaber discloses several dosing regimens of LMWHs that involve once-daily dosing, noting that these compounds are "subcutaneously administered" in order to "achieve an immediate anticoagulant effect."

104.      Straub explains that "[v]ery particular preference is given to oral administration [of the disclosed factor Xa inhibitors], this being a further advantage with respect to the prior-art therapy of thromboembolic disorders."  Straub further teaches that the compounds can be "converted in a known manner into the customary formulations, such as tablets," wherein the tablets may be administered at doses ranging from 0.01 to 50 mg/kg, "in particular, approximately 0.5 to 8 mg/kg, of body weight to achieve effective results."

105.      Because Straub notes that when administering higher dosage amounts, one may want to "divide these [dosages] into several individual administrations over the course of the day," a POSA would have understood that doses on the lower end of this preferred range do not need to be divided and may be given once daily.

106.      The prior art also taught administration of rivaroxaban once daily for at least five consecutive days.  In a multi-day dosing study evaluating the pharmacodynamics effects, pharmacokinetic effects, and safety of rivaroxaban in humans, Kubitza 1 describes the oral administration of 5 mg rivaroxaban once daily to humans for five consecutive days.

107.      A POSA would have understood that rivaroxaban was known to be safe and well tolerated in doses as low as 5 mg once daily and up to 30 mg bid.  Kubitza's multiple dose

escalation study administered rivaroxaban doses ranging from 5 mg once daily to 30 mg twice daily.  The results of the study showed that "[s]tandard safety parameters were unaffected" and that "no signs and symptoms of bleeding were observed across the dose range." Since rivaroxaban "did not affect bleeding at any dose," a POSA would understand this study to verify that multi-day dosing, including once-daily dosing of 5 mg rivaroxaban for five consecutive days, as well as twice-daily dosing of 30 mg rivaroxaban for five consecutive days, was safe.

108.    A POSA would also understand that multi-day dosing did not result in different pharmacodynamics effects.  Kubitza 1 and Kubitza 4 teach that a single dose of rivaroxaban from 5 mg-30 mg was effective in inhibiting thrombin generation.  Kubitza 1 and Kubitza 4 also teach that the relevant pharmacodynamics effects were still present 12 hours after administration of rivaroxaban (up to 24 hours after administration for 30 mg in some assays of thrombin inhibition).

109.    Kubitza 1 and Kubitza 4 also teach that administration of rivaroxaban was safe and well-tolerated at doses as low as 5 mg once-daily for at least five days and as high as 30 mg twice-daily.  Because Kubitza 1 teaches that rivaroxaban has a half-life of 4-6 hours, a POSA would understand that the anticoagulant pharmacodynamics effects were still observed after more than two half-lives, thus demonstrating that once-daily oral dosing of rivaroxaban exerts effects over multiple half-lives.  A POSA would have understood that once daily dosing of rivaroxaban for at least five consecutive days was safe and decreased thrombin generation in human subjects, thus decreasing the risk of thromboembolic incidents.

110.    Kubitza 4 also reports "dose-dependent inhibition of thrombin generation both in platelets and plasma, using either extrinsic (TF) or intrinsic (collagen) stimuli for platelet activation," noting that a "single 30 mg dose exerted a sustained effect in some assays of

thrombin generation for up to 24 hours." This sustained effect of the 30 mg dose of rivaroxaban is also shown in the table of data presented in Kubitza 4, which reports the endogenous thrombin potential (ETP), platelet-induced thrombin- generation time (PITT), and platelet-induced clotting time (PICT) measured 2 hours and 12 hours post-administration for 5 mg and 30 mg doses of rivaroxaban.

111.    For each of these measurements, thrombin generation inhibition as measured at 12 hours post-dose following administration of the 30 mg dose is comparable to that achieved by the 5 mg dose after 2 hours, thus the effect of the 30 mg dose of rivaroxaban at 24 hours is likely similar to that displayed by the 5 mg dose at 12 hours.

112.    A POSA would have had reason to administer rivaroxaban once daily because it was known that a single 30 mg dose exerted antithrombotic effects for up to 24 hours.

113.    Additionally, prior to January 31, 2005, a POSA would have known that it was routine to administer drugs with half-lives of less than 8-24 hours at higher doses to avoid multiple dosing per day if the therapeutic window permitted such administration.  Rivaroxaban was expected to have a therapeutic window wide enough to permit once-daily administration. Thus, it would have been obvious for a POSA to consider once-daily administration of rivaroxaban.

114.    Before 2005, it was well known that the pharmacokinetics of antithrombotics such as rivaroxaban would not dictate the clinically relevant dosing regiments.  For example, enoxaparin is an anticoagulant with a half-life similar to that of rivaroxaban.  The FDA approved enoxaparin for the treatment of thromboembolic disorders long before January 2005. Enoxaparin exhibits an elimination half-life of 4.5 hours after SC (subcutaneous) administration, yet was still approved as a once-daily treatment of thromboembolic disorders.

115.    A POSA would not view the SC mode of administration as sufficient cause to distinguish the teaching that a terminal half-life of 3-6 hours did not preclude once-daily administration of an anticoagulant for the prophylaxis and/or treatment of thromboembolic disorders.

116.    The reported pharmacokinetic parameters including the times to achieve maximum plasma anti-factor Xa activity (activity $T_{max}$), the terminal half-lives ($t_{1/2}$), and the durations of antithrombotic activities after SC administration of enoxaparin or dalteparin and oral administration of rivaroxaban were comparable.

117.    Because the pharmacokinetic parameters of enoxaparin and dalteparin were comparable to rivaroxaban, a POSA would have understood that orally administered rivaroxaban would achieve at least a similar drug exposure (i.e. AUC) and anticoagulant effect compared to SC administered enoxaparin or dalteparin.  Thus, a POSA would have had a reasonable expectation of success in treating thromboembolic disorders with once-daily rivaroxaban.

118.    A POSA would have had additional motivation to administer rivaroxaban once daily because once-daily dosing is generally preferred due to increased patient convenience and compliance.  A POSA would be aware that the larger the number of daily doses, the less patient compliance will be observed.  Therefore, once-daily dosing would be ideal given the likelihood of increased patient compliance.  This would provide additional motivation for once daily dosing of rivaroxaban.

119.    A POSA would have had a reasonable expectation of success in once daily administration of rivaroxaban for five consecutive days based on the general knowledge in the art in view of the teachings of Straub, Kubitza 1, Kubitza 2, Kubitza 3, and Kubitza 4.  This is

further supported by prior art anticoagulants which were successfully administered once-daily despite an elimination half-life of much less than 10 hours such as enoxaparin.

120. It was well known to those of ordinary skill in the art to administer anticoagulants for at least five consecutive days to safely and effectively prevent and treat thromboembolic disorders. It was also well known prior to 2005 that treatment of DVT and PE routinely lasts at least 3 months. Moreover, Goldhaber teaches that patients undergoing total hip replacement therapy received anticoagulant treatment routinely for 4-6 weeks.

121. Al-Yaseen similarly teaches the administration of dalteparin for "a minimum of 5 days[.]" As demonstrated by Al-Yaseen, the administration of anticoagulants like dalteparin "for 5-7 days for acute venous thromboembolism" was routine.

122. Yeager also teaches that the administration of UFH "for five to 10 days, followed by oral anticoagulation therapy for at least three months." Yeager also teaches that treatment of antithrombotic therapy for DVT using LMWHs "should include at least five days of treatment[.]"

123. Moonis similarly teaches that "effective anticoagulation…can be achieved in most cases within 5 to 7 days with once-daily dosing" of warfarin for prevention and treatment of stroke.

124. A person of ordinary skill in the art would have had good reason to administer rivaroxaban for at least 5 consecutive days in view of the disclosures in Straub and Kubitza 1, 2, and 4. Straub discloses that direct factor Xa inhibitors (including rivaroxaban) could be used to treat thromboembolic disorders such as pulmonary emboli, DVT, and stroke. Kubitza 1 discloses that rivaroxaban was administered for five consecutive days in the phase I trials of rivaroxaban.

125.    Prior to January 31, 2005, a POSA would know that methods of prophylactically and therapeutically treating serious or potentially serious thromboembolic disorders such as those recited in Straub often lasted for more than five days.

126.    Thus, prior to 2005, a POSA would have understood the importance of rapidly achieving antithrombotic efficacy as well as the routine treatment and prevention of thromboembolic disorders using once-daily dosing regimens that lasted for at least five consecutive days.

### 3.    Rapid-Release Tablet

127.    Prior to January 31, 2005, it was known that rivaroxaban can be administered as a tablet.  Specifically, it was known that rivaroxaban can be administered as a rapid-release tablet. Straub describes a conventional tablet that is an immediate/rapid-release tablet.

128.    Prior to January 31, 2005, it was known that immediate release tablet is the same as rapid release tablet.

129.    Kubitza 2 reports a rapid-release liquid formulation of rivaroxaban.  A POSA would have known that rivaroxaban was amenable to rapid-release formulation and solubilization.  Kubitza 2 also reports that a rapid-release rivaroxaban tablet had already been developed and was in use in the phase I trials reported in Kubitza 1.  It states that rivaroxaban "showed a rapid onset of action with maximal effects being observed after 2 hours."  A POSA would understand that these were rapid-release tablets because modified or extended release tablets would be modified to attain peak plasma concentration much later (*e.g.* > 5 hours).

130.    Tablet formulations provide a more reliable and accurate dosing and result in overall improved patient compliance.  They are easier to transport and keep track of than liquid oral dosage forms.  Thus, a POSA would have been motivated to make a rapid-release tablet of rivaroxaban and have a reasonable expectation of success in doing so.

27

131.    Furthermore, the tablets disclosed in Kubitza were rapid-release tablets of rivaroxaban.  However, even if one incorrectly identified the tablets as extended-release tablets, making rapid-release tablets was routine in the prior art before 2005.  Thus it would have been obvious to make a rapid-release oral tablet of rivaroxaban for the treatment of a thromboembolic disorder.

132.    The prior art teaches methods for formulating immediate/rapid-release oral tablets for low molecular weight anticoagulant thrombin inhibitors.  As explained by Forsman, these immediate/rapid-release tablets have utility "in the prophylaxis and / or treatment of thromboembolism."  This was consistent with other teachings in the art that immediate/rapid-release tablets were useful for the prophylaxis and/or treatment of thromboembolic disorders.

133.    Forsman notes that "conventional IR formulations" provided "fast dissolution of the drug…in acidic pH while markedly slower dissolution is obtained at more neutral pH."  Forsman reports that "[t]his variability in dissolution is not acceptable for safe, efficient and convenient therapy."

134.    Goldhaber teaches that the prophylaxis and therapy of thromboembolic disorders may require a rapid onset of action in order to "achieve adequate anticoagulation rapidly."

135.    Abrahmsén teaches for "treatment or prophylaxis of thrombosis, immediate release formulations may be necessary to ensure that a sufficient amount of drug is provided in plasma …to enable quick onset of action."

136.    A POSA seeking to develop a rapid-release tablet formulation of rivaroxaban would have had good reason to use Forsman's formulation to make an immediate/rapid-release tablet for rivaroxaban because Forsman teaches the use of this immediate/rapid-release

formulation for administering thrombin inhibitors for the prophylaxis and therapy of thromboembolisms without being pH dependent.

137.    The prior art teaches using rapid-release tablets to administer low molecular weight thrombin inhibitors for the prophylaxis and treatment of thromboembolic disorders because, for "treatment or prophylaxis of thrombosis, immediate release formulations may be necessary to ensure that a sufficient amount of drug is provided in plasma …to enable quick onset of action."

138.    Abrahmsén also discloses that rapid/immediate-release tablet formulations are "expected to be useful in those conditions where inhibition of thrombin is required, and/or conditions where anticoagulant therapy is indicated," including for "the therapeutic and/or prophylactic treatment of" the "[p]articular disease states…venous thrombosis (for example DVT) and pulmonary embolism…[and] thrombosis-based stroke."

139.    References describing prior art anticoagulants approved for once-daily SC dosing for prophylaxis and/or therapy of thromboembolic disorders confirmed a reasonable expectation of success for treating thromboembolic disorders via once-daily dosing of rapid-release tablets of rivaroxaban. For example, it was well known that enoxaparin was approved in a rapid-release subcutaneous dosage form.  Additionally, Lovenox is administered in once a day dosing regimens.

140.    Once-daily SC administration of enoxaparin supports once-daily administration of a rapid-release tablet of rivaroxaban because the time required to achieve peak factor Xa inhibition (activity $T_{max}$), the terminal elimination half-lives ($t_{1/2}$), and the durations of antithrombotic activities of enoxaparin and rivaroxaban were comparable.  For example, the enoxaparin label reports a plasma activity $T_{max}$ of 3-3.5 hours for SC dosing of 1.5 mg/kg

enoxaparin, and a $t_{1/2}$ of 4.5 hours for SC dosing of 40 mg of enoxaparin.  It also reports "significant anti-Factor Xa activity persists in plasma for about 12 hours" following a 40 mg SC once a day dose.

141.    Kubitza 1-4 reported similar results of oral administration of rivaroxaban.

142.    Thus, a POSA would have had motivation to administer a rapid-release tablet of rivaroxaban.  Making rapid-release tablets was well within the purview of a POSA and thus, a POSA would have had a reasonable expectation of success in making a rapid-release tablet of rivaroxaban.

### 4.    Treatment of Thromboembolic Disorders Consisting of Pulmonary Embolisms, Deep Vein Thromboses, and Stroke

143.    Prior to January 31, 2005, a POSA would know that anticoagulants, including factor Xa inhibitors, and specifically rivaroxaban, could be used to provide prevention and treatment of thromboembolic disorders including stroke, pulmonary embolism, and DVT.

144.    Abrahmsén confirms that a POSA would expect a reasonable likelihood of success in using a rapid-release tablet for therapy or prophylaxis of these conditions, teaching that its rapid-release tablet formulations of low molecular weight thrombin inhibitors are expected to be useful in pulmonary embolism, deep vein thrombosis, and stroke.

145.    It would have been obvious to a POSA prior to January 2005 to formulate a rapid-release tablet of rivaroxaban to be administered once daily for at least five consecutive days for the treatment of thromboembolic disorders including pulmonary embolism, DVT, and stroke.

### D.    Claims 2-4 of the '218 patent Are Also Invalid as Obvious Over the Prior Art

146.    Claims 2-4 depend from claim 1 and further specify the thromboembolic disorder as pulmonary embolism, deep vein thrombosis, and stroke, respectively.

30

147.     Prior to January 31, 2005, a POSA would have understood that rivaroxaban could be administered as described in claim 1 of the '218 patent for the prevention or treatment of thromboembolic disorders, including pulmonary embolism, deep vein thromboses, and stroke.

148.     A POSA would have understood that claims 2-4 of the '218 patent are invalid as obvious over the prior art.

### E.     Secondary Considerations

#### 1.     There is No Nexus

149.     Xarelto tablets are not rapid-release tablets, in accordance with the Court's claim construction because Xarelto does not have a Q value (30 minutes) of 75% using the USP release method apparatus 2 (paddle).

150.     The 10 mg, 15 mg, and 20 mg strengths of Xarelto all have a dissolution specification where Q is at least 80% at 15 minutes.  Because the Q value is at least 80% at 15 minutes for Xarelto, that necessarily means that Xarelto does not meet the claim limitation for rapid-release tablets (requiring a Q value of 75% at 30 minutes) as construed by the Court.

151.     Because Xarelto is not an embodiment of the claims of the '218 patent, there is no nexus between any secondary consideration regarding Xarelto and the claims of the '218 patent.

#### 2.     There is No Commercial Acquiescence

152.     Plaintiffs have not set forth any evidence that licensing supports an objective indicium for secondary considerations of nonobviousness.

153.     The collaborative development and licensing agreement ("CDL Agreement") was executed between Bayer Healthcare AG ("Bayer Healthcare") and Ortho-McNeil Pharmaceutical, Inc. ("Ortho-McNeil") effective October 1, 2005.

154.    Bayer Healthcare operated as a separate subsidiary of Bayer until January 1, 2016 at which point Bayer Healthcare was merged into Bayer AG.

155.    Ortho-McNeil is part of Janssen, and both are part of the Johnson & Johnson ("J&J") group of companies.

156.    Simultaneously with the execution of the CDL Agreement, the parties also executed the "USA Collaborative Development Agreement" and the "Co-Promotion Agreement."

157.    Generally, the CDL Agreement indicates that the collaboration between Bayer Healthcare and J&J on the worldwide development of the "Compound" and the commercialization of the "Product" in the U.S.  The "Compound" is defined as "Bay 59-7939" and "all salts, enantiomers, crystal structures, metabolites, and polymorphs."  The "Product" is defined as "a pharmaceutical composition containing the Compound and in (a) finished packaging and labeling as approved by the FDA or equivalent Governmental Authority for an Approved Indication (when referring to commercial product) and (b) primary packaging (when referring to clinical supplies or bulk product supply)."

158.    The CDL agreement further states that Bayer Healthcare had rights under the "BHC Patent Rights" and "BHC Know-How" with respect to the compound, and that J&J had significant experience in developing, marketing, promoting, and selling pharmaceutical products.

159.    BHC Patent Rights is defined as all patents and patent applications relating directly to the Compound and/or the Product in the U.S. controlled by Bayer Healthcare or its affiliates.  Schedule 1.16 to the CDL Agreement identifies at least five U.S. patent applications, and 159 foreign patents and patent applications that comprise the BHC Patent Rights.

160.    BHC Know-How is defined as all technical information and data controlled by Bayer Healthcare and its affiliates as of the effective date of the agreement relating to the Compound and/or Product, including composition of matter, formulations, dosing regimens, synthesis of the Compound and its utility in the "Field."  The Field is defined as all antithrombotic/anticoagulant human therapeutic uses, including, for example, venous thromboembolism (VTE), deep vein thrombosis (DVT), and pulmonary embolism (PE).

161.    J&J believed it could use this experience to make significant contributions to the successful development of the Compound and the successful commercialization of the Product in the U.S.

162.    Per the agreement Bayer Healthcare granted J&J a "Marketing License" and a "Development License," described as follows:

163.    Bayer Healthcare granted J&J an exclusive, non-transferable, royalty-bearing license under the BHC Patent Rights, BHC Know-How and BHC Future Rights to import, make, and sell the Product in the U.S.

164.    Development License. Bayer also granted J&J a non-exclusive, non-transferable, royalty-free license under the BHC Patent Rights, BHC Know-How, and BHC Future Rights to develop and use the Compound in the Field in accordance with the "Development Plan" or as approved by the "Joint Steering Committee" for independent development by J&J.  Bayer Healthcare would be entitled to royalties on any new indications developed independently by J&J if Bayer Healthcare paid J&J ████ of the development costs incurred by J&J with respect to the new indication.

165.     J&J also granted Bayer Healthcare a perpetual, worldwide, non-exclusive, royalty-free license to practice J&J's future rights and know-how with respect to the Compound and/or the Product.

166.     The agreement also contains a co-promotion clause where Bayer Healthcare had the right to co-promote the Product in the "Hospital" and "Specialty Market" in the U.S. during the period beginning upon the first filing of the NDA for the Product and ending upon the third anniversary of the Launch Date.

167.     Documentary evidence indicates that Bayer Healthcare exercised its right for limited co-promotion of Xarelto in the United States.  A Xarelto presentation states that Bayer Healthcare had "exclusive detailing of ▮▮ of hospitals."

168.     Per the agreement, J&J was to make an initial ▮▮▮▮▮ payment to Bayer Healthcare as well as various milestone and tiered royalty payments.  The agreement identifies fourteen milestones with payments ranging from ▮▮▮▮ to ▮▮▮▮ for achievement of each milestone.  Subsequent to launch of the Product, J&J agreed to pay Bayer Healthcare royalties ranging from ▮▮ to ▮▮ of net sales, with the percentage based upon the annual dollar volume of product sold.

169.     The parties also agreed to split development costs relating to the clinical and nonclinical development of the Product.  Bayer Healthcare was to pay for ▮▮ of development costs less than and equal to ▮▮▮▮.  The parties were to equally share development costs greater than ▮▮▮▮.

170.     Unless terminated earlier by either party, the license term is through the later of (a) the expiration of the last-to-expire of the BHC Patent Rights, BHC Future Patent Rights or

J&J Future Patent Rights in the U.S., or (b) the last to expire statutory marketing exclusivity period for any Product in the U.S. that is being commercialized pursuant to the CDL Agreement.

171.    Xarelto is based upon a compound discovered by Bayer, and commercialized under the CDL Agreement.

172.    On July 1, 2011, the FDA approved New Drug Application ("NDA") No. 022406 for 10 mg rivaroxaban oral tablets, marketed in the United States under the trade name Xarelto.

173.    On November 4, 2011, the FDA approved 15 mg and 20 mg rivaroxaban tablets.

174.    Xarelto rivaroxaban 2.5 mg tablets were approved on October 11, 2018.

175.    Several patents are currently listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") as allegedly covering Xarelto.  The patents covering Xarelto 10 mg, 15 mg, and 20 mg tablets are U.S. Patent Nos 7,157,456, 7,585,860, 7,592,339, 9,415,053, and 9,539,218.  According to the Orange Book, the Xarelto 2.5 mg tablet is covered by all of the aforementioned patents except the '218 patent.

176.    Plaintiffs claim that BIP is the assignee of the '218 patent, while Bayer AG is an exclusive licensee and Janssen is an exclusive sublicensee under the '218 patent.

177.    Because the CDL Agreement is directed towards Xarelto and Xarelto does not meet the claim limitations of the '218 patent, there is no nexus between the CDL Agreement and the '218 patent.

178.    Even if a nexus was present, the CDL Agreement fails to provide any recognition or apportionment to the '218 patent.

179.    The CDL Agreement transferred various rights to Janssen, including rights to certain patents and patent applications, know-how, and certain future patent rights and know-

how (as defined in the CDL Agreement).  In exchange for the license, Bayer is to receive

royalties from Janssen on net sales of rivaroxaban products in the U.S.

180.    The CDL Agreement, however, does not apportion or allocate any royalties paid

for the various rights granted in the agreement.  The CDL Agreement does not apportion or

allocate any royalties paid to the Asserted Claims of the '218 patent or any of the many patents

and patent applications covered by the CDL Agreement as compared to any of the other assets

described in the CDL Agreement (e.g., BHC Know-How as defined in the agreement).

181.    Even with respect to the patents and patent applications licensed in the agreement,

the CDL Agreement does not provide any indication of the value of the '218 Patent in relation to

the other patents and patent applications licensed in the agreement.

182.    The '218 patent is not the patent responsible for the Xarelto drug product itself;

and, therefore, has less value with respect to the CDL Agreement given that the stated objective

of the CDL Agreement is "to collaborate on the worldwide development of Compound

[rivaroxaban] and the commercialization of the Product in the USA."

183.    There is no evidence to indicate, nor have the Plaintiffs presented an analysis that

shows that the CDL Agreement arose out of a recognition and acceptance of the '218 patent.

184.    The '218 patent had not been issued as of the date of the CDL Agreement.  The

CDL Agreement was made effective October 1, 2005 whereas the '218 patent only was issued on

January 10, 2017.  The application for the '218 patent was filed on January 19, 2006, which is

after the effective date of the CDL Agreement.

185.    The BHC Patent Rights were comprised of at least five U.S. patent applications,

and 159 foreign patents and patent applications.  The patent application relating to the '218

patent was not one of the five patent applications explicitly identified under the BHC Patent Rights.

186.    As the CDL Agreement indicates, not only is it a license agreement for the intellectual property therein, it is a collaborative development agreement as well. Bayer was to make and has made contributions to the development of products developed under the agreement.

187.    For example, Bayer was to split development costs with J&J/Janssen. In addition, Bayer has contributed to the co-promotion of Xarelto in the U.S.  As a result, not only would an apportionment be necessary to determine what, if any, portion of the royalties should be attributable to the '218 patent amongst the other licensed intellectual property, there also would need to be an accounting of the economic benefits attributable to the collaborative development stipulated in the CDL Agreement.

188.    There is no evidence of any analyses that take into account the collaborative development portion of this agreement.  Therefore, because the CDL Agreement provides significant economic benefits independent of the '218 patent, simply claiming this CDL Agreement is evidence of commercial acquiescence with respect to the '218 patent is inappropriate.

189.    Since Plaintiffs have provided no apportionment to show the economic value, if any, that can be associated with the '218 patent, there is no evidence of a nexus between the CDL Agreement and the '218 patent.

### 3.    There are No Unexpected Results

190.    There is no evidence that the results of the alleged invention of the '218 patent were unexpected as compared to the closest prior art.

191. The teachings of the '218 patent confirm what was known in the prior art and was therefore not unexpected. In Example 1, a "dose guiding study" for a direct factor Xa inhibitor was performed to assess the safety, tolerability, and efficacy of the inhibitor "at different oral doses (bid and od) compared with subcutaneously administered enoxaparin 40 mg in the prevention of venous thromboembolism."

192. Example 1 reports that 642 individuals undergoing elective primary total hip replacement surgery were enrolled in an open-label dose-escalating study and received either 40 mg enoxaparin once daily by subcutaneous injection, or rivaroxaban rapid-release tablets at one of six doses, once or twice daily, with a treatment duration of 7-9 days. The reduction of the combined number of deep vein thromboses, non-fatal pulmonary emboli, and deaths from all causes were reported for each treatment group as the primary efficacy endpoint, and major bleeding observed within 2 days of drug intake was reported as the main safety endpoint.

193. The '218 patent reports that 7-9 days of treatment with rivaroxaban in a 12-fold dose range of 2.5-30 mg bid prevented venous thromboembolism, "confirming the proof-of-principle of [rivaroxaban] in this indication." The '218 patent reports primary efficacy endpoint rates for this same dose range (23.8-10.2%) that were comparable to that observed for enoxaparin (16.8%).

194. The '218 patent states that the primary composite endpoint comprising DVT, PE, and death "was dose-dependent in the range from 2.5 to 20 mg bid," but Table 1-1 of the '218 patent reports that venous thromboembolism incidence nominally increased when the dose was doubled from 2.5 mg bid to 5 mg bid and then nominally decreased at 10 mg bid.

195.    Table 1-1 also reports a nominal venous thromboembolism incidence when the dose was increased from 20 mg bid to 30 mg bid, but these results are both less than the reported incidence at 2.5, 5, and 10 mg twice-daily.

196.    A POSA would conclude these results did not indicate a dose-dependent effect.

197.    The '218 patent does not report any data for once daily administration of any dose of rivaroxaban other than 30 mg. The '218 patent states that once-daily administration at 30 mg "is surprisingly perfect in line with bid administration."  However, there is nothing surprising in the findings in the '218 patent because Kubitza 3 had already demonstrated the efficacy of rivaroxaban over the same dosage range reported in the '218 patent.

198.    Kubitza 3 reports that factor Xa inhibition activity of rivaroxaban was maintained for 8-12 hours at the 5 mg dose and for ~12 hours at the 10, 20, and 30 mg doses.  Higher doses, and twice-daily administration of those higher doses of rivaroxaban, did not significantly extend the duration of factor Xa activity as compared to the 5 mg once-daily dose.  A POSA would have reasonably expected that the difference in long-term anticoagulation efficacy would only be marginal between cohorts receiving rivaroxaban once-daily and twice-daily if at all, particularly at a dose as high as 30 mg.  Therefore, the results shown in the '218 patent confirmed what was already known in the art as of January 2005.

199.    No statistical analysis of the primary efficacy endpoint numbers was provided in the patent and there is no reason to suspect that the efficacy results of any of the doses were statistically significantly different from any other doses.  Since Table 1-1 fails to include error or variation information, it is impossible to conclude that any of the nominal differences in incidence rates (including between 10 mg bid and 20 mg bid) are significantly different, as opposed to being the result of chance variation.

200.    The data in Table 1-1 confirms that doses of rivaroxaban as low as 2.5 mg bid and as high as 30 mg bid were comparably effective to the standard prior art enoxaparin dose, but does not demonstrate that any nominal differences existed between the various rivaroxaban doses.

201.    As shown in Table 1-1 of the patent, the incidence rate nominally increased between 20 mg bid and 30 mg bid administration, supporting the conclusion that the nominal differences in results reflect no more than chance variation.  Because any nominal differences between 10 mg bid and 20 mg bid cannot be attributed to anything other than chance variation, it cannot be said that the incidence rate of the 30 mg once-daily dose falling within this non-significant, but nominally-different range was "surprisingly perfect in line with bid administration."

202.    The '218 patent data demonstrates there is no significant difference between once-daily and twice-daily administration of the same dose, meaning that it is improper to double the bid dose to compare its total daily dose with a dose that was administered once daily.  In fact, in Table 1-1 it can be seen that administration of 30 mg once daily resulted in an incidence rate (including DVT, PE, and death) of 15.1% whereas administration of 30 mg twice daily resulted in an incidence rate of 17.4%.

203.    The incidence rates for both of the 30 mg doses (once and twice daily) are very similar (15.1% and 17.4%, respectively) to the incidence rate observed for the standard of care control (40 mg once-daily administration of enoxaparin) of 16.8. The '218 patent even states that the "above data clearly demonstrate[s] the efficacy of [once-daily] administration…and in the range of standard therapy."

204.     Because 30 mg rivaroxaban was the only once-daily administration tested and because enoxaparin was the only comparator, the '218 patent necessarily concluded that the 15.1% incidence rate was comparable to the 16.8% incidence rate of enoxaparin and was therefore not unexpected or surprising.  Twice daily administration of rivaroxaban did not materially affect efficacy.  This result was not unexpected.

205.     Additionally, the data presented in Table 1-1 does not demonstrate a linear relationship between the daily dosage of rivaroxaban that was administered and the incidence rate as measured by the composite endpoint described in the '218 patent specification.  For example, when increasing the rivaroxaban dosing from 2.5 to 5 mg twice daily, the incidence rate actually increased.  The same is true for increasing dosing from 20 mg to 30 mg twice daily.  Thus, the claim that it is surprising that 30 mg once daily allegedly resulted in an incidence rate between that of the administration of 10 mg twice daily and 20 mg twice daily, is not supported by the data of Table 1-1.  The data does not demonstrate that there is a difference between any of the doses. In other words, the arguments of unexpected results merely reflect the fact that the data fails to prove any dose response effect within the tested dose range.

206.     Bayer provided additional data during its EPO prosecution of its foreign related patent that was excluded from the '218 patent.  This data, presented in Table 1 of the Patent Owner Response in the EPO, was from clinical trials that "compared the claimed once-daily dosage regimen of rivaroxaban to the respective standard of care treatment with enoxaparin or warfarin." The primary efficacy endpoint presented in this table is the same composite endpoint discussed in the '218 patent, consisting of incidences of proximal deep vein thromboses, non-fatal pulmonary emboli, and death from all causes including pulmonary emboli.

207.     While the values in this table are not the same as those in the patent, the data

presented by the patent owner in the EPO proceeding provide sample sizes and 95% confidence

intervals that permit statistical evaluation of the data, unlike the data of the '218 patent

specification.  Table 1 from Bayer's brief is reproduced below.

**TABLE 1**

Efficacy end points (incidence of any deep vein thrombosis, nonfatal pulmonary embolism, and all-cause death)

ODIXa-OD-HIP (PP Population; n=618)

| Total daily dose | Rivaroxaban OD | | | | | | Enoxaparin |
|---|---|---|---|---|---|---|---|
| | 5 mg (n = 94) | 10 mg (n = 113) | 20 mg (n = 106) | 30 mg (n = 104) | 40 mg (n = 94) | 60 mg (n/a) | 40 mg (n = 107) |
| Primary efficacy endpoint, $n$ (%) | 14 (14.9) | 12 (10.6) | 9 (8.5) | 14 (13.5) | 6 (6.4) | - | 27 (25.2) |
| 95% confidence interval (%) | 8.4, 23.7 | 5.6, 17.8 | 4.0, 15.5 | 7.6, 21.8 | 2.4, 13.4 | - | 17.3, 34.6 |

ODIXa-HIP2 (PP Population; n=548)

| Total daily dose | Rivaroxaban BID | | | | | | Enoxaparin |
|---|---|---|---|---|---|---|---|
| | 5 mg (n = 104) | 10 mg (n = 109) | 20 mg (n = 101) | 30 mg (n/a) | 40 mg (n = 99) | 60 mg (n = 29) | 40 mg (n = 106) |
| Primary efficacy endpoint, $n$ (%) | 16 (15.4) | 15 (13.8) | 12 (11.9) | - | 18 (18.2) | 2 (6.9) | 18 (17.0) |
| 95% confidence interval (%) | 9.1, 23.8 | 7.9, 21.7 | 6.3, 19.8 | - | 11.1, 27.2 | 0.8, 22.8 | 10.4, 25.5 |

208.     The upper half of the table addresses once-daily administration of 5 mg, 10 mg,

20 mg, 30 mg and 40 mg of rivaroxaban compared to once-daily administration of 40 mg

enoxaparin.  The lower half of the table addressed twice-daily administration of 5 mg, 10 mg, 20

mg, 40 mg, and 60 mg of rivaroxaban compared to once-daily administration of 40 mg

enoxaparin.

209.     Regarding the data in both of the studies in Table 1 above, many of the nominal

differences in the primary efficacy endpoints observed among the different doses of rivaroxaban

were not shown to be statistically significant.  The mean primary efficacy endpoint values for the

doses of rivaroxaban are almost all within the 95% confidence intervals of one another in each

respective study.  This patient population is so small that the confidence interval is literally large

enough to encompass every other dose in the twice-daily dosing study, as well as every dose in the once-daily dosing study.

210.    The graph below depicts the data from Table 1 from the EPO Patentee's Response.  It shows the primary efficacy endpoint as measured at each dose for both the once-daily (OD Mean, red solid line) and twice-daily (BID Mean, blue solid lines) studies.  The dashed lines on the graph indicate the top and bottom of the 95% confidence interval for each dose from each of the two studies.



211.    The exact same treatment (standard of care administration of 40 mg enoxaparin once daily, shown in Table 1, above) resulted in a primary efficacy endpoint incidence rate of 25% in one study but 17% in another study.  An 8% difference in the primary efficacy endpoint rate would not be expected to be necessarily a result of a difference in dosing, and suggests that even a large nominal variation in incidence rate does not reflect an actual dose-response effect.  I

note that the lower 95% confidence interval in the od (upper) study for enoxaparin (17.3) was almost equal the mean for enoxaparin in the second (lower) study (18.0).

212.    The nominal difference in incidence rate between any dose within the od or bid regimens, respectively, or between the od and bid regimens, are comparable to the nominal difference observed between the identical enoxaparin control group in each study.  This further confirms that the dose-response effect asserted by the patentee is not supported by the data.

213.    Thus, the finding that 30 mg once-daily dosing was in line with bid dosing merely reflects the fact that Bayer's early clinical studies failed to establish a significant dose-response effect and was therefore not an unexpected result.

214.    Certain results from the rivaroxaban Phase I studies were published prior to the priority date of the '218 patent and thus inform a POSA's expectation.  These published results from the rivaroxaban Phase I studies confirm that rivaroxaban was safe and well tolerated in doses up to 80mg and that once-daily dosing was as effective as twice-daily ("bid") dosing.

215.    Straub and Kubitza 1, 2, 3, and 4 taught a broad therapeutic range of rivaroxaban. This would have given a POSA reason to expect that once-daily administration of the direct factor Xa inhibitor rivaroxaban would successfully provide prophylaxis and therapy for thromboembolic disorders.

216.    Plaintiffs erroneously assume a POSA would think the half-life of rivaroxaban in healthy patients from a Phase I study would be as high as it is in predominantly older patients undergoing hip replacement surgery.  A POSA would have known before January 2005 that half-life of compounds are generally longer in older patients.  It was also known that older patients, on average as a group, are at greater risk of thromboembolic disorders, than younger patients. For example, Lowe discloses that it was well known that "[t]he most important risk predictor for

both venous and arterial thrombosis is age: the increases with age in incidence and prevalence of both conditions are exponential in both women and men."  Even Plaintiffs conceded during the prosecution of the '218 patent that the half-life of rivaroxaban is "11-13 hours…in elderly patients, which is a significant group of the patients that receive rivaroxaban."

217.    The '218 patent reports clinical trial results of hip replacement patients receiving rivaroxaban, and reports that the age of the subjects was as old as 92.  When the population is instead focused on older patients in whom the half-life would be expected to be higher, the results of once-daily dosing were certainly not surprising.  Notably, the claims of the '218 patent are not limited to administering rivaroxaban to non-geriatric patients.  Even if they were, the safety and efficacy of once-daily dosing of rivaroxaban reported in the '218 patent would not have been surprising to a POSA before January 2005.

### 4.    The Prior Art Did Not Teach Away from the Asserted Claims

218.    With respect to drugs with half lives between 30 minutes and 8 hours, the prior art did not teach away from the use of once daily dosing ("od") rather than twice daily dosing ("bid").

219.    The reference Clinical Pharmacokinetics taught that:

> [T]he major considerations are therapeutic index and convenience of dosing. A drug with a high therapeutic index need only be administered once every 1 to 3 half-lives, or even less frequently. A drug with a low therapeutic index must be given approximately every half-life, or more frequently, or be given by infusion.

220.    Kubitza 1-4 disclosed that rivaroxaban exhibits a high therapeutic index.  The therapeutic index is a measure of the therapeutic window that is the range of concentrations higher than the minimum concentration at which the drug is active and lower than the minimum concentration at which the drug shows undesired and/or toxic effects.  Figure 7-6, reproduced

45

below from Clinical Pharmacokinetics illustrates that a drug with a high therapeutic index (or

wide therapeutic window) can be administered less frequently than a drug with a lower

therapeutic index (or narrower therapeutic window).  Thus, higher concentrations of the drug

within the therapeutic window can be administered less frequently and are, not surprisingly,

effective and safe.



Fig. 7–6. From a kinetic perspective, the impact of a missed dose is greater the larger the dose and the less frequent the administration. Consider steady-state multi-dose conditions for a drug with a therapeutic window of 7 to 20 mg/L (color screened), a volume of distribution of 23.1 L, and a half-life of 15.9 hr. **Panel A:** When a 300-mg dose is given once daily to maintain therapeutic concentrations, a missed dose results in a trough concentration of 2.5 mg/L, a value well below the lower limit of the therapeutic window. **Panel B:** When a 100-mg dose is given every 8 hr (colored long dashed line), the lowest concentration achieved after a single missed dose is 7.3 mg/L, a value within the therapeutic concentration range. If 3 consecutive doses are missed (colored short-dashed line) the minimum concentration (3.7 mg/L) is still above that observed when a single daily dose of 300-mg is missed. The figure was adapted from concepts presented by Levy G., A pharmacokinetic perspective on medicament noncompliance. Clin. Pharmacol. Ther. 54:242-244, 1993.

221.    A POSA would not have solely focused on elimination half-life in selecting a

dosing interval, but would have evaluated the compound's therapeutic index.  For rivaroxaban,

Kubitza 1 discloses the elimination half-life to be 3-6 hours, but also teaches that when a single 5

mg dose of rivaroxaban was administered "[r]elevant changes in the PD parameters were still

present after 12 hours."

222.    Thus, a POSA would not look at the half-life of a drug and automatically

conclude that the only appropriate dosing would be double the half-life.  Similarly, a POSA

46

would not be surprised to learn that a drug was safe and effective at a dosage interval greater than twice the half-life.

223.     Kubitza 1, 2, and 4 report rivaroxaban's wide therapeutic window.  Kubitza 2 reports that rivaroxaban "was safe and well tolerated over a wide range of oral doses."  This is evidenced by the fact that single oral doses of up to 80 mg and doses of 30 mg twice a day for 5 consecutive days were safe, well tolerated, and did not cause any elevated bleeding risks. This data indicates that rivaroxaban had a wide enough therapeutic window to permit safe and effective once-daily dosing.

224.     Kubitza 4 also teaches that "[a] single 30 mg dose exerted a sustained effect in some assays of thrombin generation for up to 24 hours."

225.     Because the therapeutic window of rivaroxaban was known in the prior art, a POSA would have expected once-daily dosing to be a viable option rather than teaching away from the use of once-daily dosing.

226.     As noted in the European Patent Office's decision revoking EP 1,845,961 ('961 patent"), the 30 mg dose would have been expected to have greater pharmacodynamics outcome values at 22 hours and thus known to inhibit thrombin generation for upwards of 24 hours, much longer than its half-life.

227.     Dr. Misselwitz's declaration was submitted in the EPO proceedings regarding the '961 patent. The EPO revoked the '961 patent in light of the prior art.

228.     The prior art relied upon by the EPO in making its decision included the Kubitza and Harder references – including the same Harder PO078 Abstract that Bayer cited as why they pursued once daily dosing.

229.     Dr. Misselwitz's opinion was given little to no weight in the EPO's decision.

230.    With respect to the therapeutic index, Kubitza 2 confirms that rivaroxaban "was safe and well tolerated over a wide range of oral doses," as demonstrated by the fact that single oral doses of up to 85 mg and doses of 30 mg bid for 5 consecutive days were safe, well tolerated, and did not cause any elevated bleeding risks.  These data indicate that rivaroxaban had a wide enough therapeutic window to permit safe and effective once-daily dosing, even if the pharmacokinetics directly drove the pharmacodynamics.  It was therefore not surprising that the 30 mg once-daily dose of rivaroxaban discussed in the '218 patent was safe and effective in reducing the risk for venous thromboembolism and the prior art did not teach away from this disclosure.

231.    Eriksson confirms the observations disclosed in Kubitza 1-4 (in particular Kubitza 4) that once daily dosing would be effective. Eriksson confirms that efficacy of once-daily administration of rivaroxaban for the treatment of thromboembolic disorders would not be surprising to a POSA in view of the data published in Kubitza 1-4 and did not teach away from the alleged invention.

232.    Moreover, prior to 2005, a POSA would have known that ximelagatran caused an increase in liver enzymes that indicated a potential for causing liver toxicity.  The level of liver toxicity for ximelagatran was such that a POSA would not consider it to have a wide therapeutic index in the same way that rivaroxaban did.  Thus, dosing schedules used with ximelagatran do not demonstrate that rivaroxaban would not be amenable to once-daily dosing.

233.    The prior art as of January 2005 teaches that low molecular weight heparins ("LMWH") with half-lives of less than 10 hours had been routinely administered once daily and thus does not teach away from once daily dosing.  Those LMWHs were reported to be safe and effective for prophylaxis and therapy of thromboembolic disorders, including through once-daily

dosing.  For example, Bueller teaches that LMWHs "can be administered SC once or twice daily" for the initial treatment of deep vein thrombosis.  Bueller further teaches that once-daily administration of LMWHs (*e.g.*, enoxaparin and nadroparin) was "as effective and safe as" twice-daily dosing.

234.    Enoxaparin, nadroparin, and dalteparin which are all LMWHs each provide an example that rivaroxaban's half-life would be safe and effective at once-daily dosing.  While other anticoagulants with a half-life lower than 10 hours may be administered at certain doses twice daily, i.e. ximelagatran.  However, a decision to administer a particular anticoagulant twice-daily, even if attributed to the short half-life of that drug, does not preclude once-daily administration of anticoagulants with similar half-lives, as demonstrated by enoxaparin, nadroparin, and dalteparin.  The most important consideration when determining a dosing regimen is the therapeutic window, not solely the half-life.

235.    While LMWHs are different classes of compounds than factor Xa inhibitors, that does not mean that the knowledge surrounding LMWHs cannot inform a POSA's opinion regarding the performance of a factor Xa inhibitor, especially since LMWHs display anti-Xa activity.  A POSA would note the similarities between LMWHs such as enoxaparin and rivaroxaban, namely: (1) similar half-lives; (2) both anticoagulants; (3) both indicated for the treatment and prevention of DVT and PE; and (4) the '218 patent compares the efficacy of multiple rivaroxaban doses to the standard of care, enoxaparin.  These are all fair comparisons to make and would inform a POSA's opinion regarding the dosing interval of rivaroxaban.

236.    Martineau teaches that nadroparin and enoxaparin exhibit half-lives of approximately 2.2-3.5 hours and 2.2-6.0 hours, respectively, which are very similar to rivaroxaban.

237.    Enoxaparin, which has a half-life of 2.2-6 hours, was recommended to be administered once-daily for the treatment of pulmonary embolisms, DVT, and stroke for at least five consecutive days.  The Lovenox Label reports that enoxaparin and rivaroxaban had similar $T_{max}$ values (2.5-4 vs. 2 hours), and Martineau reports that enoxaparin and rivaroxaban have similar half-lives (2.2-6.0 vs. 3-6 hours) and bioavailabilities ($\geq$90%).

238.    With respect to nadroparin, Ageno teaches that "[f]rom pharmacokinetic data it has been observed that therapeutic anti-Xa levels could be achieved over 24 h when LMWHs are administered once daily."  In one controlled study "once daily nadroparin was shown to have equal efficacy and safety as twice daily nadroparin."  As noted above, nadroparin's half-life was reported to be 2.2-3.5 hours.

239.    As another example, the LMWH dalteparin was known to have a half-life of 3-5 hours and was approved for once-daily administration for treatment of thromboembolic disorders as disclosed by Al-Yaseen and the Fragmin Label. The prior art therefore did not teach away from once daily dosing for similar drugs used for the same indications with similar half-lives and bioavailabilities.

240.    Rivaroxaban and LMWHs like enoxaparin, nadroparin, and dalteparin are all anticoagulants possessing anti-Xa activity.  Thus, a POSA would recognize that these examples are instructive when looking at half-life and once-daily dosing of rivaroxaban.  These similarities demonstrate that once daily dosing may be employed in a rapid-release, non-extended release, dosage form even when the half-life of the drug is less than 10 hours, and as low as 3 hours.

241.    These examples also demonstrate that the advantages of once-daily dosing were sufficient to justify using a dose that was larger than the minimum effective dose.  When a drug is safe and effective over a larger dose range, a POSA would not constrain the dosing regimen to

the minimum effective dose multiple times per day.  Kubitza 1 and 2 confirm that one could safely administer rivaroxaban at doses as high as 80 mg per day (Kubitza 2) and 30 mg twice daily (Kubitza 1).  This demonstrates that a POSA would not have constrained rivaroxaban's dosing regimen to administering a minimum effective dose multiple times per day, but instead that once-daily dosing was an obvious option.

242.    A POSA would recognize that the half-lives reported for enoxaparin (4.5 to 7 hrs) and dalteparin (3 to 5 hrs) were obtained following subcutaneous administration of these drugs. The half-life already takes into consideration the route of administration and thus there is no distinction drawn between subcutaneous administration versus oral administration when comparing half-lives.

243.    The terminal half-life reported for a drug in a dosage form is the slowest step in the drug's pharmacokinetics as disclosed in Ronfeld:

> The term 'flip-flop model' has been used recently to illustrate the nonuniqueness of any concentration-time curve believed to describe first-order input and disposition from a one-compartment pharmacokinetic model, since the slow rate constant may be attributed to *either* absorption or elimination and the fast rate constant the alternate.

244.    A POSA would recognize that for these drugs, which are administered subcutaneously, the potential slow absorption is already considered in the half-lives reported. The slow absorption of subcutaneous administration is comparable to the slow absorption of oral administration.

245.    The label for Fragmin reports "Following intravenous doses of 40 and 60 IU/kg, mean terminal half-lives were 2.1 ± 0.3 and 2.3 ± 0.4 hours, respectively.  Longer apparent terminal half-lives (3 to 5 hrs) are observed following s.c. dosing, possibly due to delayed absorption."

246.     The half-lives of the drugs a POSA would consider—enoxaparin, nadroparin and dalteparin—were all determined after subcutaneous administration, and a POSA would recognize that the half-life already takes into account the route of administration and thus the half-lives can be correctly compared to one another even if one was after subcutaneous administration and one was after oral administration.

247.     Also, the determination of the half-lives of enoxaparin and dalteparin were based on their anti-Xa activity and thus any attempt to disregard the importance of LMWHs just because they are not classified as factor-Xa inhibitors fails because both rivaroxaban and LMWH half lives are measured using the same activity.

### 5.     There Is No Evidence of Skepticism That Once-Daily Dosing of Rivaroxaban Would Be Effective

248.     Plaintiffs have failed to provide evidence of skepticism that once-daily dosing of rivaroxaban would be effective.  Plaintiffs failed to provide any reference or document that evidences such skepticism.

249.     A POSA would have found it to routine to test a once-daily administration of a drug to determine whether once-daily administration can be as effective as twice-daily or three times a day administration.  A POSA would recognize that once-daily administration can increase patient compliance.

## IV.   CLAIMS 1-4 OF THE '218 PATENT ARE INVALID UNDER 35 U.S.C. § 112 FOR LACK OF WRITTEN DESCRIPTION

250.     Claims 1-4 of the '218 patent lack sufficient written description as required by 35 U.S.C. §112.

251.     Each claim requires a "rapid-release tablet."

252.     Neither the specification nor the prosecution history of the '218 patent, however, describes how to formulate a rapid-release tablet according to the Court's construction of that term.

253.     The specification of the '218 patent does not describe the parameters that define the Q value.

254.     The specification of the '218 patent does not describe what the USP is or what section of the USP is referenced by the definition.

255.     The specification of the '218 patent does not describe a dissolution procedure that would result in a rapid-release tablet with a dissolution profile using the paddle method of 75% at 30 minutes.

256.     There are no examples in the specification of the '218 patent of how to formulate a rapid-release tablet.

257.     There are no formulation examples of any kind in the specification of the '218 patent.

258.     Numerous variables affect dissolution of a rapid-release tablet of rivaroxaban including pH, solubility, and stability, but the '218 patent does not describe any of these variables with respect to how to achieve a rapid-release tablet.

259.     A POSA would know that tablets typically include excipients such as fillers (diluents), disintegrants, solution binders, dry binders, glidants, lubricants, or antiadherents, yet the '218 patent provides no description whatsoever of the excipients to be used in a rapid-release formulation or what amount is to be used.

260.    A POSA would know that tablets typically are manufactured using processes such as wet granulation, dry granulation, melt granulation, or direct compression; however, the '218 patent fails to describe any manufacturing method for preparing the rapid-release tablets.

261.    The specification of the '218 patent refers to PCT/04/01289 as a reference that describes the preparation of such rapid-release tablets; however, PCT/04/01289 does not exist.

262.    Plaintiffs contend that the reference to PCT/04/01289 is a typographical error and that the correct citation is PCT/04/012897; however, even if this reference were considered, it too fails to disclose a rapid-release tablet with a dissolution profile using the paddle method of 75% at 30 minutes.

263.    A POSA reviewing the '218 patent and its reference to PCT/04/01289 would not know how to locate PCT/04/012897 instead.

264.    The specification of the '218 patent states that "[p]reparation of such tablets is for example described in PCT/04/01289, whose disclosure is hereby included by way of reference."

265.    Claims 1-4 lack sufficient written description because there is no description of any rapid-release tablet that has a Q value (30 minutes) of 75%.

## V.    REMEDIES

266.    Plaintiffs have not carried their burden of proving infringement, and Mylan is entitled to a declaration that claims 1-4 of the '218 patent are not infringed by Mylan's ANDA Products.

267.    Mylan is entitled to a declaration that claims 1-4 of the '218 patent are invalid and cannot be infringed as a matter of law.

268.    Mylan is entitled to an award of its costs and attorneys' fees and any further relief as the Court may deem proper.

269.    Plaintiffs have not carried their burden of proving an exceptional case pursuant to 35 U.S.C. § 285.

EXHIBIT 4

## EXHIBIT 4

## PLAINTIFFS' STATEMENT OF CONTESTED ISSUES OF LAW

## TABLE OF CONTENTS

I.  INFRINGEMENT..................................................................................................2

   A.  Infringement Analysis..............................................................................2

   B.  Infringement Under the Doctrine of Equivalents.....................................4

   C.  Induced and Contributory Infringement ..................................................5

II.  VALIDITY ...........................................................................................................6

   A.  The '218 Patent Is Not Invalid for Obviousness.....................................6

      1.  Defendants Bear the Burden of Proving Obviousness by Clear and
          Convincing Evidence ....................................................................6

      2.  The Legal Standard for Obviousness.............................................7

      3.  The Person of Ordinary Skill in the Art......................................11

      4.  The Scope and Content of the Prior Art.......................................12

      5.  The Differences Between the Invention and the Prior Art .........13

      6.  Objective Indicia of Nonobviousness ..........................................15

   B.  WRITTEN DESCRIPTION.....................................................................18

III.  REMEDIES.........................................................................................................19

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341 (Fed. Cir. 2008)................................................8, 9, 10

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) ........................................................................................................................2

*Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272 (Fed. Cir. 2000)........................2

*Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308 (Fed. Cir. 1999)....................................................11

*Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir. 1984) ..........................7

*Am-Pro Protective Agency, Inc. v. U.S.*, 281 F.3d 1234 (Fed. Cir. 2002) ......................................6

*Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034 (Fed. Cir. 2016)........................................14, 15

*Application of Eltgroth*, 57 C.C.P.A. 833 (1970) ..........................................................................18

*Arctic Cat Inc. v. Bombardier Recreational Prod. Inc.*, 876 F.3d 1350 (Fed. Cir. 2017) ........................................................................................................................13

*Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc)........................18

*AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042 (Fed. Cir. 2010)...................................................5

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F. 2d 443 (Fed. Cir. 1986) ........................................................................................................................13

*Biovail Corp. Int'l. v. Andrx Pharms., Inc.*, 239 F.3d 1297 (Fed. Cir. 2001)................................2

*Bone Care Int'l, L.L.C. v. Roxane Labs., Inc.*, No. 09-CV-285 GMS, 2012 WL 2126896 (D. Del. June 11, 2012) ..............................................................................5

*Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130 (Fed. Cir. 1995) ...........................19

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc*, 752 F.3d 967 (Fed. Cir. 2014)...................14

*Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331 (Fed. Cir. 2009) ............................................2

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085 (Fed. Cir. 1998) ......................6

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371 (Fed. Cir. 2004) ........................................................................................................................17

*Catalina Marketing Int'l v. Coolsavings.com*, 289 F. 3d 801 (Fed. Cir. 2002)..............................4

*Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360 (Fed. Cir. 2019)..........................................18

*Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365 (Fed. Cir. 2006)....................................................2

*Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308 (Fed. Cir. 2009) ...............................................................................................................4

*Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254 (Fed. Cir. 2007) ............................................11

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1988) ...............................................................................................................16

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009) ...............................................................................................................14

*Eisai Co. v. Dr. Reddy's Laboratories, Ltd.*, 533 F.3d 1353 (Fed. Cir. 2008) ...............................8

*Eli Lilly & Co. v. Sicor Pharms., Inc.*, 705 F. Supp. 2d 971 (S.D. Ind. 2010) ............................16

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357 (Fed. Cir. 2017) ...............................................................................................................5

*Eli Lilly and Co. v. Teva Pharmaceuticals USA, Inc.*, 619 F.3d 1329 (Fed. Cir. 2010) ...............................................................................................................9

*Eli Lilly & Co. v. Zenith Goldline Pharma., Inc.*, 364 F. Supp. 2d 820 (S.D. Ind. Apr. 14, 2005) ...............................................................................................................16

*Eli Lilly and Company v. Actavis Elizabeth LLC*, 435 F. App'x 917 (Fed. Cir. 2011) ...............................................................................................................6

*Endo Pharm. Sols. Inc. v. Custopharm, Inc.*, 234 F. Supp. 3d 587 (D. Del. 2017) ......................11

*Endo Pharm. Sols. Inc. v. Custopharm, Inc.*, 894 F.3d 1374 (Fed. Cir. 2018)............................11

*Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357 (Fed. Cir. 2006) ..................................................19

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) ........................................................6

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d (Fed. Cir. 2011) ...............................................................................................................17

*Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720 (Fed. Cir. 1990)................................13, 17

*Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339 (Fed. Cir. 2004) ...................................................7

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ........................................................................7, 15

*Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605 (1950) ......................................................................4

*Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948 (Fed. Cir. 1993)............................................3

*Ieradi v. Mylan Laboratories, Inc.*, 230 F. 3d 594 (3d Cir. 2000).................................................3

*In re Brimonidine Patent Litig.*, 643 F.3d 1366 (Fed. Cir. 2011)...................................................8

*In re Carroll*, 601 F.2d 1184 (CCPA 1979) ....................................................................................9

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063 (Fed. Cir. 2012) ............................................................................................7, 9

*In re Dow Chem. Co.*, 837 F.2d 469 (Fed. Cir. 1988) ..................................................................10

*In re Kotzab*, 217 F.3d 1365 (Fed. Cir. 2000)..............................................................................12

*In re Rouffet*, 149 F.3d 1350 (Fed. Cir. 1998) .............................................................................11

*In re Wesslau*, 353 F.2d 238 (CCPA 1965) .................................................................................13

*Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363 (Fed. Cir. 2008)............................................8

*Insituform Technologies v. Cat Contracting*, 161 F. 3d 688 (Fed. Cir. 1998)................................5

*Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337 (Fed. Cir. 2013)..............................................................................................8, 9, 15

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563 (Fed. Cir. 1997) ..............................16

*KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398 (2007)...................................................................8

*Lawther v. Hamilton*, 124 U.S. 1 (1888) .....................................................................................18

*Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320 (Fed. Cir. 2000)...................................12

*Lucent Techs. Inc. v. Gateway Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) .............................................3

*Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996) .......................................................12

*Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301 (S.D.N.Y. 2004).........................................11

*Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*, 370 F.3d 1354 (Fed. Cir. 2004)..............................................................................................17

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 103 F.3d 1538 (Fed. Cir. 1997) ..................................................................................................................10

*Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91 (2011)............................................................................6

*Millennium Pharmaceuticals, Inc. v. Sandoz, Inc.*, 862 F. 3d 1356 (Fed. Cir. 2017) ...................................................................................................................16

*Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372 (Fed. Cir. 2012) ....................................10

*Moleculon Research Corp. v. CBS, INC.*, 793 F. 2d 1261 (Fed. Cir. 1986)...................3

*Monarch Knitting Machinery v. Sulzer Morat GmbH*, 139 F. 3d 877, 885 (Fed. Cir. 1998) ...............................................................................................................17

*Noelle v. Lederman*, 355 F.3d 1343 (Fed. Cir. 2004) ....................................................12

*Ortho-McNeil Pharmaceutical v. Mylan Labs.*, 520 F. 3d 1358 (Fed. Cir. 2008)..................10, 15

*Pfizer Inc. v. Watson Pharm.*, 920 F. Supp. 2d 552 (D. Del. 2013) ...............................11

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F. 3d 1342 (Fed. Cir. 2007).......................17

*Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151 (Fed. Cir. 2012)......................................4

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989 (Fed. Cir. 2009) ...........10, 15, 16

*Prometheus Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092 (Fed. Cir. 2015) ...........................17

*Rembrandt Wireless Tech v. Samsung Electronics*, 853 F. 3d 1370 (Fed. Cir. 2017) ...................................................................................................................14

*Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325 (Fed. Cir. 2010)....................7

*S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364 (Fed. Cir. 2001) ............................................18

*Sanofi v. Watson Laboratories Inc.*, 875 F. 3d 636 (Fed. Cir. 2017).............................5

*Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075 (Fed. Cir. 2008) .............................13

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269 (Fed. Cir. 2011) ............................................................................4

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511 (Fed. Cir. 1990) .................................................................................................................3

*Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448 (Fed. Cir. 1985)......................12

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364 (Fed. Cir. 2011)....................13

*Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530 (Fed. Cir. 1983) .............................15

*Symantec Corp. v. Computer Assocs. Int'l Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) ...........................3

*Takeda Chemical Industries v. Alphapharm Pty.*, 492 F.3d 1350 (Fed. Cir. 2007) .....................15

*Tec Air, Inc. v. Denso Mfg. Mich., Inc.,* 192 F.3d 1353 (Fed. Cir. 1999).......................................14

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316 (Fed. Cir. 2001)...........................3

*Transocean Offshore Deepwater v. Maersk Drilling*, 699 F. 3d 1340 (Fed. Cir. 2012) .......................................................................................................................17

*W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983)........................................12

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317 (Fed. Cir. 2016) ....................................................15, 17

*Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340 (Fed. Cir. 2000) ..........................................14

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339 (Fed. Cir. 2000) ...........................................................................................................................9, 10

## OTHER AUTHORITIES

21 U.S.C. § 355(c)(3)(C)(ii)(II) .........................................................................................................19

35 U.S.C. § 102(e) ............................................................................................................................12

35 U.S.C. § 103...............................................................................................................................7, 10

35 U.S.C. § 271(b) ..............................................................................................................................5

35 U.S.C. § 271(c) ..............................................................................................................................5

35 U.S.C. § 271(e)(4)(A) ..................................................................................................................19

35 U.S.C. § 282...................................................................................................................................6

D. Del. Local Rule 16.3(c)(5) ............................................................................................................1

Fed. R. Evid. 201(b)(2) ......................................................................................................................3

Office of Patent Legal Administration (OPLA), Robert J. Spar, Director USPTO, Textual Equivalent of Training Slides entitled "35 USC §§ 102(e) and 374 as amended by HR 2215 (Technical Correction Act)" (enacted 11/02/02, effective 11/29/00), *available at* http://www.uspto.gov/web/offices/dcom/olia/ aipa/textpp102e.htm ................................................................................................................12

MPEP 706.02(f)(1) ...........................................................................................................................12

Pursuant to Local Rule 16.3(c)(5), Plaintiffs submit the following Statement of Contested Issues of Law.  Plaintiffs further incorporate by reference any issues of law set forth in their other pretrial submissions, claim construction submissions, and presentations, or responsive papers to any comparable material filed by Mylan.  The citation of authorities is not exhaustive. Plaintiffs reserve the right to rely on additional authorities in support of their claims and defenses and intended proofs.

Plaintiffs reserve the right to modify or supplement this statement to the extent necessary to reflect any future rulings by the Court.  Plaintiffs also reserve the right to modify or supplement this statement to fairly respond to any new issues that Mylan may raise.  By submitting this statement, Plaintiffs are in no way waiving their rights to amend or supplement this submission after they consider Mylan's submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, the trial itself, or post-trial briefing.

To the extent any of these issues of law is deemed an issue of fact rather than an issue of law, Plaintiffs incorporate said issues by reference into Plaintiffs' Statement of Contested Facts (Exhibit 2). Conversely, to the extent any issue in Plaintiffs' Statement of Contested Facts is deemed an issue of law, Plaintiffs incorporate said issue by reference into this statement.

I.      **INFRINGEMENT**

    A.      **Infringement Analysis**

    1.      Infringement is a two-step inquiry:  (1) "the proper construction of the asserted claim" and (2) "a determination whether the claim as properly construed reads on the accused product or method." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1319 (Fed. Cir. 2012) (internal quotation marks omitted).

    2.      With respect to claim construction, "[c]laim language . . . must be read consistently with the totality of the patent's applicable prosecution history." *Biovail Corp. Int'l. v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001).

    3.      Material incorporated by reference into a patent's specification may also inform claim construction. *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1375-76 (Fed. Cir. 2006) "'Incorporation by reference provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.'" *Id.* (quoting *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000), alteration in *Cook Biotech*) (construing the claim term "the luminal portion of the tunica mucosa" in view of the "the procedure for preparing intestinal submucosa" described in an incorporated reference).

    4.      "To incorporate matter by reference, a host document must contain language clearly identifying the subject matter which is incorporated and where it is to be found . . . ." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1345-47 (Fed. Cir. 2009) (internal quotation marks omitted) (incorporation by reference of golf ball cover layers described in another patent was achieved by virtue of the statement "Reference is made to . . . U.S. Pat. No. 4,274,637 which describes a number of foamable compositions of a character which may be employed . . . for the

golf ball of this invention.").  "When a document is 'incorporated by reference' into a host document, such as a patent, the referenced document becomes effectively part of the host document as if it were explicitly contained therein."  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316, 1329 (Fed. Cir. 2001).

5.      Courts may take judicial notice of publicly accessible documents.  *See* Fed. R. Evid. 201(b)(2); *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 954 n.27 (Fed. Cir. 1993), *see also Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 514 n.3 (Fed. Cir. 1990) (proper to take judicial notice of publicly available PTO correspondence); *Ieradi v. Mylan Laboratories, Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000).

6.      The POSA would understand the Court's construction of the term "rapid-release tablet" to be satisfied where, according to the USP paddle stirrer test, a tablet releases 75% of the active ingredient in less than 30 minutes or, put another way, where a tablet releases more than 75% of the active ingredient at 30 minutes.

7.      The patentee's burden is not to prove infringement by an absolute certainty, but rather to prove infringement by a preponderance of the evidence—*i.e.*, that it is more likely than not that the direct infringement occurred.  *Lucent Techs. Inc. v. Gateway Inc.*, 580 F.3d 1301, 1317-18 (Fed. Cir. 2009).  A patentee is not required to present direct evidence of infringement, but rather may prove infringement by direct or circumstantial evidence.  *Id.* at 1318; *Symantec Corp. v. Computer Assocs. Int'l Inc.*, 522 F.3d 1279, 1293 (Fed. Cir. 2008); *Moleculon Research Corp. v. CBS, INC.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).

8.      To infringe a method claim, all steps of the claimed method must be performed. *Lucent Technologies*, 580 F.3d at 1317.

3

**B.      Infringement Under the Doctrine of Equivalents**

9.      "An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents . . . ." *Catalina Marketing Int'l v. Coolsavings.com*, 289 F.3d 801, 812 (Fed. Cir. 2002) (internal quotation marks omitted).  "The essential inquiry in any determination under the equivalents doctrine is whether the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011) (internal quotations omitted, alteration in *Siemens*).

10.      Analyses under the doctrine of equivalents are performed from the perspective of the POSA.  *Catalina Marketing*, 289 F.3d at 812-13.

11.      An element in the accused method is equivalent to a claim limitation "if the differences between the two are insubstantial to one of ordinary skill in the art." *Catalina Marketing*, 289 F.3d at 812-13 (internal quotation marks omitted).  Thus, "[t]he doctrine of equivalents prohibits one from avoiding infringement liability by making only insubstantial changes and substitutions . . . which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Siemens*, 637 F.3d at 1279 (internal quotation marks omitted, alteration in *Siemens*).

12.      Infringement may be proven under the doctrine of equivalents where it is shown "'on a limitation by limitation basis that the accused [method] performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented [method].'" *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1167 (Fed. Cir. 2012) (quoting *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009)).

13.     However, the equivalence analysis is not subject to a rigid calculus, and "[i]t does not require complete identity for every purpose and in every respect." *Graver Mfg. Co. v. Linde Co.*, 339 U.S. 605, 609 (1950) ("Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum."); *see also Insituform Technologies v. Cat Contracting*, 161 F.3d 688, 693 (Fed. Cir. 1998) (accused process infringed under the doctrine of equivalents even though it possessed advantages over the process literally claimed).

### C.     Induced and Contributory Infringement

14.     Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."

15.     In Hatch-Waxman litigation, the content of a drug label can "permit[] the inference of specific intent to encourage the infringing use." *Sanofi v. Watson Laboratories Inc.*, 875 F.3d 636, 646 (Fed. Cir. 2017).  Indeed, "evidence that the product labeling that Defendants seek would inevitably lead some physicians to infringe establishes the requisite intent for inducement." *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1369 (Fed. Cir. 2017); *see also AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) ("In the context of specific intent . . . . [t]he pertinent question is whether the proposed label instructs users to perform the patented method.  If so, the proposed label may provide evidence of [the accused infringer's] affirmative intent to induce infringement."); *Bone Care Int'l, L.L.C. v. Roxane Labs., Inc.*, No. 09-CV-285 GMS, 2012 WL 2126896, at *9 (D. Del. June 11, 2012) ("[S]tatements in a package insert that encourage infringing use of a drug product are alone sufficient to establish intent to encourage direct infringement for purposes of inducement to infringe under 35 U.S.C. § 271(b)." (internal quotation marks omitted)).

16.     Under 35 U.S.C. § 271(c), "[w]hoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture,

combination or composition, or a material or an apparatus for use in practicing a patented

process, constituting a material part of the invention, knowing the same to be especially made or

especially adapted for use in an infringement of such patent, and not a staple article or

commodity of commerce suitable for substantial noninfringing use, shall be liable as a

contributory infringer."

17.      To establish contributory infringement, the patentee must show "1) that there is

direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the

component has no substantial noninfringing uses, and 4) that the component is a material part of

the invention."  *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

18.      The possibility of off-label prescribing "does not avoid infringement by a product

that is authorized to be sold solely for the infringing use."  *Eli Lilly and Company v. Actavis*

*Elizabeth LLC*, 435 F. App'x 917, 927 (Fed. Cir. 2011).

## II.      VALIDITY

### A.      The '218 Patent Is Not Invalid for Obviousness

#### 1.      Defendants Bear the Burden of Proving Obviousness by Clear and Convincing Evidence

19.      The claims of the '218 patent are presumed valid.  35 U.S.C. § 282.  That

presumption "exists at every stage of the litigation"—thus, if "the challenger fails to identify any

persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden

on the validity issue."  *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088

(Fed. Cir. 1998).

20.      Defendants must prove invalidity by clear-and-convincing evidence.  *Microsoft*

*Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011).  The standard of clear-and-convincing proof is meant to

convey a significant burden for the party challenging validity; the Federal Circuit has described it

as evidence requiring "an abiding conviction that the truth of a factual contention is *highly probable.*"  *Am-Pro Protective Agency, Inc. v. U.S.*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) (internal quotation marks omitted, emphasis in *Am-Pro*).

21.     Where invalidity is asserted on the basis of references that were considered by the PTO during prosecution, it is "especially difficult" to overcome the presumption of validity. *Glaxo Grp. Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004); *see also Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984) (noting that the PTO is "a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents.").

22.     The burden of proving invalidity remains on Defendants, as the patent challenger, at all times.  *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1077-78 (Fed. Cir. 2012) ("[T]he Supreme Court has never imposed nor even contemplated a formal burden-shifting framework in the patent litigation context.").

23.     Mylan cannot prove by clear and convincing evidence that the claims of the '218 patent are invalid for obviousness.

## 2.     The Legal Standard for Obviousness

24.     A patent claim is invalid under 35 U.S.C. § 103 (pre-AIA) only "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  Obviousness is a question of law based on several underlying issues of fact:  (1) the level of skill of the person of ordinary skill in the art ("POSA"); (2) the scope and content of the prior art; (3) the differences between the

invention and the prior art; and (4) any objective indicia of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010).

25.     Obviousness requires that the POSA, based on what was known in the prior art, would have been motivated or have had reason to make the claimed invention by putting together all of the elements of the claim in the particular way the claims recite, and would have had reasonable expectation of success in doing so.  *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373-74 (Fed. Cir. 2008); *Institut Pasteur & Universite Pierre Et Marie Curie v. Focarino*, 738 F.3d 1337, 1344 (Fed. Cir. 2013).

26.     The Supreme Court has stated that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, *predictable* solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.  If this leads to the *anticipated success*, it is likely the product not of innovation but of ordinary skill and common sense."  *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (emphases added).  By the same token, where the prior art provided no basis to predict the results of a particular solution, and no reason to expect that solution to prove successful, the solution is likely not an obvious one.  *See id.*; *see also In re Brimonidine Patent Litig.*, 643 F.3d 1366, 1376 (Fed. Cir. 2011)*, as corrected* (Aug. 8, 2011) (affirming nonobviousness of relevant patent where claimed solutions would not have been an "anticipated success" given that "one of ordinary skill would not have been expected to disregard [certain] roadblocks")*.

27.     Whether a POSA would have had a reasonable expectation of success in achieving the claimed solution must be assessed in light of the particular technology at issue.  *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008).  As the Federal Circuit has

noted "potential solutions are less likely to be genuinely predictable" in the chemical arts, as compared with arts such as the mechanical ones at issue in KSR. *See Eisai Co. v. Dr. Reddy's Laboratories, Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008).

28.     In particular, courts have often faulted patent challengers in the pharmaceutical arts for assuming relationships between pharmacokinetic, pharmacodynamic, and even clinical data when such relationships are unreported in the art. *Abbott Labs.*, 544 F.3d at 1352) (affirming judgment of nonobvious where POSA would not have had reasonable expectation of success in using vitro results for one antibiotic to predict in vivo results for a second antibiotic, concluding that the drugs had differing mechanisms of antibiotic action, and thus different pharmacokinetic behavior); *In re Cyclobenzaprine*, 676 F.3d at 1070 (rejecting obviousness theory requiring POSA to assume that "assume that the immediate-release and extended-release [pharmacokinetic] profiles produce the same [pharmacodyamic] effect" where no known pharmacokinetic-pharmacodyanmic relationship existed, and where even the challenger's expert conceded that "nothing in the prior art or published literature . . . would help a person skilled in the art determine a therapeutically effective plasma concentration over a 24–hour period." (internal quotation marks omitted)); *In re Carroll*, 601 F.2d 1184, 1186 (CCPA 1979) (rejecting obviousness theory where witness had stated that in vitro testing was unreliable for in vivo effectiveness in a specific context); *cf. Eli Lilly and Co. v. Teva Pharmaceuticals USA, Inc.*, 619 F.3d 1329, 1336–38 (Fed. Cir. 2010) ("The record shows that Teva was not able to show a credible connection between the type of osteoporosis at issue in this case—postmenopausal osteoporosis—and autoimmune diseases.").

29.     Whether or not a POSA would have had a reasonable expectation of success must be evaluated in light of the desired goal, not "a different goal that may be a less challenging but

also less worthwhile pursuit." *Institut Pasteur*, 738 F.3d at 1346; *cf. Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1345 (Fed. Cir. 2000) (holding that an expectation of "baseline" activity for a drug was insufficient to show obviousness, because the claimed success was not the discovery of one of many compounds exhibiting such baseline activity, but rather "a compound that had high activity, few side effects, and lacked toxicity."). Mere "knowledge of the goal does not render its achievement obvious." *Abbott Labs.*, 544 F.3d at 1352.

30.     It is legally impermissible to use hindsight in assessing obviousness. *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 997 (Fed. Cir. 2009). A proper obviousness analysis "requires a form of amnesia that 'forgets' the invention and analyzes the prior art and understanding of the problem at the date of invention." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012).

31.     To that end, it is improper to assess obviousness by beginning the inquiry with the inventor's claimed invention and then looking backwards to piece together the limitations of the claim from the disclosures of the prior art. *Yamanouchi*, 231 F.3d at 1343-45; 35 U.S.C. § 103 (pre-AIA) ("Patentability shall not be negated by the manner in which the invention was made."). As the Federal Circuit has noted, an inventor's "pathway to the invention," may, in hindsight, "seem[] to follow the logical steps to produce [the desired result], but at the time of invention, the inventor's insights, willingness to confront and overcome obstacles, and yes, even serendipity, cannot be discounted." *Ortho-McNeil Pharmaceutical v. Mylan Labs.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).

32.     While the path of the inventors cannot be used to establish obviousness, the inventors' own extensive struggles and efforts to arrive at the claimed invention can be relevant as evidence of the nonobviousness of the invention. *See*, *e.g.*, *Micro Chem., Inc. v. Great Plains*

*Chem. Co., Inc.*, 103 F.3d 1538, 1547 (Fed. Cir. 1997) (finding inventor's "extensive efforts to

solve the problem" suggested an absence of a motivation to combine the relevant references),

*abrogated on other grounds by Medicines Co. v. Hospira, Inc*., 827 F.3d 1363 (Fed. Cir. 2016);

*In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988).

### 3.   The Person of Ordinary Skill in the Art

33.    Obviousness inquiries are evaluated from the perspective of the person of

ordinary skill in the art ("POSA").  *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).  The

POSA is presumed to know the relevant art as of the priority date, and can represent multiple

individuals working together as a team of scientists.  *Endo Pharm. Sols. Inc. v. Custopharm, Inc.*,

234 F. Supp. 3d 587, 598 (D. Del. 2017), *aff'd*, 894 F.3d 1374 (Fed. Cir. 2018); *Pfizer Inc. v.

Watson Pharm., Inc.*, 920 F. Supp. 2d 552, 558 (D. Del. 2013); *Medinol Ltd. v. Guidant Corp*.,

341 F. Supp. 2d 301, 321 (S.D.N.Y. 2004); *cf. Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d

1254, 1256 (Fed. Cir. 2007).

34.    When determining the skill level of the person of ordinary skill in the art, specific

experience in the subject matter of the invention is often more pertinent than general knowledge

of a broad field.  *Daiichi Sankyo*, 501 F.3d at 1256 (rejecting the district court's conclusion that

the relevant POSA was a general practitioner or pediatrician, and ruling instead that, because the

inventors included a "professor specializing in otorhinolaryngology," "a clinical development

department manager . . . involved with new drug development and clinical trials" and "a research

scientist . . . engaged in the research and development of antibiotics," the POSA would have the

skills of "a person engaged in developing pharmaceutical formulations and treatment methods

for the ear or a specialist in ear treatments such as an otologist, otolaryngologist, or

otorhinolaryngologist who also has training in pharmaceutical formulations").

35.     "[T]he level of skill in the art is a prism or lens through which a judge or jury views the prior art and the claimed invention.  This reference point prevents these deciders from using their own insight or, worse yet, hindsight, to gauge obviousness."  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1324 (Fed. Cir. 1999).

36.     The POSA is "presumed to think along conventional lines without undertaking to innovate, whether by systematic research or by extraordinary insights."  *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000) (citing *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985)); *see also In re Kotzab*, 217 F.3d 1365, 1369 (Fed. Cir. 2000) (stating that the POSA is "guided only by the prior art references and the then-accepted wisdom in the field").

37.     Evidence that the POSA would have been required to "proceed[] contrary to the accepted wisdom of the prior art" to achieve the invention "is strong evidence of nonobviousness."  *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1552-53 (Fed. Cir. 1983) (internal quotation marks omitted).

**4.     The Scope and Content of the Prior Art**

38.     A challenger has the burden of persuading the factfinder, by clear and convincing evidence, that a reference qualifies as prior art as of the priority date.  *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-78 (Fed. Cir. 1996) (burden applies to "all issues relating to the status" of a reference as prior art).

39.     The teachings of the '218 patent itself are not prior art, and the challenger's obviousness argument—including any basis for a reasonable expectation of success—must be found in the prior art rather than the patentee's disclosure.  *Noelle v. Lederman*, 355 F.3d 1343, 1352 (Fed. Cir. 2004).

40.     An issued U.S. patent that claims priority to an international application filed

before November 29, 2000 can only be prior art under 35 U.S.C. § 102(e) as of the filing date of

the international application if the international application was published in English.  *See* 35

U.S.C. § 102(e) (pre-AIA); MPEP 706.02(f)(1); *see also* Office of Patent Legal Administration

(OPLA), Robert J. Spar, Director USPTO, Textual Equivalent of Training Slides entitled "35

USC §§ 102(e) and 374 as amended by HR 2215 (Technical Correction Act)" (enacted 11/02/02,

effective 11/29/00), *available at* http://www.uspto.gov/web/offices/dcom/olia/aipa/

textpp102e.htm.

### 5.    The Differences Between the Invention and the Prior Art

41.    The prior art must be considered as a whole, and individual references must be

considered in their entirety—it is improper to cherry-pick favorable disclosures while ignoring

others that would color the opinion of the POSA.  *Arctic Cat Inc. v. Bombardier Recreational

Prod. Inc.*, 876 F.3d 1350, 1360 (Fed. Cir. 2017); *Bausch & Lomb, Inc. v. Barnes-

Hind/Hydrocurve, Inc.*, 796 F.2d 443, 448-49 (Fed. Cir. 1986) ("The district court also failed to

consider the Caddell reference in its entirety and thereby ignored those portions of the reference

that argued against obviousness."); *In re Wesslau*, 353 F.2d 238, 241 (CCPA 1965) ("[I]t is

impermissible within the framework of section 103 to pick and choose from any one reference

only so much of it as will support a given position, to the exclusion of other parts necessary to

the full appreciation of what such reference fairly suggests to one of ordinary skill in the art.").

42.    Likewise, any determination of obviousness must be made in light of the claimed

invention as a whole, rather than by considering "separate pieces of the claim."  *Sanofi-

Synthelabo v. Apotex*, *Inc.*, 550 F.3d 1075, 1086 (Fed. Cir. 2008); *Gillette Co. v. S.C. Johnson &

Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990) ("Focusing on the obviousness of substitution and

differences, instead of on the invention as a whole, is a legally improper way to simplify the

often difficult determination of obviousness.").

13

43.     An obviousness analysis requires consideration of references that teach away

from the invention.  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1374-75

(Fed. Cir. 2011).  A reference teaches away "when a person of ordinary skill, upon reading the

reference, would be discouraged from following the path set out in the reference, or would be led

in a direction divergent from the path that was taken by the applicant . . . [or] if it suggests that

the line of development flowing from the reference's disclosure is unlikely to be productive of

the result sought by the applicant."  *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1360

(Fed. Cir. 1999) (internal quotation omitted, alterations in *Tec Air*).

44.     Where the prior art "teaches away" from the invention rather than motivating the

POSA to do what the patentee has done, the invention is nonobvious.  *DePuy Spine, Inc. v.

Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009).  A prior art reference that

teaches away "alone can defeat [an] obviousness claim."  *Winner Int'l Royalty Corp. v. Wang*,

202 F.3d 1340, 1349-50 (Fed. Cir. 2000).

45.     Prior art teachings that do not rise to the level of "teaching away" may

nevertheless demonstrate the absence of a motivation to combine references or otherwise pursue

a particular path.  *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 n.15 (Fed. Cir. 2016)

("[E]ven if Plaisant does not teach away, its statements regarding users preferring other forms of

switches are relevant to a finding regarding whether a skilled artisan would be motivated to

combine the slider toggle in Plaisant with the mobile phone in Neonode.").  "Whether a

reference teaches away is doctrinally distinct from whether there is no motivation to combine

prior art references."  *Rembrandt Wireless Tech. v. Samsung Electronics,* 853 F.3d 1370, 1379–

80 (Fed. Cir. 2017) ("[T]he absence of a formal teaching away in one reference does not

automatically establish a motivation to combine it with another reference in the same field.").

14

46.     Unknown properties of a compound cannot be used as the basis for an obviousness argument.  *Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc*, 752 F.3d 967, 974 (Fed. Cir. 2014).

### 6.     Objective Indicia of Nonobviousness

47.     "The Supreme Court [has] explained that various factors 'may also serve to "guard against slipping into use of hindsight," and to resist the temptation to read into the prior art the teachings of the invention in issue.'  These factors are commonly known as secondary considerations or objective indicia of non-obviousness."  *Apple*, 839 F.3d at 1052-53 (citation omitted, quoting *Graham*, 383 U.S. at 36).

48.     Objective indicia of non-obviousness include evidence of factors such as skepticism, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1335 (Fed. Cir. 2016), and unexpected properties, *Procter & Gamble Co.*, 566 F.3d at 997.

49.     A patent is presumed valid even if the patentee does not present any evidence of objective indicia of nonobviousness.  *Takeda Chemical Industries v. Alphapharm Pty.*, 492 F.3d 1350, 1362-63 (Fed. Cir. 2007).

50.     Evidence of objective indicia is "not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness."  *Ortho-McNeil*, 520 F.3d at 1365 (citation omitted).

51.     Objective indicia "may often establish that an invention appearing to have been obvious in light of the prior art was not."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538-39 (Fed. Cir. 1983).

52.     For evidence of objective indicia to be given substantial weight in an obviousness decision, there must be a nexus between the merits of the claimed invention and the objective indicia of nonobviousness.  In other words, "[t]o be afforded substantial weight, the objective

15

indicia of non-obviousness must be tied to the novel elements of the claim at issue." *Institut Pasteur*, 738 F.3d at 1347.  "Objective indicia need only be reasonably commensurate with the scope of the claims." *Id.*  "[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent." *WBIP,* 829 F.3d at 1329.  Where the patentee demonstrates its entitlement to a presumption of nexus, the burden shifts to the patent challenger to reubut this presumption. *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997); *Eli Lilly & Co. v. Zenith Goldline Pharma., Inc.*, 364 F. Supp. 2d 820, 907 (S.D. Ind. Apr. 14, 2005) ("[I]f the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."); *see also Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392-93 (Fed. Cir. 1988) (discussing burden shifting).

### a.    Unexpected Properties

53.     A patentee can make a showing of unexpected properties "by demonstrating that the claimed invention exhibits some superior property or advantage that a person of ordinary skill in the relevant art would have found surprising or unexpected." *Procter & Gamble Co.*, 566 F.3d at 994 (internal quotation marks omitted).

54.     "[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art." *Millennium Pharmaceuticals, Inc. v. Sandoz, Inc.*, 862 F.3d 1356, 1367 (Fed. Cir. 2017) (internal quotation marks omitted, emphasis in *Millenium*).

55.     Unexpected properties can include unexpected, desirable clinical properties.  *See, e.g., Eli Lilly & Co. v. Sicor Pharms., Inc.*, 705 F. Supp. 2d 971, 987-88 (S.D. Ind. 2010); *cf.*

16

*Prometheus Labs., Inc. v. Roxane Labs., Inc.,* 805 F.3d 1092, 1098 (Fed. Cir. 2015) (suggesting that "[a]n obviousness rejection likely would not be appropriate where the new patient subset displayed unexpected results" in the context of a claim to a method of treating a particular patient subset).

56.     A patentee can rely on unexpected properties not known or disclosed at the time of the invention to support a finding of nonobviousness.  This is true as a matter of necessity, as "[r]elevant secondary considerations often are not manifest even until well after the issuance of a patent."  *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d, 1291, 1307 (Fed. Cir. 2011).

### b.     Skepticism

57.     Skepticism of those in the art—even if such skepticism does not amount to evidence that the art taught away from the claimed invention—is "'relevant and persuasive evidence' of nonobviousness."  *Monarch Knitting Machinery v. Sulzer Morat GmbH*, 139 F.3d 877, 885 (Fed. Cir. 1998) (quoting *Gillette*, 919 F.2d at 726).

58.     Evidence of industry skepticism weighs in favor of non-obviousness.  "If industry participants or skilled artisans are skeptical about whether or how a problem could be solved" or whether the proposed solution was feasible or workable, it favors non-obviousness.  *WBIP*, 829 F.3d at 1335.

59.     "The reaction of scientific peers after the achievement is relevant to whether the invention would indeed have been obvious at the time it was made."  *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1376 (Fed. Cir. 2007); *see also Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371, 1376 (Fed. Cir. 2004) (evidence of skepticism that the multi-mode treatment of the invention could be achieved supported the jury's verdict of nonobviousness); *Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*, 370

F.3d 1354, 1368 (Fed. Cir. 2004) (evidence that skilled artisans were initially skeptical about the invention supported the jury's verdict of nonobviousness); *Transocean Offshore Deepwater v. Maersk Drilling*, 699 F.3d 1340, 1352-53 (Fed. Cir. 2012) (jury finding of skepticism was adequately supported by inventor testimony).

### B.    WRITTEN DESCRIPTION

60.    "[T]he 'test for sufficiency' of a patent's written description 'is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.'" *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019) (quoting *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc)).

61.    Whether a patent's disclosure satisfies the written description requirement is evaluated from the perspective of the POSA. *Id.* ("'[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed.'" (quoting *Ariad*, 598 F.3d at 1351)).

62.    A patent need not disclose routine details familiar to the POSA in order to satisfy the written description requirement. *Id.* at 1365-66 (reversing summary judgment of invalidity and remanding for factual consideration, in light of argument that that the district court improperly "requir[ed] the specification to disclose basic, routine implementation details"); *see also Lawther v. Hamilton*, 124 U.S. 1, 9 (1888) ("These several steps being well known in the art when the patent was applied for, required no particular explanation."); *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) ("The law is clear that patent documents need not include subject matter that is known in the field of the invention . . . ."); *Application of Eltgroth*, 419

F.2d 918, 921 ( CCPA 1970) ("This court has often observed that the minutiae of descriptions or procedures perfectly obvious to one of ordinary skill in the art yet unfamiliar to laymen need not be set forth.").

63.     Neither examples nor actual reduction to practice are necessary to satisfy the written description requirement.  *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366-67 (Fed. Cir. 2006).

## III.     REMEDIES

64.     If the product that is the subject of an ANDA would infringe a valid patent claim, then the "patent owner is entitled to an order that FDA approval of the ANDA containing the paragraph IV certification not be effective until the patent expires." *Bristol-Myers Squibb Co. v. Royce Labs., Inc.*, 69 F.3d 1130, 1135 (Fed. Cir. 1995); 21 U.S.C. § 355(c)(3)(C)(ii)(II); 35 U.S.C. § 271(e)(4)(A)

EXHIBIT 5

## EXHIBIT 5

**MYLAN'S STATEMENT OF ISSUES OF LAW**

Pursuant to Local Rule 16.3(c)(5), Mylan respectfully submits the following issues of law that remain to be litigated and a citation of representative authorities relied upon.  Mylan's submission is based, in part, on their understanding of Plaintiffs' positions.   Mylan reserves the right to amend or supplement this submission after considering Plaintiffs' submissions, including amendments or supplementation made apparent in pre-trial proceedings, the trial itself, post-trial briefing, or otherwise.[1]

To the extent this exhibit contains issues of fact, they are incorporated by reference into Mylan's Statement of Contested Facts.  To the extent Mylan's Statement of Contested Facts contains issues of law, they are hereby incorporated into this exhibit.  The citation of authorities referenced in this document is not intended to be exhaustive.  Mylan reserves the right to rely on additional authorities in support of their defenses and intended proofs.

The substantive issues remaining to be litigated are whether claims 1-4 of the '218 patent are infringed by Mylan's ANDA Products and whether the claims are invalid as obvious under 35 U.S.C. § 103 and/or lack written description under 35 U.S.C. § 112.

---

[1] For example, Mylan reserves the right to revise, supplement, or otherwise change their issues of law that remain to be litigated should the claim construction change in this Court or on appeal.

## I.   NONINFRINGEMENT

1.     The patent owner has the burden of proving infringement by a preponderance of the evidence.  *See Ferring B.V. v. Watson Labs., Inc.-Fla.*, 764 F.3d 1401, 1408 (Fed. Cir. 2014); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1366 (Fed. Cir. 2003).

2.     Infringement is a question of fact.  *See Ferring*, 764 F.3d at 1408.

3.     An infringement analysis is a two-step process. "The first step is determining the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  In the second step, the accused device must be compared to the claim language as properly interpreted. *See id.*; *Tanabe Seiyaku Co. v. U.S. Int'l Trade Comm'n*, 109 F.3d 726, 731 (Fed. Cir. 1997).  To establish infringement of a patent claim, every limitation set forth in the patent claim must be found in the accused product or process either literally or by a substantial equivalent. *See*, *e.g.*, *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 858 (Fed. Cir. 2014).

4.     Because a finding of infringement first requires a proper construction of the claim terms of the allegedly infringed patent, any expert testimony directed to the issue of infringement must be based on correct claim constructions to be admissible.  *See Liquid Dynamics Corp. v. Vaughan Co.,* 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006) (affirming district court's decision to exclude expert testimony "as irrelevant because it was based on an impermissible claim construction"); *Easyweb Innovations, LLC v. Twitter, Inc.*, No. 11-CV-4550, 2016 WL 1253674, at *30 (E.D.N.Y. Mar. 30, 2016) ("evidence based upon a mistaken construction of a patent is irrelevant") (quoting *Chicago Mercantile Exch., Inc. v. Tech. Research Grp., LLC*, 782 F. Supp. 2d 667, 673 (N.D. Ill. 2011)); *Laboratoires Perouse, S.A.S. v. W.L. Gore & Assocs., Inc.*, 528 F. Supp. 2d 362, 371 (S.D.N.Y. 2007) (similar).

## A.      Literal Infringement

5.      A claim may be infringed either literally, or under the doctrine of equivalents. Moreover, because a dependent claim incorporates all of the elements and limitations of the independent claim on which it depends, a dependent claim cannot be infringed unless each and every element of the underlying claim is also infringed.  *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310-11 & n. 3 (Fed. Cir. 2001).

6.      As a matter of law, there is no literal infringement where even a single element of the asserted claim is not found in the accused product.  *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013) (citing *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1379 (Fed. Cir. 2008)).  Because dependent claims encompass all of the limitations of the claims on which they depend, "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (citing *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed. Cir. 1989)).

## B.      Infringement Under the Doctrine of Equivalents

7.      "A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method."  *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007).

8.      A patentee attempting to show infringement under the doctrine of equivalents must present evidence "under each prong of the function-way result test"; for example, "'[t]hat a

claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way.'" *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1320 (Fed. Cir. 2015) (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1531 n.6 (Fed. Cir. 1987)).

9.     There can be no infringement under the doctrine of equivalents "if even one limitation of a claim or its equivalent" is missing from an accused product or process. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003); *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."). A patentee attempting to show infringement under the doctrine of equivalents must "provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test . . . Such evidence must be presented on a limitation-by-limitation basis. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *AquaTex*, 479 F.3d at 1328 (quoting *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) (emphasis omitted)); *accord Advanced Steel Recovery*, 808 F.3d at 1319. "An analysis of the role played by each element in the context of the specific patent claim . . .inform[s] the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the

substitute element plays a role substantially different from the claimed element." *Warner-Jenkinson*, 520 U.S. at 40.

10.     A finding of infringement under the doctrine of equivalents is improper if it would "vitiate" or "eviscerate" any limitations of the claims in the patent. *See Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1328-29 (Fed. Cir. 2007).

11.     In order for an ANDA applicant to have its ANDA product approved, the applicant must show that the proposed ANDA product is bioequivalent to the reference-listed branded drug. *See* 21 U.S.C. § 355(j)(2)(A)(iv).  Importantly, however, "bioequivalency and equivalent infringement are different inquiries.  Bioequivalency is a regulatory and medical concern aimed at establishing that two compounds are effectively the same for pharmaceutical purposes. In contrast, equivalency for purposes of patent infringement requires an element-by-element comparison of the patent claim and the accused product, requiring not only equivalent function but also equivalent way and result." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1298 (Fed. Cir. 2009).  Accordingly, "the bioequivalency of an accused product with a product produced from the patent at issue is not sufficient to establish infringement by equivalents." *Id.*; *accord Reckitt Benckiser Inc. v. Watson Labs., Inc.*, 430 F. App'x 871, 878 (Fed. Cir. 2011).

## C.     Direct Infringement

12.     "Direct infringement" refers to actual acts of making, using, selling, offering to sell and/or importing a patented invention.  *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993); *see also* 35 U.S.C. § 271(a).  "'Direct infringement requires a party to perform each and every step or element of a claimed method or product.'"  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009) (quoting *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007)); *accord Move, Inc. v. Real Estate Alliance Ltd.*, 709 F.3d 1117, 1122

(Fed. Cir. 2013).  Thus, a method or a process claim is infringed only when that method or

process is actually performed.  *See Joy Techs*., 6 F.3d at 773.  The sale of an apparatus to perform

a method or process claimed in a patent is not a sale of the claimed method or process within the

meaning of 35 U.S.C. § 271(a) and therefore not a direct infringement of the method or process

claim. *See id.* at 773-74.

13.     Pharmaceutical companies generally are not liable for direct infringement of

method-of-use patents that involve "administering" a drug because "pharmaceutical companies do

not generally treat diseases; rather, they sell drugs to wholesalers or pharmacists, who in turn sell

the drugs to patients possessing prescriptions from physicians."  *Warner-Lambert*, 316 F.3d at

1363 & n.7.

### D.     Induced Infringement

14.     To establish liability for induced infringement under 35 U.S.C. § 271(b), the patent

owner must show that, knowing of the asserted patents, the alleged infringer actively and

knowingly aided and abetted another's direct infringement.  *See Takeda Pharms. U.S.A., Inc. v.*

*West-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015); *DSU Med. Corp. v. JMS Co*., 471

F.3d 1293, 1305 (Fed. Cir. 2006).  Liability for induced infringement is possible only where there

has been a finding of direct infringement.  *See Limelight Networks, Inc. v. Akamai Techs., Inc.*,

134 S. Ct. 2111, 2117 (2014); *Allergan, Inc. v. Alcon Labs.*, 324 F.3d 1322, 1334 (Fed. Cir.

2003); *Warner-Lambert*, 316 F.3d at 1363.

15.     In the ANDA context, "[t]he mere existence of direct infringement by physicians,

while necessary to find liability for induced infringement, is not sufficient for inducement."

*Takeda Pharms*., 785 F.3d at 631.  The patent owner must show that the alleged infringer

knowingly and with specific intent induced the infringement by, for example, presenting

"evidence of active steps taken to encourage direct infringement." *Id*. at 630-31 (alteration

omitted); *accord Warner-Lambert*, 316 F.3d at 1363-64.  "[I]n the Hatch–Waxman Act context

where . . . it is alleged that the drug label induces infringement by physicians," "[t]he label must

encourage, recommend, or promote infringement." *Takeda Pharms*., 785 F.3d at 631.  It is not

sufficient merely that the "instructions 'describe the infringing mode.'"  *Id*. (alteration omitted)

(quoting *Toshiba Corp. v. Imation Corp*., 681 F.3d 1358, 1365 (Fed. Cir. 2012)).  "[V]ague label

language cannot be combined with speculation about how physicians may act to find

inducement." *Id*. at 632.

16.     "[I]t is well-established that 'mere knowledge of possible infringement by others

does not amount to inducement; specific intent and action to induce infringement must be

proven.'"  *Id*. at 631 (quoting *Warner-Lambert*, 316 F.3d at 1364); *accord DSU*, 471 F.3d at

1305.  "This requirement of inducing acts is particularly important in the Hatch-Waxman Act

context because the statute was designed to enable the sale of drugs for non-patented uses even

though this would result in some off-label infringing uses." *Id*.

### E.     Contributory Infringement

17.     A party is liable for contributory infringement under 35 U.S.C. § 271(c) if it "sells

or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material

or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is

known by the party 'to be especially made or especially adapted for use in an infringement of

such patent.'"  *In re Bill of Lading Transmission & Processing Sys. Patent Litig*., 681 F.3d 1323,

1337 (Fed. Cir. 2012) (quoting 35 U.S.C. § 271(c)).  Like induced infringement, contributory

infringement is predicated on a finding of direct infringement.  *See DSU*, 471 F.3d at 1303.

18.    If direct infringement is established, the patent owner must then show, among other things, that the accused product has no substantial non-infringing use. *Toshiba*, 681 F.3d at 1362. "'Non-infringing uses are substantial when they are not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'" *Id*. (quoting *Vita-Mix Corp. v. Basic Holding, Inc*., 581 F.3d 1317, 1327 (Fed. Cir. 2009)) (alteration omitted); *see also Takeda Pharms. USA, Inc., v. West-Ward Pharm. Corp*., 72 F. Supp. 3d 539, 545 (D. Del. 2014) (noninfringing uses found to be substantial where at least 43.75% of prescriptions would not infringe the patent),

**F.    Lexicography**

19.    A patentee is "free to act as his own lexicographer, and may set forth any special definitions of the claim terms in the patent specification or file history, either expressly or impliedly." *Schoenhaus v. Genesco, Inc.*, 440 F. 3d 1354, 1358 (Fed. Cir. 2006).

20.    "[A] a patentee can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (internal citation omitted). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Astrazeneca LP v. Apotex, Inc.,* 633 F.3d 1042, 1051 (Fed.Cir.2010) (*quoting Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed.Cir.2005) (*en banc*)).

21.    Settled practice requires the court to "construe the claim as written, not as the patentees wish they had written it." *Chef Am.*, 358 F.3d at 1374.

22.    Moreover, "courts may not redraft claims, whether to make them operable or to sustain their validity." *Id*. In *Chef America*, the Federal Circuit refused to read "to" to mean "at"

because the meaning of the ordinary, simple words are "clear and unquestionable.  There is no indication that their use in this particular conjunction changes their meaning. They mean exactly what they say."  *Id.* at 1373.

### G.   Incorporation By Reference

23.    "To incorporate material by reference, the host document must identify with *detailed particularity* what specific material it incorporates and *clearly indicate where* that material is found in the various documents."  *Droplets, Inc. v. E*TRADE Bank*, 887 F.3d 1309, 1318 (Fed. Cir. 2018) (internal quotations omitted) (emphasis in original) (*quoting Cook Biotech, Inc. v. Acell, Inc.*, 460 F.3d 1365, 1376 (Fed. Cir. 2006); *Zenon Envtl., Inc. v. United States Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007).

24.    "[T]he standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity."  *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1283 (Fed. Cir. 2000).

25.    "Whether material has been incorporated by reference into a host document, and the extent to which it has been incorporated, is a question of law."  *Zenon.*506 F.3d at 1378.

26.    When the "plain language expressly limits the incorporation to only relevant disclosures of the patents" this indicates "that the disclosures are not being incorporated in their entirety."  *Id.* at 1379 (finding that the following statement did not incorporate by reference the entire disclosure of the prior art reference: "The vertical skein is not the subject matter of this invention and any prior art vertical skein may be used. Further details relating to the construction and deployment of a most preferred skein are found in the parent U.S. Pat. No. 5,639,373, and in Ser. No. 08/690,045, the relevant disclosures of each of which are included by reference thereto as if fully set forth herein.") (emphasis omitted).

27.     "[A]n incorporation by reference must be set forth in the specification and must:

(1)  Express a clear intent to incorporate by reference by using the root words 'incorporat(e)' and

'reference' (*e.g.*, 'incorporate by reference'); and (2)  Clearly identify the referenced patent,

application, or publication."  37 C.F.R. §1.57(b) (2005).

28.     "'Essential material' may be incorporated by reference, but only by way of an

incorporation by reference to a U.S. patent or U.S. patent application publication, which patent or

patent application publication does not itself incorporate such essential material by reference.

'Essential material' is material that is necessary to: (1)  Provide a written description of the

claimed invention, and of the manner and process of making and using it, in such full, clear,

concise, and exact terms as to enable any person skilled in the art to which it pertains, or with

which it is most nearly connected, to make and use the same, and set forth the best mode

contemplated by the inventor of carrying out the invention as required by the first paragraph of 35

U.S.C. 112; (2)  Describe the claimed invention in terms that particularly point out and distinctly

claim the invention as required by the second paragraph of 35 U.S.C. 112; or (3)  Describe the

structure, material, or acts that correspond to a claimed means or step for performing a specified

function as required by the sixth paragraph of 35 U.S.C. 112."  37 C.F.R. §1.57(c) (2005).

## II.     INVALIDITY

29.     A party challenging a patent may overcome that presumption of validity by

showing by clear and convincing evidence that the patent fails to satisfy one or more of the

conditions of patentability set forth in Title 35 of the United States Code.  *See Microsoft Corp. v.*

*i4i Ltd. P'ship*, 564 U.S. 91, 95-97 (2011).

30.     Once a party challenging a patent's validity "'has presented a prima facie case of

invalidity, the patentee has the burden of going forward with rebuttal evidence.'"  *Prometheus*

*Labs., Inc. v. Roxane Labs., Inc.*, 805 F.3d 1092, 1101-02 (Fed. Cir. 2015) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 (Fed. Cir. 2007)).

### A.    Date of Invention, Priority, and Prior Art

31.    The date of invention is "presumed to be the filing date of the parent application" but this presumption can be rebutted if the party seeking an earlier invention date can show, by a preponderance of the evidence, "either an earlier reduction to practice or an earlier conception and diligence in reduction to practice." *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, 536 F. Supp. 2d 476, 490 (D. Del. 2008).

32.    A patent application may claim priority to the date of an earlier-filed application only if the earlier-filed application satisfies the written description and enablement requirements under 35 U.S.C. § 112 ¶ 1. *See* 35 U.S.C. § 120; *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1359 (Fed. Cir. 2010). Thus, the purported priority document must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention" claimed in the later application (*New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002) (citation omitted)), and it must enable one of skill in the art to practice the invention without undue experimentation. *See Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004). In other words, "the disclosure must show [the patentee] had invented each feature that is included as a claim limitation." *New Railhead Mfg.*, 298 F.3d at 1295; *see also Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1381-82 (Fed. Cir. 2015) ("A provisional application's effectiveness as prior art depends on its written description support for the claims of the issued patent of which it was a provisional."). The patentee bears the burden of demonstrating entitlement to the priority date. *See Dynamic Drinkware,* 800 F.3d at 1381-82.

### B.   Obviousness

33.     The determination of obviousness under § 103(a) is a question of law based on underlying factual considerations, including the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in the art, and any relevant secondary considerations. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

34.     "[T]he results of ordinary innovation are not the subject of exclusive rights under the patent laws." *Id.* at 427.   Therefore, a claim is invalid as obvious if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. *See* 35 U.S.C. § 103(a); *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 13 (1966).

35.     Obviousness does not require absolute predictability of success or "[c]onclusive proof of efficacy"; "[a]ll that is required is a reasonable expectation of success." *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1331 (Fed. Cir. 2014).  Thus, "obviousness cannot be avoided simply by a showing of some degree of unpredictability in the art so long as there was a reasonable probability of success." *Pfizer*, 480 F.3d at 1364.

36.     Test results or data are not required to show a reasonable expectation of success. Where the "prior art . . . predicted [that] the results" of such testing would be favorable, the fact that a skilled artisan would have "had to verify through routine testing" a claimed drug's "expected traits" does not make the invention nonobvious. *Id.* at 1367.  "[T]o conclude" a claimed invention "would have been obvious," the prior art "merely ha[s] to suggest" that it "would work for its intended purpose." *Id.* at 1368; *see also PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1363-64 (Fed. Cir. 2007) (where "the inventors merely used routine research methods to prove what was already believed to be the case," "[s]cientific

confirmation of what was already believed to be true . . . does not give rise to a patentable invention").

37.     To find obviousness in a Hatch-Waxman case, the person of ordinary skill need only have a reasonable expectation of success of developing the claimed invention, not the approved drug product at issue.  *See Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1292 (Fed. Cir. 2013).

38.     The Court has long held that "[t]he inherent teaching of [the] prior art … arises both in the context of anticipation and obviousness."  *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995).  Thus, "inherency may supply a missing claim limitation in an obviousness analysis" if "the limitation at issue is the 'natural result' of the combination of prior art elements."  *Par Pharm., Inc. v. TWi Pharms., Inc.*, 773 F.3d 1186, 1194-95 (Fed. Cir. 2014); *see Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1369 (Fed. Cir. 2012).

### 1.     Level of Ordinary Skill in the Art

39.     The person of ordinary skill in the art is a hypothetical person presumed to know all of the teachings of the prior art references in the field of the invention at the time the invention was made.  *See Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1576 (Fed. Cir. 1984) (quoting *In re Winslow*, 365 F.2d 1017, 1020 (C.C.P.A. 1966)) (describing the person of ordinary skill in the art as "'the inventor working in his shop with the prior art references— which he is presumed to know—hanging on the walls around him'").  "A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *KSR*, 550 U.S. at 421.

40.     In determining the level of ordinary skill in the art, a court should consider the following factors, which are not exhaustive, but merely a guide: "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems;

(4) rapidity with which innovations are made; (5) sophistication of the technology; and (6)

educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d

1254, 1256 (Fed. Cir. 2007) (quoting *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696

(Fed. Cir. 1983)).

### 2.    The Scope and Content of the Prior Art

41.    In determining obviousness, the prior art includes printed publications, patents,

patent applications, and other prior art as set forth in 35 U.S.C. § 102.

42.    A prior art reference is relevant to the obviousness inquiry if it is analogous.

"Two criteria are relevant in determining whether prior art is analogous: '(1) whether the art is

from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is

not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent

to the particular problem with which the inventor is involved.'" *Wyers v. Master Lock Co.*, 616

F.3d 1231, 1237 (Fed. Cir. 2010) (quoting *In re Clay,* 966 F.2d 656, 658-59 (Fed. Cir. 1992)).

43.    "'A reference is reasonably pertinent if, even though it may be in a different field

of endeavor, it is one which, because of the matter with which it deals, logically would have

commended itself to an inventor's attention in considering his problem.'" *In re GPAC Inc.*, 57

F.3d 1573, 1578 (Fed. Cir. 1995) (quoting *In re Clay,* 966 F.2d at 659 ).  "If a reference

disclosure relates to the same problem as that addressed by the claimed invention, 'that fact

supports use of that reference in an obviousness [finding]. An inventor may well have been

motivated to consider the reference when making [the] invention.'" *Id.* (quoting *In re Clay*, 966

F.2d at 659).

44.    The prior art is presumed to be enabled for whatever is disclosed therein.  *Amgen

Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003); *see also Symbol*

*Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991).  When evaluating a prior art

reference to determine obviousness, the reference must be considered for all that it teaches, not

only the invention claimed or described.  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076

(Fed. Cir. 2015).

45.     An admission in the specification that a given reference qualifies as prior art is

"binding on the patentee for purposes of a later inquiry into obviousness."  *PharmaStem*, 491

F.3d at 1362.

### 3.     The Differences Between the Claimed Invention and the Prior Art

46.     In general, a claim is invalid for obviousness if "a skilled artisan would have been

motivated to combine the teachings of the prior art references to achieve the claimed invention,

and . . . would have had a reasonable expectation of success in doing so."  *Pfizer*, 480 F.3d at

1361.  "The motivation to combine particular references may come 'from the nature of the

problem to be solved, leading inventors to look to the references relating to possible solutions to

that problem.'"  *In re Inland Steel Co.*, 265 F.3d 1354, 1362 (Fed. Cir. 2001) (quoting *Pro-Mold

& Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996)).

47.     "The combination of familiar elements according to known methods is likely to

be obvious when it does no more than yield predictable results."  *KSR*, 550 U.S. at 416; *see also

id.* at 417 ("[A] court must ask whether the improvement is more than the predictable use of prior

art elements according to their established functions.").  Thus, "product[s] of routine

optimization that would have been obvious to one of skill in the art" are not patentable.  *Senju

Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1353 (Fed. Cir. 2015); *accord Pfizer*, 480 F.3d at 1371;

*see also Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1003 (Fed. Cir. 2016) ("For a

technique's use to be obvious, the skilled artisan need only be able to recognize, based on her

background knowledge, its potential to improve the device and be able to apply the technique.").

48.     Obviousness is judged under "an expansive and flexible approach" driven by

"common sense."  *KSR*, 550 U.S. at 407, 415, 421 (rejecting the Federal Circuit's rigid

"teaching, suggestion, or motivation" test, "under which a patent claim is only proved obvious if

'some motivation or suggestion to combine the prior art teachings' can be found in the prior art,

the nature of the problem, or the knowledge of a person having ordinary skill in the art")

(quoting *Al-Site Corp. v. VSI Int'l Inc.*, 174 F.3d 1308, 1323-24 (Fed. Cir. 1999)).  The

obviousness "analysis need not seek out precise teachings directed to the specific subject matter

of the challenged claim, for a court can take account of the inferences and creative steps that a

person of ordinary skill in the art would employ."  *Id.* at 418.  Moreover, the analysis "cannot be

confined by a formalistic conception of the words teaching, suggestion, and motivation, or by

overemphasis on the importance of published articles and the explicit content of issued patents."

*Id.* at 419.  "Common sense teaches . . . that familiar items may have obvious uses beyond their

primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of

[prior art references] together like pieces of a puzzle."  *Id.* at 420.  When there is market pressure

to solve a problem and "there are a finite number of identified, predictable solutions, a person of

ordinary skill has good reason to pursue the known options within his or her technical grasp."

*Id.* at 421.

49.     For an obviousness analysis, it will often be necessary to look to (1) "interrelated

teachings of multiple [prior art references]"; (2) "the effects of demands known to the design

community or present in the marketplace"; and (3) "the background knowledge possessed by a

person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* at 418.

50.     A suggestion or motivation to modify prior art references may be derived from the references themselves, from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved. *See Pro-Mold*, 75 F.3d at 1573.   A suggestion may also come "from the prior art, as filtered through the knowledge of one skilled in the art." *Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1472 (Fed. Cir. 1997) (emphasis omitted).

51.     The Federal Circuit's "case law does not require that a particular combination must be the preferred, or the most desirable, combination described in the prior art in order to provide motivation for the current invention." *In re Fulton*, 391 F.3d 1195, 1200 (Fed. Cir. 2004).   "[J]ust because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes." *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012).

52.     Further, the manner by which an inventor reaches an invention is irrelevant to the obviousness analysis. *See CFMT, Inc. v. YieldUp Int'l Corp.*, 349 F.3d 1333, 1340 (Fed. Cir. 2003); *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1325 (Fed. Cir. 2000).   In other words, "[i]n determining whether the subject matter of a patent claim is obvious, neither the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim.   If the claim extends to what is obvious, it is invalid under § 103." *KSR*, 550 U.S. at 419.

53.     An invention may also be obvious if "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp.   If this leads to the anticipated success, it is likely that product [was] not of innovation but of ordinary skill and common sense.

In that instance the fact that a combination was obvious to try might show that it was obvious under § 103."  *Id.* at 421.  Thus, an invention may be obvious if it would have been obvious to try choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success.  *See, e.g.*, *Pfizer,* 480 F.3d at 1348 (holding invention was obvious because it was obvious to try different salt forms); *Alza Corp. v. Mylan Labs., Inc.,* 464 F.3d 1286 (Fed. Cir. 2006) (holding invention was obvious because it would have been obvious to try the known methods for formulating sustained-release compositions, with a reasonable expectation of success).

54.     A claim's disclosure of a previously unknown but inherent characteristic of an otherwise obvious combination does not render the claim patentable.  *See In re Huai-Hung Kao*, 639 F.3d 1057, 1070 (Fed. Cir. 2011); *see also In re Kubin*, 561 F.3d 1351, 1357-58 (Fed. Cir. 2009).  Were the rule otherwise, "any formulation—no matter how obvious—[would] become patentable merely by testing and claiming an inherent property."  *Santarus, Inc. v. Par Pharm., Inc.*, 694 F.3d 1344, 1354 (Fed. Cir. 2012).

55.     The fact that a reference was previously considered by the PTO does not preclude a finding of invalidity by the Court.  *See Sciele Pharma, Inc. v. Lupin Ltd*., 684 F.3d 1253, 1260 (Fed. Cir. 2012).

### 4.     Secondary Considerations

56.     A patentee may attempt to rebut the obviousness of a claimed invention by presenting evidence of secondary considerations of nonobviousness.  *See*, *e.g.*, *Pfizer*, 480 F.3d at 1369.  To weigh against a finding of obviousness, "'objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support.'"

*Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008) (quoting *Grasselli v. Rohm & Hass Co.*, 713 F.2d 731, 743 (Fed. Cir. 1983)).

57.     "But there is a more fundamental requirement that must be met before secondary considerations can carry the day.  'For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*.'"  *In re Huai-Hung Kao*, 639 F.3d at 1068 (alteration omitted) (quoting *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010)).  "Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention."  *Id.*  Even "impressive" evidence of secondary considerations is not "entitled to weight" unless "it is relevant to the claims at issue."  *In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994).  The plaintiff bears the burden of demonstrating a "legally and factually sufficient connection."  *Id.*  Whether the requisite nexus exists is a question of fact.  *See Pro-Mold*, 75 F.3d at 1573.

58.     Secondary considerations of nonobviousness, moreover, cannot override a strong prima facie showing of obviousness.  *See, e.g., Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008).  "Where the inventions represent no more than 'the predictable use of prior art elements according to their established functions,' the secondary considerations are inadequate to establish nonobviousness as a matter of law." *Stone Strong, LLC v. Del Zotto Prods. of Fl., Inc.*, 455 F. App'x 964, 971 (Fed. Cir. 2011) (quoting *Wyers,* 616 F.3d at 1246) (alterations omitted); *see also Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (similar); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (finding secondary considerations of nonobviousness insufficient to overcome obviousness finding "given the strength of the prima facie obviousness showing"); *Richardson-*

19

*Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1483-84 (Fed. Cir. 1997) (similar); *Kroy IP Holdings,*

*LLC v. Safeway, Inc.*, 107 F. Supp. 3d 656, 675 (E.D. Tex. 2015) (evidence of secondary

considerations of non-obviousness cannot "overcome a strong showing of obviousness in a case

in which obviousness is clear from a comparison of the prior art references and the patent in

suit").

59.     Secondary considerations can include factors such as commercial success, long-

felt but unsolved needs and failure of others, copying, unexpected results, industry praise, and

licensing.  *See*, *e.g.*, *KSR*, 550 U.S. at 406 (citing *Graham*, 383 U.S. at 17-18); *In re Cree, Inc.*,

818 F.3d 694, 702 (Fed. Cir. 2016); *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139

F.3d 877, 884-85 (Fed. Cir. 1998); *Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*, 73

F.3d 1085, 1087-88 (Fed. Cir. 1995).

### a.     Unexpected Results

60.     When a patentee attempts to rely on the unexpected benefits of a claimed

invention, the patentee must "'show that the claimed invention exhibits some superior property

or advantage that a person of ordinary skill in the relevant art would have found surprising or

unexpected'" compared to the prior art.  *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997)

(emphasis added) (quoting *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995)); *see also Pfizer*, 480

F.3d at 1371; *Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 970 (Fed. Cir. 2006).  Whether an

invention has produced unexpected results is a question of fact. *See In re Harris*, 409 F.3d 1339,

1341 (Fed. Cir. 2005).

61.     The claimed invention must be compared to "the closest prior art" in order to

determine whether the invention yields unexpected results.  *Harris*, 409 F.3d at 1344; *accord*

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014).

62.      "[A]ny superior property must be *unexpected* to be considered as evidence of nonobviousness."  *Pfizer*, 480 F.3d at 1371 (emphasis in original).  A result is not unexpected if it is disclosed in the prior art.  *See In re Depomed, Inc.*, 680 F. App'x 947, 951 (Fed. Cir. 2017); *Hoffman-La Roche*, 748 F.3d at 1334.

63.      However, "[u]nexpected properties . . . do not necessarily guarantee that a new compound is nonobvious."  *Bristol-Myers Squibb Co.*, 752 F.3d at 977.  The allegedly unexpected property of the claimed invention must prove to be a *significant* benefit in comparison to the prior art.  *See id.*

64.      Unexpected results that are probative of nonobviousness are those that are "'different in kind and not merely in degree from the results of the prior art.'"  *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013) (quoting *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1322 (Fed. Cir. 2004)); *see also Iron Grip Barbell*, 392 F.3d at 1322-23 (noting that "even though a modification results in great improvement and utility over the prior art, it may still not be patentable if the modification was within the capabilities of one skilled in the art, unless the claimed ranges 'produce a new and unexpected result which is *different in kind and not merely in degree* from the results of the prior art'") (quoting *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996)) (alteration omitted) (emphasis added).  When differences based upon degree are asserted, the evidence must "show that the properties of the compounds differed in such an appreciable degree that the difference was really unexpected."  *In re Merck & Co., Inc.*, 800 F.2d 1091, 1099 (Fed. Cir. 1986).  Further, even if there are "some differences in degree between the properties" of the claimed and prior art compounds, it is not a sufficient showing of unexpected results when "the compounds expectedly have the same type of biological activity."  *Id.*; *see also Bristol-Myers Squibb Co.*, 752 F.3d at 977.

21

65.     In order to claim unexpected results, a patentee additionally must present evidence that the results claimed to be unexpected actually occurred.  *See In re De Blauwe*, 736 F.2d 699, 705 (Fed. Cir. 1984) ("It is well settled that unexpected results must be established by factual evidence.").  "Mere argument or conclusory statements . . . do[] not suffice," (*id.*); nor do speculation or unproven hypotheses about what might become an unexpected result.  *See Geisler*, 116 F.3d at 1470 (finding a statement that it was "common sense" that an effect was unexpected to be unpersuasive).

66.     Additionally, in order for purportedly unexpected results to be probative of nonobviousness, the data upon which the claims of unexpected results are based must be reliable.  *See Inland Steel*, 265 F.3d at 1365-66; *Eli Lilly & Co. v. Perrigo Co.*, 202 F. Supp. 3d 918, 1010-11 (S.D. Ind. 2016).

67.     "To be particularly probative, evidence of unexpected results must establish that there is a difference between the results obtained and those of the closest prior art, and that the difference would not have been expected by one of ordinary skill in the art at the time of the invention."  *Bristol-Myers Squibb*, 752 F.3d at 977.

68.     To be successful on a claim of unexpected results, the patentee must offer evidence that the unexpected results bear a nexus to the novel aspects of the asserted claim.  *Kennmetal, Inc. v. Ingersoll Cutting Tool Co*., 780 F.3d 1376, 1385 (Fed. Cir. 2015).

69.     Before a result can be considered "unexpected" the patentee must present evidence of what results and properties were expected beforehand.  *Pfizer, Inc.*, 480 F.3d at 1371 ("Another defect in the district court's reasoning is its failure to recognize that by definition, any superior property must be unexpected to be considered as evidence of non-obviousness.  Thus, in order to properly evaluate whether a superior property was unexpected, the court should have

22

considered what properties were expected.") (internal citations and emphasis omitted).  The proper analysis of unexpected results is based on what the POSA would have expected in light of the prior art not just what was unexpected by the inventor.  *Bristol-Myers Squibb*, 752 F. 3d at 978.

70.     Finally, any evidence that is provided should be weighed against contrary evidence indicating that the results were not unexpected or not a substantial improvement over the prior art.  *See Geisler*, 116 F.3d at 1470-71.

### b.     Teaching Away

71.     "[W]hether a reference teaches away from the claimed invention [is a] question[] of fact."  *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017) (citing *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047-48 (Fed. Cir. 2016); *In re Mouttet*, 686 F.3d at 1330).

72.     A reference teaches away "when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken" in the claim.  *Galderma Labs.,* 737 F.3d at 738 (citation omitted).  A reference that "merely expresses a general preference for an alternative invention but does not criticize, discredit, or otherwise discourage investigation into' the claimed invention does not teach away."  *Id.* (citation omitted)  *Meiresonne*, 849 F.3d at 1382.

### c.     Commercial Acquiescence

73.     In order for acquiescence of validity to be relevant evidence of nonobviousness, it must be long-standing and must not be the result of factors other than industry belief in the validity of the patent, such as the cost of defending a litigation.  *Upjohn Co. v. Riahom Corp.*,

641 F.Supp. 1209, 1218 (D. Del 1986) (*citing Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp.*, 443 F.2d 867, 871 (2d Cir.1971)).

74.     Where a patentee presents evidence of licensing as a secondary consideration of non-obviousness, the Federal Circuit "'specifically require[s] affirmative evidence of nexus...because it is often cheaper to take licenses than to defend infringement suits.'"  *Cree*, 818 F.3d at 703 (quoting *Iron Grip Barbell*, 392 F.3d at 1324) (internal quotation marks omitted). Thus, the patentee must show that any licenses "were based on the merits of the [claimed invention]."  *Id.*; *accord Iron Grip Barbell*, 392 F.3d at 1324 (without a showing of nexus, "the existence of licenses is of little significance").

### d.     Skepticism

75.     When "[t]he sum total of the evidence regarding skepticism was also particularly thin" and Plaintiff "offered no documents or exhibits expressing initial skepticism about" the invention and Plaintiff's expert's testimony "is the sole proffered basis for such skepticism" the alleged skepticism is not enough to overcome a prima facie showing of obviousness.  *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 923 F. Supp. 2d 602, 680 (D. Del. 2013) (rejecting plaintiff's skepticism argument when plaintiff's expert's did not provide any details about the meetings at which he expressed such skepticism, or about others with whom he spoke who supported that view); *see also Allergan, Inc. v. Watson Labs., Inc.*, 869 F. Supp. 2d 456, 490 (D. Del. 2012) (rejecting plaintiffs' skepticism argument because, *inter alia*, "no written or published statements of skepticism...were introduced into evidence to support [another pharmaceutical company's] alleged rationale" and some of the testimony related to "out-of-court statements" of "unnamed" employees); *see also Santarus, Inc. v. Par Pharm., Inc.*, 720 F. Supp. 2d 427, 457 (D. Del. 2010), *aff'd in relevant part by* 694 F.3d 1344 (Fed. Cir. 2012).

### C.    Written Description

76.    "Pursuant to 35 U.S.C. § 112, [paragraph 1], the specification of a patent 'shall

contain a written description of the invention.' The written description 'analysis compares the

claims with the invention disclosed in the specification, and if the claimed invention does not

appear in the specification,' the claim 'fails regardless whether one of skill in the art could make

or use the claimed invention.'" *FlatWorld Interactives LLC v. Samsung Elecs. Co.*, 77 F. Supp.

3d 378, 383 (D. Del. 2014) (citing *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1348

(Fed. Cir. 2010)).

77.    "Since its inception, [the Federal Circuit] has consistently held that § 112, first

paragraph, contains a written description requirement separate from enablement, and [has]

articulated a 'fairly uniform standard.'" *Ariad*, 598 F.3d at 1351 (Fed. Cir. 2010) (citing *Vas-

Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1562-63 (Fed. Cir. 1991)). "Specifically, the description

must 'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented

what is claimed.'" *Id.* (citing *Vas-Cath*, 935 F.2d 1555 at 1563).

78.    "[T]he test for sufficiency is whether the disclosure of the application relied upon

reasonably conveys to those skilled in the art that the inventor had possession of the claimed

subject matter as of the filing date." *Id.*

79.    To determine whether the written description requirement is satisfied, one looks

to "the four corners of the specification." *Id.* To satisfy the written description requirement, the

specification of a patent application must describe the claimed invention in sufficient detail such

that a person of ordinary skill in the art can reasonably conclude the inventor had possession of

the full scope of the claimed invention. *See id.* (stating that the disclosure must "'clearly allow

persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed'")

(quoting *Vas-Cath*, 935 F.2d at 1563); *Vas-Cath,* 935 F.2d at 1563-64 ("The purpose of the 'written description' requirement is broader than to merely explain how to 'make and use'; the applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention.") (emphasis omitted).  The possession must be "possession as shown in the disclosure." *Ariad Pharm.*, 598 F.3d at 1351.  Therefore, "actual 'possession' or reduction to practice outside of the specification is not enough." *Id.* at 1352.

80.     "Put another way, one skilled in the art, reading the original disclosure, must immediately discern the limitation at issue in the claims." *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (internal quotations omitted); *see also Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 923 (Fed. Cir. 2004) ("'It is not a question whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure of the application. Rather, it is a question whether the application necessarily discloses that particular device.'") (quoting *Jepson v. Coleman*, 314 F.2d 533, 536 (C.C.P.A. 1963)).

81.     "[A]ctual 'possession' or reduction to practice outside of the specification is not enough...it is the specification itself that must demonstrate possession." *Ariad Pharm.*, 598 F.3d at 1352.  "[A] description that merely renders the invention obvious does not satisfy the requirement." *Id.*

82.     The written description inquiry is a question of fact.  *Id.* at 1351.

## III.     MYLAN'S ENTITLEMENT TO RELIEF

83.     Mylan is entitled to a declaration that claim 1-4 of the '218 patent are invalid.

84.     Mylan is entitled to a declaration that Plaintiffs are entitled to no damages, interest, costs, or other relief from or against Mylan.

85.     Mylan is entitled to a declaration that Plaintiffs are not entitled to injunctive relief.

86.     Mylan is entitled to an award of attorneys' fees and costs and any further and additional relief as this Court may deem just and proper.

EXHIBIT 6

*Bayer Intellectual Property GmbH, et al v. Aurobindo Pharma Limited, et al.*

**Exhibit 6 - Joint Trial Exhibit List**

| JTX No. | Bates Number | Date | Description | Plaintiffs' Objections | Mylan's Objections |
|---|---|---|---|---|---|
| JTX-001 | BAYX218-0243991 - BAYX218-0244006 | 1/10/2017 | Certified Copy of U.S. Patent No. 9,539,218 | | D, Y |
| JTX-002 | BAYX218-0000001 – BAYX218-0008222 | | Certified Copy of U.S. Patent No. 9,539,218 File History | | D, R, OS |
| JTX-003 | BAYX218-0244100 - BAYX218-0244135 | 00/00/1990 | Benet, et al., "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution and Elimination," Goodman and Gilman's The Pharmacological Basis of Therapeutics, 8th Ed. (Gilman, et al. Eds. Pergamon Press), Ch. 1 (1990) | H | D, R, Y |
| JTX-004 | BAYX218-0244305 - BAYX218-0244312 | 00/00/2006 | Eriksson, et al., "Oral, direct Factor Xa inhibition with BAY 59-7939 for the prevention of venous thromboembolism after total hip replacement," J. Thromb. Haemost. 4:121-128 (2006) | H | D, R, Y |
| JTX-005 | | 5/24/2018 | Declaration of Leslie Z. Benet, Ph.D., IPR Ex. 1002, re Patent No. 9,539,218 | H | D, Y, R, P, U |
| JTX-006 | BAYX218-0243954 - BAYX218-0243969 | 7/7/2005 | CA 2 547 113 A1 | | D, R, Y |
| JTX-007 | MYL_RIV_218_00001106 - MYL_RIV_218_00001178 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Applicant: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "2.7.1 Summary of Biopharmaceutic Studies and Associated Analytical Materials" | | D, Y, R |
| JTX-008 | MYL_RIV_218_00001044 - MYL_RIV_218_00001083 | | Dissolution Profiles and Certificates of Analysis for 10mg, 15mg and 20mg Rivaroxaban Tablets | | D, Y, R |
| JTX-009 | MYL_RIV_218_00019191 - MYL_RIV_218_00019195 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, "1.14.1.5 Labeling History" | F, H | D, R, Y |
| JTX-010 | MYL_RIV_218_00019196 - MYL_RIV_218_00019239 | 11/00/2017 | Highlights of Prescribing Information for Rivaroxaban Tablets | | D, Y, R |
| JTX-011 | MYL_RIV_218_00019240 - MYL_RIV_218_00019243 | 11/00/2017 | "Medication Guide, Rivaroxaban Tablets" | F, H | D, R, Y |
| JTX-012 | MYL_RIV_218_00019331 - MYL_RIV_218_00019332 | 11/00/2017 | "Medication Guide, Rivaroxaban Tablets" Package Insert | F, H | D, R, Y |
| JTX-013 | MYL_RIV_218_00000093 - MYL_RIV_218_00000099 | | "1.14.2.1 Final Carton and/or Container Labels - Bottles" | F, H | D, Y, R |
| JTX-014 | MYL_RIV_218_00019390 - MYL_RIV_218_00019392 | 12/8/2017 | Letter from Mylan to FDA re Patent and Labeling Amendment (Patent and Labeling Information Provided), ANDA 208561, Sequence No. 0018 | F, H | D, R, Y |
| JTX-015 | MYL_RIV00000998 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Applicant: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "2.2 Introduction" | F, H | D, R, Y |
| JTX-016 | MYL_RIV00001054 - MYL_RIV00001104 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Manufacturer: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "2.3.P Drug Product" | | D, Y, R |
| JTX-017 | MYL_RIV00001105 - MYL_RIV00001131 | | "2.3.P.5 Control of Drug Product" | | D, Y, R |

*Bayer Intellectual Property GmbH, et al v. Aurobindo Pharma Limited, et al.*

**Exhibit 6 - Joint Trial Exhibit List**

| JTX No. | Bates Number | Date | Description | Plaintiffs' Objections | Mylan's Objections |
|---|---|---|---|---|---|
| JTX-018 | MYL_RIV_218_00001353 - MYL_RIV_218_00001358 | 2/8/2017 | "Drug Product, Specifications for Release/Stability" for Rivaroxaban Tablets 10mg, 15mg and 20 mg | | D, Y,  R |
| JTX-019 | MYL_RIV_218_00000549 - MYL_RIV_218_00000555 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Manufacturer: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "3.2.P.5.6 Justification of Specifications" | F, H | D, R, Y |
| JTX-020 | MYL_RIV00002234 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Manufacturer: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "3.2.P.5.2 Analytical Procedures" | F, H | D, R, Y |
| JTX-021 | MYL_RIV00002255 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Manufacturer: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "3.2.P.5.3 Validation of Analytical Procedures" | F, H | D, R, Y |
| JTX-022 | MYL_RIV00002256 - MYL_RIV00002269; MYL_RIV00001340 - MYL_RIV00001367 | | "Method Validation Report, Dissolution, FP-RIVARO-US-DS-M" for Rivaroxaban Tablets, 10 mg, 15 mg, and 20 mg and Dissolution Profiles for Xarelto 15mg and 20mg Tablets and Rivaroxaban 20 mg Tablets and Certificates of Analysis for Rivaroxaban and Xarelto 10mg, 15mg and 20mg Tablets | F, H | D, R, Y |
| JTX-023 | MYL_RIV00001332 - MYL_RIV00001339; MYL_RIV00001368 | | Dissolution Profiles for Rivaroxaban and Xarelto 10mg Tablets and Rivaroxaban 15mg Tablets | | D, Y, R |
| JTX-024 | MYL_RIV_218_00000579 - MYL_RIV_218_00000623 | 6/22/2016 | "Mylan Research and Development Accumulated Stability Data" for Rivaroxaban 10 mg, 15 mg and 20 mg Tablets | F, H | D, R, Y |
| JTX-025 | MYL_RIV00000562 - MYL_RIV00000563 | | Rivaroxaban - 10 mg, 15 mg and 20 mg - Tablets, Applicant: Mylan Pharmaceuticals Inc. (Morgantown, WV USA), "1.12.15 Request for Waiver of *In Vivo* Studies" | F, H | D, R, Y |
| JTX-026 | BAYX218-0243334 - BAYX218-0243337 | | Curriculum Vitae of Frank Misselwitz, MD, PhD. | | D, R |
| JTX-027 | BAYX-03592200 - BAYX-03592215 | 3/00/2017 | Xarelto® Label | | D, R |
| JTX-028 | | | Curriculum Vitae of Allan S. Myerson | | D, Y |
| JTX-029 | BAYX218-0244007 - BAYX218-0244021 | 7/7/2005 | WO 2005/060940 A2 | T | D, R, Y |
| JTX-030 | | | Curriculum Vitae of Jeffrey Weitz | | D, Y |
| JTX-031 | JOINT_RIV0000720 – JOINT_RIV0000725 | 00/00/1994 | Camerlingo, et al., "Immediate Anticoagulation With Heparin for First-Ever Ischemic Stroke in the Carotid Artery Territories Observed Within 5 Hours of Onset," Arch. Neurol., 51:462-467 (1994) | H, R | D, R |
| JTX-032 | JOINT_RIV0000174 – JOINT_RIV0000190 | 00/00/2003 | Fareed, et al., "Pharmacodynamic and Pharmacokinetic Properties of Enoxaparin, Implications for Clinical Practice," Clin. Pharmacokinetics, 42(12):1043-1057 (2003) | H | D, R, Y |

**Bayer Intellectual Property GmbH, et al v. Aurobindo Pharma Limited, et al.**

**Exhibit 6 - Joint Trial Exhibit List**

| JTX No. | Bates Number | Date | Description | Plaintiffs' Objections | Mylan's Objections |
|---|---|---|---|---|---|
| JTX-033 | JOINT_RIV0000205 | 00/00/2003 | Harder, et al., "Effects of BAY 59-7939, an innovative, oral, direct factor Xa inhibitor, on thrombin generation in healthy volunteers," Pathophysiol. Haemost. Thromb., 33(supp2):97, Abstr. No. PO078 (2003) | H | D, R, Y |
| JTX-034 | JOINT_RIV0000206 | 11/16/2003 | Harder, et al., "Effects of BAY 59-7939, an Oral, Direct Factor Xa Inhibitor, on Thrombin Generation in Healthy Volunteers," Blood 102(11):811a, Abstr. No. 3003 (2003) | H | D, R, Y |
| JTX-035 | JOINT_RIV0000206 | 11/16/2003 | Kubitza, et al, "Multiple Dose Escalation Study Investigating the Pharmacodynamics, Safety, and Pharmacokinetics of Bay 59-7939, an Oral, Direct Factor Xa Inhibitor, in Healthy Male Subjects," Blood, 102(11):811a, Abstr. No. 3004 (2003) | H | D, R, Y |
| JTX-036 | JOINT_RIV0000207 – JOINT_RIV0000208 | 11/16/2003 | Kubitza, et al., "Single Dose Escalation Study Investigating the Pharmacodynamics, Safety, and Pharmacokinetcs of BAY 59-7939 an Oral Direct Factor Xa Inhibitor in Healthy Male Subjects," Blood 102(11):813a, Abstr. No. 3010 (Nov. 2003) | H | D, R, Y |
| JTX-037 | JOINT_RIV0000209 | 00/00/2003 | Kubitza, et al., "Single dose escalation study of BAY 59-7939 - an oral, direct factor Xa inhibitor - in healthy male subjects" Pathophysiol. Haemost. Thromb., 33(suppl2):98, Abstr. PO081 (2003) | H | D, R, Y |
| JTX-038 | JOINT_RIV0000258 – JOINT_RIV0000332 | 8/14/2003 | U.S. Patent Application No. 2003/0153610 A1 | H | D, R, Y |
| JTX-039 | JOINT_RIV0000516 – JOINT_RIV0000570 | 1/1/2000 | United States Pharmacopeia, Vol. 24, pp. 1941-1946, 2051-2098 (effective January 1, 2000) | | D, R |
| JTX-040 | JOINT_RIV0000571 – JOINT_RIV0000572 | 1/1/2003 | United States Pharmacopeia, Vol. 26, pp. 2155-2156 (effective January 1, 2003) | | D, R |
| JTX-041 | JOINT_RIV0000573 – JOINT_RIV0000601 | 00/00/2001 | Wilkinson, G.R., "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution, and Elimination," Goodman & Gilman's The Pharmacological Basis of Therapeutics, 10thEd. (McGraw-Hill Professional), Ch. 1 (2001) | H | D, R |
| JTX-042 | JOINT_RIV0001041 – JOINT_RIV0001060 | 3/16/2000 | WO 00/13671 | H | D, R |
| JTX-043 | JOINT_RIV0000908 – JOINT_RIV0000919 | 5/00/1998 | Martineau, P. & N. Tawil, "Low-Molecular-Weight Heparins in the Treatment of Deep-Vein Thrombosis," Ann. Pharmacother., 32:588-598, 601 (1998) | H | D, R, Y |
| JTX-044 | JOINT_RIV0000968 – JOINT_RIV0000998 | 00/00/1995 | Rowland, M. & T.N. Tozer, "Multiple-Dose Regimens," Clinical Pharmacokinetics, Concepts And Applications, 3rd Edition (Williams & Wilkins), Chapter 7 (1995) | H | D, R, Y |
| JTX-045 | MYL_RIV00074495 – MYL_RIV00074616 | 12/2/2014 | "2014 AHA/ACC/HRS Guideline for the Management of Patients With Atrial FibrillationFibrillation - A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines and the Heart Rhythm Society," Circulation, 130:e199-e267 (2014) | H | D, R |

*Bayer Intellectual Property GmbH, et al v. Aurobindo Pharma Limited, et al.*

**Exhibit 6 - Joint Trial Exhibit List**

| JTX No. | Bates Number | Date | Description | Plaintiffs' Objections | Mylan's Objections |
|---|---|---|---|---|---|
| JTX-046 | MYL_RIV00074617 – MYL_RIV00074660 | 8/2/2016 | "2016 ACC/AHA Clinical Performance and Quality Measures for Adults With Atrial Fibrillation or Atrial Flutter," JACC, 68(5):525-568 (Aug. 2, 2016) | H | D, R |
| JTX-047 | MYL_RIV00074661 – MYL_RIV00074688 | 00/00/2017 | "2017 ACC Expert Consensus Decision Pathway for Periprocedural Management of Anticoagulation in Patients With Nonvalvular Atrial Fibrillation," JACC, 1-28 (2017) | H | D, R |
| JTX-048 | MYL_RIV00074689 – MYL_RIV00074707 | 00/00/2000 | Acova® Label (2000) | H | D, R, Y |
| JTX-049 | MYL_RIV00074773 – MYL_RIV00074778 | 00/00/2006 | Bergqvist, D., "Review of fondaparinux sodium injection for the prevention of venous thromboembolism in patients undergoing surgery," Vascular Health & Risk Mgmt, 2(4):365-370 (2006) | H | D, R, Y |
| JTX-050 | MYL_RIV00074779 – MYL_RIV00074810 | 8/00/2017 | Coumadin® Label (2017) | H, R | D, R |
| JTX-051 | MYL_RIV00074832 – MYL_RIV00074861 | 12/00/2012 | Eliquis® Label (2012) | H, R | D, R |
| JTX-052 | MYL_RIV00074862 – MYL_RIV00074907 | 8/00/2014 | Eliquis® Label (2014) | H, R | D, R |
| JTX-053 | MYL_RIV00074996 – MYL_RIV00075011 | 00/00/1998 | Lovenox® Label (1998) | H | D, R, Y |
| JTX-054 | MYL_RIV00075012 – MYL_RIV00075053 | 10/00/2013 | Lovenox® Label (2013) | H, R | D, R |
| JTX-055 | MYL_RIV00075054 – MYL_RIV00075058 | 00/00/1996 | "Lovenox®," Physician's Desk Reference (50th Ed.), pp. 329, 2020-2022 (1996) | H | D, R |
| JTX-056 | MYL_RIV00075059 – MYL_RIV00075067 | 10/00/2010 | Pradaxa® Label (2010) | R, H | D, R |
| JTX-057 | MYL_RIV00075068 – MYL_RIV00075089 | 4/00/2014 | Pradaxa® Label (2014) | R, H | D, R |
| JTX-058 | MYL_RIV00075090 – MYL_RIV00075117 | 11/00/2015 | Pradaxa® Label (2015) | R, H | D, R |
| JTX-059 | MYL_RIV00075159 – MYL_RIV00075190 | 1/00/2015 | Savaysa® Label (2015) | H, R | D, R |
| JTX-060 | MYL_RIV00075448 – MYL_RIV00075468 | 7/00/2011 | Xarelto® Label (July 2011) | | D, R |
| JTX-061 | MYL_RIV00075469 – MYL_RIV00075501 | 11/00/2011 | Xarelto® Label (November 2011) | | D, R |
| JTX-062 | MYL_RIV00075502 – MYL_RIV00075540 | 11/00/2012 | Xarelto® Label (2012) | | D, R |

***Bayer Intellectual Property GmbH, et al v. Aurobindo Pharma Limited, et al.***

**Exhibit 6 - Joint Trial Exhibit List**

| JTX No. | Bates  Number | Date | Description | Plaintiffs' Objections | Mylan's Objections |
|---|---|---|---|---|---|
| JTX-063 | MYL_RIV00002240 – MYL_RIV00002242 | 6/9/2015 | Dissolution Protocol FP-RIVARO-US-DS-M for 10 mg, 15 mg & 20 mg Rivaroxaban Tablets | | D,Y, R |
| JTX-064 | MYL_RIV_218_00000231 – MYL_RIV_218_00000240 | 5/25/2016 | Letter from FDA to Mylan re Deficiencies | | D, H, Y, R |
| JTX-065 | MYL_RIV_218_00000007 – MYL_RIV_218_00000049 | 6/27/2016 | Letter from Mylan to FDA re Information Request Response Quality, Reference #7788426 (Chamistry and Labeling Information Provided), ANDA 208561, Sequence No. 0006 | | D,Y, R |
| JTX-066 | BAYX218-0244218 - BAYX218-0244220 | 11/16/2003 | Lassen, et al., "A Phase II Randomized, Double-Blind, Five-Arm, Parallel-Group, Dose-Response Study of a New Oral Directly-Acting Factor Xa Inhibitor, Raxaxaban, for the Prevention of Deep Vein Thrombosis in Knee Replacement Surgery - on Behalf of Razaxaban Investigators," Blood, 102(11):15a, Abstr. No. 41 (Nov. 2003) | H | D, R, Y |
| | | | | | |

**Plaintiffs have used the following codes in the objections above:**

| Objection Code | Description | Basis |
|---|---|---|
| A | Lack of authenticity | FRE 901 |
| F | Lack of foundation or personal knowledge | FRE 602 |
| H | Hearsay | FRE 801, 802, 805 |
| N | Not produced in discovery | FRCP 37; FRE 403 |
| R | Lack of relevance | FRE 401, 402, 403 |
| U | Unduly prejudicial, confusing, wasteful, and/or cumulative | FRE 403 |
| I | Incomplete document | FRE 106, 403 |
| T | Not translated into English | FRE 403 |

**DEFENDANT'S OBJECTIONS KEY**

| Code | Objection |
|------|-----------|
| A | Argumentative |
| AT | Attorney objections not removed |
| AU | Authenticity or Identification (FRE 901) |
| B | Violates Best Evidence Rule (FRE 1002-1004) |
| C | Compound |
| D | Duplicative/Cumulative |
| F | Lack of Foundation (FRE 602) |
| H | Hearsay/Improper Use of Deposition (FRE 801-802: FRCP 32) |
| I | Improper/Incomplete Designation (FRE 106: FRCP 32(a)(6)) |
| IC | Improper Counter-Designation (FRE 106: FRCP 32(a)(6)) |
| ID | Improper Designation of a Witness To Be Called Live (FRCP 32) |
| IO | Improper Lay or Expert Opinion (FRE 701-703) |
| K | Lack of Personal Knowledge/Incompetent (FRE 602) |
| L | Leading Objection in Redirects |
| LC | Improper Legal Conclusion (FRE 403) |
| M | Misleading/Mischaracterizes Prior Testimony |
| MD | Mischaracterizes Underlying Document (FRE 401-403) |
| N | Not previously produced, lacks production numbers, or illegible |
| NE | Assumes Facts Not In Evidence (FRE 103) |
| NR | Nonresponsive |
| NSW | No Sponsoring Witness |
| OS | Oversized document in terms of page length, rendering meaningful objections impossible until Defendant knows the purpose for which the document is being offered |
| P | Prejudice/Confusion/Delay/Waste of Time (FRE 403) |

| Code | Objection |
|------|-----------|
| **R** | Relevance (FRE 401/402) |
| **RRW** | Writing or recorded statement cannot be introduced without other writing or recorded statement (FRE 106) |
| **S** | Calls for Speculation (FRE 602) |
| **SC** | Beyond the Scope of the Witness's Testimony as a Corporate Representative |
| **U** | Improper Use Against Other Parties or For Other Purposes (FRE 105) |
| **V** | Vague/Ambiguous/Overbroad |
| **X** | Incomplete Document (FRE 106) |
| **Y** | Wrong Document or Incorrectly Described |
| **Z** | Reserved Because Exhibit Has Not Been Provided, the Copy Provided is Illegible, and/or the Entry Includes Multiple Documents |

# EXHIBIT 7

# Plaintiffs' Trial Exhibit List

Bayer Intellectual Property GmbH et al. v. Taro Pharmaceutical Industries Ltd. et al., No. 17-462-TBD (D. Del.)

| PTX NO. | BATES RANGE | DATE | DESCRIPTION | DEPOSITION EXHIBIT NO. | MYLAN'S OBJECTIONS |
|---|---|---|---|---|---|
| PTX-101 | N/A | 5/24/2018 | IPR2018-1143, Petition for *Inter Partes* Review | Parr 8 | R, P, U |
| PTX-102 | MYL_RIV_218_00018403 - MYL_RIV_218_00018405 | 9/1/2015 | FDA Draft Guidance on Rivaroxaban | | H, NSW, R, P |
| PTX-103 | N/A | 3/5/2019 | Dissolution Methods for rivaroxaban (FDA website) | | H, NSW, R, P |
| PTX-104 | MYL_RIV00065557 - MYL_RIV00065572 | 7/8/2014 | Mylan PowerPoint Presentation - Rivaroxabal Tablets, 10 mg (RLD), 15 mg and 20 mg (RLD), PK Consult | | NSW, R, P |
| PTX-105 | MYL_RIV00001160 - MYL_RIV00001185 | | Mylan ANDA 208561 - 2.3.S.1 General Information | | NSW, R, P |
| PTX-106 | MYL_RIV00001436 - MYL_RIV00001522 | | Mylan ANDA 208561 - 3.2.P.2 Pharmaceutical Development | | NSW, R, P |
| PTX-107 | MYL_RIV_218_00018503 - MYL_RIV_218_00018505 | 4/6/2017 | Correspondence - Mylan to FDA re Patent Amendment | | NSW, R, P |
| PTX-108 | BAYX218-0244325 - BAYX218-0244334 | 1996 | Andrassy and V. Eschenfelder, Are the Pharmacokinetic Parameters of Low Molecular Weight Heparins Predictive of their Clinical Efficacy? Thrombosis Research, 81(2S): S29-38, 1996. | Benet 140; Doherty 23;Weitz 23 | F, SC, R, P, U, Y |
| PTX-109 | BAYX218-0244229 - BAYX218-0244266 | 1985 | Benet, L.Z. and Sheiner, L.B., "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution, and Elimination," Goodman & Gilman's The Pharmacological Basis of Therapeutics, 7th Ed. (Macmillan), Ch. 1 (1985) | | D, R, Y |
| PTX-110 | N/A | 1995 | Benet and P. Zia-Amirhosseini, Basic Principles of Pharmacokinetics. Toxicologic Pathology, 23(2): 115-123, 1995. | Benet 155 | F, H, R, P, Y |
| PTX-111 | BAYX218-0244352 - BAYX218-0244361 | 2002 | Birkett, D.J. Pharmacodynamics - The Concentration-Effect Relationship. Pharmacokinetics Made Easy, Revised (McGraw-Hill) Ch. 11, 2002. | Weitz 26 | F, SC, R, P, U, Y |
| PTX-112 | BAYX218-0244195 - BAYX218-0244204 | 2002 | Birkett, D.J. Designing dose regimens. Pharmacokinetics Made Easy, Revised (McGraw-Hill) Ch. 12, 2002. | Benet 15 | F, H, R, P, Y |
| PTX-113 | BAYX218-0244070 - BAYX218-0244099 | 1999 | Coumadin Approval Letter and Label | | F, H, NSW, R, P |
| PTX-114 | BAYX-03592396 - BAYX-03592398 | 1/11/1999 | Crowther et al., A Randomized Trial Comparing 5-mg and 10-mg Warfarin Loading Doses, 159 Arch. Internal Med. 46-48 (1999) | | F, H, NSW, R, P |

## Plaintiffs' Trial Exhibit List

Bayer Intellectual Property GmbH et al. v. Taro Pharmaceutical Industries Ltd. et al., No. 17-462-TBD (D. Del.)

| PTX NO. | BATES RANGE | DATE | DESCRIPTION | DEPOSITION EXHIBIT NO. | MYLAN'S OBJECTIONS |
|---|---|---|---|---|---|
| PTX-115 | BAYX218-0244297 - BAYX218-0244304 | 2006 | Eriksson, B. I., et al. A Once-Daily, Oral, Direct Factor Xa Inhibitor, Rivaroxaban (BAY 59-7939), for Thromboprophylaxis After Total Hip Replacement. Circulation, 114: 2374-2381, 2006. | Benet 26 | D, R, Y |
| PTX-116 | BAYX218-0244313 - BAYX218-0244324 | 2008 | European Pharmacopoeia 6.0, Volume 1 (2005), pp. 266-275 (2008) | | F, H, NSW, R, P |
| PTX-117 | BAYX-03591910 - BAYX-03591934 | 1998 | Hirsh et al., Oral Anticoagulants: Mechanism of Action, Clinical Effectiveness, and Optimal Therapeutic Range, 114 CHEST 445S-469S (1998) | | F, H, NSW, R, P |
| PTX-118 | BAYX-03591888 - BAYX-03591909 | 1998 | Hirsh et al., Heparin and Low-Molecular Weight Heparin: Mechanisms of Action, Pharmacokinetics, Dosing Considerations, Monitoring, Efficacy, and Safety, 114 CHEST 489S-510S (1998) | | F, H, NSW, R, P |
| PTX-119 | BAYX-03591935 - BAYX-03591952 | 11/1/1998 | Hyers et al., Antithrombotic Therapy for Venous Thromboembolic Disease, 114 CHEST 561S-78S, 561-62S (1998) | | F, H, NSW, R, P |
| PTX-120 | BAYX-03591953 - BAYX-03592028 | 2014 | January et al., 2014 AHA/ACC/HRS Guideline for the Management of Patients with Atrial Fibrillation, 64(21) JACCS e1-e35 (2014) | | D, F, H, NSW, R, P |
| PTX-121 | BAYX-03592035 - BAYX-03592072 | 2016 | Kearon et al., Antithrombotic Therapy for VTE Disease, CHEST 149(2):315-352 (2016) | | D, F, H, NSW, R, P |
| PTX-122 | BAYX218-0244784 - BAYX218-0244796 | 12/1/2013 | Kreutz, A clinical and pharmacologic assessment of once-daily versus twice-daily dosing for rivaroxaban. J Thromb Thrombolysis 38:137-149, 2014. | Doherty 22; Weitz 15 | F, SC, R, P, U, Y |
| PTX-123 | BAYX218-0244145 - BAYX218-0244159 | 2005 | Linkins, L.A. New Anticoagulant Therapy. Annu. Rev. Med. 56:63-77, 2005. | Benet 50 | D, R, Y |
| PTX-124 | BAYX218-0244160 - BAYX218-0244184 | | Majerus, P and Tollefsen, D, "Anticoagulant, Thrombolytic, and Antiplatelet Drugs," Goodman & Gilman's The Pharmacological Basis of Therapeutics, 10th Ed. (McGraw-Hill), Ch. 55 (2001) | | F, H, NSW, R, P |
| PTX-125 | N/A | 2008 | Sahin and L. Benet, The Operational Multiple Dosing Half-life: A Key to Defining Drug Accumulation in Patients and to Designing Extended Release Dosage Forms. Pharm Res., 25(12): 2869-2877, 2008. | Benet 142 | F, H, NSW, R, P, Y |

# Plaintiffs' Trial Exhibit List

Bayer Intellectual Property GmbH et al. v. Taro Pharmaceutical Industries Ltd. et al., No. 17-462-TBD (D. Del.)

| PTX NO. | BATES RANGE | DATE | DESCRIPTION | DEPOSITION EXHIBIT NO. | MYLAN'S OBJECTIONS |
|---------|-------------|------|-------------|------------------------|--------------------|
| PTX-126 | N/A | 2018 | Parasrampuria, D et al. Why Drugs Fail in Late Stages of Development: Case Study Analyses from the Last Decade and Recommendations. The AAPS Journal, 20(46): 1-16, 2018. | Benet 147 | F, H, NSW, R, P, Y |
| PTX-127 | N/A | 2015 | Parasrampuria and L. Benet, Inclusion of Placebos and Blinding for Ascending Dose First-in-Human Studies and Other Underpowered Phase 1 Studies has not been Justified and on Balance is Not Useful. Basic & Clin. Pharmacology & Toxicology, 117: 44-51, 2015. | Benet 146 | F, H, NSW, R, P, Y |
| PTX-128 | BAYX218-0244194 | 2004 | Swaminathan, A. et al. Pharmacokinetic and Pharmacodynamic Characteristics in Healthy Volunteers of Razaxaban, an Orally-Active, Potent, Selective Inhibitor of Factor Xa. Am. Soc. Clin. Pharm. & Ther. 74, P6 (Abstract PI-12) , 2004. | Benet 70 | D, R, Y |
| PTX-129 | BAYX218-0244205 - BAYX218-0244209 | 1992 | Thompson, Gary A., Dosage Regimen Design: A Pharmacokinetic Approach, 32 J. Clin. Pharmacol. 210-214, 210, 1992. | Benet 71 | F, H, NSW, R, P, Y |
| PTX-130 | BAYX218-0243985 - BAYX218-0243990 | 7/7/2005 | U.S. Patent App. Pub. No. 2008/0026057 | | F, H, NSW, R, P |
| PTX-131 | BAYX218-0243941 - BAYX218-0243953 | 2005 | United States Pharmacopeia, 28th Edition/National Formulary, 23rd Edition (2005), pp. 2412-2421 | Parr 3 | F, H, NSW, R, P |
| PTX-132 | BAYX218-0244221 - BAYX218-0244228 | 2005 | United States Pharmacopeia, 28th Edition/National Formulary, 23rd Edition (2005), pp. 2636-2641 | | F, H, NSW, R, P |
| PTX-133 | BAYX218-0243970 - BAYX218-0243984 | 11/21/2016 | United States Pharmacopeia, 33(4) Fourth Interim Revision Announcement, <711> Dissolution (2016) | Parr 4 | F, H, NSW, R, P |
| PTX-134 | BAYX218-0011311 - BAYX218-0011320 | 2002 | Weitz and M. Crowther, Direct thrombin inhibitors. Thrombosis Research, 106: V275-V284, 2002. | Benet 145; Misselwitz Exp. 15; Weitz 24A | F, SC, R, P, U, Y |
| PTX-135 | N/A | 2004 | Weitz et al. Thrombophilia and New Anticoagulant Drugs. Hematology (Am Soc Hematol Educ Program); 424-438, 2004. | Benet 148; Weitz 25 | F, SC, R, P, U, Y |
| PTX-136 | BAYX218-0244210 - BAYX218-0244217 | 2004 | Weitz, J., "New Anticoagulants for Treatment of Venous Thromboembolism," Circulation 110 (Suppl. I) I-19-I-26 (2004) | | D, R |

## Plaintiffs' Trial Exhibit List

Bayer Intellectual Property GmbH et al. v. Taro Pharmaceutical Industries Ltd. et al., No. 17-462-TBD (D. Del.)

| PTX NO. | BATES RANGE | DATE | DESCRIPTION | DEPOSITION EXHIBIT NO. | MYLAN'S OBJECTIONS |
|---|---|---|---|---|---|
| PTX-137 | BAYX218-0244185 - BAYX218-0244193 | 2003 | Wiebe, "Mechanism of Catalysis of Inhibition of Factor IXa by Antithrombin in the Presence of Heparin or Pentasaccharide," 278(37) J. Bio. Chem. 35767-35774 (2003) | | F, H, NSW, R, P |
| PTX-138 | JOINT_RIV0000207 - JOINT_RIV0000208 | 2003 | Wong et al., Antithrombotic Effects of Razaxaban, an Orally-Active Factor Xa Inhibitor, in Rabbit Models of Thrombosis. Blood 102(11):813a, Abstr. No. 3011, 2003. | Misselwitz Exp. 10 | F, H, NSW, R, P |
| PTX-139 | BAYX218-0244022 - BAYX218-0244069 | 8/1/2018 | Xarelto® Label  (2018) | | F, H, NSW, R, P |
| PTX-140 | BAYX218-0244377 - BAYX218-0244381 | 1/16/2019 | Certified copy of May 21, 2008 patent application assignment | | F, H, NSW, R, P |
| PTX-141 | BAYX218-0244382 - BAYX218-0244497 | 1/16/2019 | Certified copy of April 08, 2009 patent application assignments | | F, H, NSW, R, P |
| PTX-142 | BAYX218-0244498 - BAYX218-0244612 | 1/16/2019 | Certified copy of April 21, 2009 patent application assignments | | F, H, NSW, R, P |
| PTX-143 | BAYX218-0244776 - BAYX218-0244783 | 1/16/2019 | Certified copy of November 12, 2012 patent application assignments | | F, H, NSW, R, P |
| PTX-144 | BAYX218-0244613 - BAYX218-0244775 | 1/16/2019 | Certified copy of December 6, 2012 patent application assignments | | F, H, NSW, R, P, OS |
| PTX-145 | N/A | 10/12/2018 | Expert Report of Allan S. Myerson, Ph.D. Concerning Infringement | Myerson 1 | H, R, P, U |
| PTX-146 | N/A | 10/12/2018 | Allan S. Myerson, Ph.D. Infringement Report Materials Considered | | H, R |
| PTX-147 | N/A | 10/12/2018 | Expert Report of Jeffrey I. Weitz, M.D. F.R.C.P.(C), F.A.C.P Concerning Infringement | Weitz 2 | H, R, P, U |
| PTX-148 | N/A | 10/12/2018 | Jeffrey I. Weitz, M.D. F.R.C.P.(C), F.A.C.P Infringement Report Materials Considered | | H, R |
| PTX-149 | N/A | 12/6/2018 | Expert Report of Jeffrey I. Weitz, M.D. F.R.C.P.(C), F.A.C.P Concerning Validity | Benet 200; Weitz 8 | H, R, P, U |
| PTX-150 | N/A | 12/6/2018 | Jeffrey I. Weitz, M.D. F.R.C.P.(C), F.A.C.P Validity Report Materials Considered | | H, R |
| PTX-151 | N/A | 12/5/2018 | Expert Report of Allan S. Myerson, Ph.D. Concerning Validity | Myerson 2 | H, R, P, U |
| PTX-152 | N/A | 12/5/2018 | Allan S. Myerson, Ph.D. Validity Report Materials Considered | | H, R |

## Plaintiffs' Trial Exhibit List

Bayer Intellectual Property GmbH et al. v. Taro Pharmaceutical Industries Ltd. et al., No. 17-462-TBD (D. Del.)

| PTX NO. | BATES RANGE | DATE | DESCRIPTION | DEPOSITION EXHIBIT NO. | MYLAN'S OBJECTIONS |
|---------|-------------|------|-------------|------------------------|--------------------|
| PTX-153 | BAYX218-0004029 - BAYX218-0004043 | 7/7/2005 | WO 2005/060940 - Excerpt from File History | | D, F, H, NSW, R, P |
| PTX-154 | BAYX-01415423 - BAYX-01417573 | 12/7/2004 | Study Report for ODIXa-HIP Phase IIa Dose-Escalating Proof of Principle Trial (Study No. 10942) | Weitz 7; Misselwitz Exp. 8 | F, H, NSW, R, P, OS |
| PTX-155 | BAYX-01415423 - BAYX-01415559 | 12/7/2004 | Excerpt from Study Report for ODIXa-HIP (Study No. 10942) - Part I of Study Report | | F, H, NSW, R, P, OS |
| PTX-156 | BAYX-01416720 - BAYX-01416731 | 8/12/2003 | Amendment No. 4 from Study Report for ODIXa-HIP (Study No. 10942) | | F, H, NSW, R, P |
| PTX-157 | BAYX218-0000006 - BAYX218-0000021 | 7/27/2007 | United States '218 Patent Application - Excerpt from File History | | D, F, H, NSW, R, P |
| PTX-158 | BAYX218-0000071 - BAYX218-0000087 | 1/31/2005 | Priority Application for '218 Patent - Excerpt from File History | | D, F, H, NSW, R, P |
| PTX-159 | N/A | 7/11/2018 | 30(b)(6) Deposition Notice - Mylan Pharmaceuticals Inc. | Britton 1; Kirsch 1 | H, R, P |
| PTX-160 | MYL_RIV00000112 - MYL_RIV00000154 | 3/1/2016 | Mylan ANDA 208561 - Proposed Prescribing Information - Mylan's Rivaroxaban Tablets | Britton 5 | F, R, P |
| PTX-161 | N/A | 5/9/2018 | Mylan Objections and Responses to Plaintiffs' First Set of Interrogatories (Nos. 1-5) | | F, NSW, R, P |
| PTX-162 | N/A | 8/13/2018 | Mylan's First Supplemental Objections and Responses to Plaintiffs' Interrogatories (Nos. 1-2) | | F, NSW, R, P |
| PTX-163 | N/A | 9/14/2018 | Mylan's Second Supplemental Objections and Responses to Plaintiffs' Interrogatories (Nos. 1-2) | | F, NSW, R, P |
| PTX-164 | N/A | | Rivaroxaban Orange Book Listing 10 mg | | F, H, NSW, R, P |
| PTX-165 | N/A | | Rivaroxaban Orange Book Listing 15 mg | | F, H, NSW, R, P |
| PTX-166 | N/A | | Rivaroxaban Orange Book Listing 20 mg | | F, H, NSW, R, P |
| PTX-167 | BAYX-03381038 - BAYX-03381084 | 10/10/2005 | Bay 59-7939 Novel, oral , direct Factor Xa Inhibitor | | F, H, NSW, R, P |

## Plaintiffs' Trial Exhibit List

Bayer Intellectual Property GmbH et al. v. Taro Pharmaceutical Industries Ltd. et al., No. 17-462-TBD (D. Del.)

| PTX NO. | BATES RANGE | DATE | DESCRIPTION | DEPOSITION EXHIBIT NO. | MYLAN'S OBJECTIONS |
|---------|-------------|------|-------------|------------------------|--------------------|

| Code | Objection |
|------|-----------|
| A | Argumentative |
| AT | Attorney objections not removed |
| AU | Authenticity or Identification (FRE 901) |
| B | Violates Best Evidence Rule (FRE 1002-1004) |
| C | Compound |
| D | Duplicative/Cumulative |
| F | Lack of Foundation (FRE 602) |
| H | Hearsay/Improper Use of Deposition (FRE |
| I | Improper/Incomplete Designation (FRE 106: |
| IC | Improper Counter-Designation (FRE 106: |
| ID | Improper Designation of a Witness To Be |
| IO | Improper Lay or Expert Opinion (FRE 701- |
| K | Lack of Personal Knowledge/Incompetent |
| L | Leading Objection in Redirects |
| LC | Improper Legal Conclusion (FRE 403) |
| M | Misleading/Mischaracterizes Prior Testimony |
| MD |  Mischaracterizes Underlying Document (FRE |
| N | Not previously produced, lacks production |
| NE | Assumes Facts Not In Evidence (FRE 103) |
| NR | Nonresponsive |
| NSW | No Sponsoring Witness |
| OS | Oversized document in terms of page length, |
| P | Prejudice/Confusion/Delay/Waste of Time |
| R | Relevance (FRE 401/402) |
| RRW | Writing or recorded statement cannot be |
| S | Calls for Speculation (FRE 602) |
| SC | Beyond the Scope of the Witness's Testimony |
| U | Improper Use Against Other Parties or For |
| V | Vague/Ambiguous/Overbroad |
| X | Incomplete Document (FRE 106) |
| Y | Wrong Document or Incorrectly Described |
| Z | Reserved Because Exhibit Has Not Been |

# EXHIBIT 8

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1001 | XARELTO_0004882 | 11/19/2010 | Rivaroxaban, Film-Coated Tablet 15- and 20-mg, "3.2.P.2.2 Drug Product, Physicochemical and Biological Properties" | Benke 2 | F, R |
| DTX-1002 | BAYX-01870416 - BAYX-01870518 | 10/6/2008 | Bayer HealthCare Research Report No. PH-35539, "Rivaroxaban Tablets 10 mg: Drug Development Report" | Benke 4 | F, R |
| DTX-1003 | MYL_RIV00000945 - MYL_RIV00000947 | 7/1/2015 | Letter from Mylan to FDA re Original Abbreviated New Drug Application, ANDA 208561, Sequence No. 0000 | Britton 2 | F, H |
| DTX-1004 | BAYX218-0006246 - BAYX218-0006266 | 3/17/2011 | Office Action in Application No. 11/883,218 | Handke 1 | F |
| DTX-1005 | BAYX218-0006360 - BAYX218-0006368 | 6/17/2011 | Response to Non Final Office Action in Application No. 11/883,218 | Handke 2 | F |
| DTX-1006 | BAYX218-0006396 - BAYX218-0006416 | 9/21/2011 | Office Action in Application No. 11/883,218 | Handke 6 | F |
| DTX-1007 | BAYX218-0006421 - BAYX218-0006431 | 1/30/2012 | Response to Final Office Action in Application No. 11/883,218 | Handke 7 | F |
| DTX-1008 | BAYX218-0006455 - BAYX218-0006469 | 4/20/2012 | Brief on Appeal in Application No. 11/883,218 | Handke 8 | F |
| DTX-1009 | BAYX218-0006486 - BAYX218-0006502 | 11/22/2013 | Office Action in Application No. 11/883,218 | Handke 9 | F |
| DTX-1010 | BAYX218-0006503 - BAYX218-0006505 | 1/21/2014 | Reply Brief Pursuant to 37 CFR §41.41 in Application No. 11/883,218 | Handke 10 | F |
| DTX-1011 | BAYX218-0006510 - BAYX218-0006519 | 6/3/2016 | Office Action in Application No. 11/883,218 (Decision on Appeal) | Handke 11 | F |
| DTX-1012 | BAYX218-0007265 - BAYX218-0007278 | 8/29/2016 | Notice of Allowance and Fee(s) Due in Application No. 11/883,218 | Handke 12 | F |
| DTX-1013 | MYL_RIV00001940 - MYL_RIV00002002 | | "Validation of Blending Procedures Using 'V' Blenders" | Kirsch 16 | F, H |
| DTX-1014 | BAYX218-0008223 - BAYX218-0008236 | 8/12/2003 | Protocol Amendment Approval Form for BAY 59-7939, "Oral Direct Factor Xa Inhibitor BAY 59-7939 in the Prevention of VTE in Patients Undergoing Total Hip Replacement", Amendment No. 4, Version 1.1 | Kubitza 7 | |
| DTX-1015 | BAYX218-0243295 | | Curriculum Vitae of Dr. Dagmar Kubitza | Kubitza 14 | F, R |
| DTX-1016 | BAYX-00010901 - BAYX-00010977 | 1/2/2007 | Certified Copy of U.S. Patent No. 7,157,456 B2 | Kubitza 15 | R |
| DTX-1017 | | 00/00/1999 | United States Pharmacopeia, Vol. 24, pp. 1941-1943 (effective January 1, 2000) | Kubitza 16 | N, F, H |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1018 | BAYX-00017069 | 3/17/2005 | Submission from Bayer to FDA, Information Amendment: Clinical, IND #64,892, Serial No. 258 | Kubitza 17 | |
| DTX-1019 | BAYX218-0009943 | | Kubitza, et al., "Multiple Dose Escalation Study Investigating the Pharmacodynamics, Safety, and Pharmacokinetics of BAY 59-7939 an Oral, Direct Factor Xa Inhibitor in Healthy Male Subjects," Poster | Kubitza 18 | R, U, F, H |
| DTX-1020 | BAYX-00016927 | 3/2/2004 | Bayer Healthcare Product Report No. PH-33185/1, "Module 1: Single-cenre, randomised, placebo-controlled, single-blind, parallel-group investigation of the safety, tolerability, pharmacodynamics and pharmacokinetics of BAY 59-7939 after | Kubitza 19 | F |
| DTX-1021 | BAYX-00017216 | 1/19/2006 | Letter from Bayer to FDA re Information Amendment: Chemistry, Manufacturing and Controls, IND #64,892, Serial No. 383 | Kubitza 20 | F |
| DTX-1022 | BAYX-00016925 | 6/17/2004 | Letter from Bayer to FDA re Information Amendment: Clinical, IND #64,892, Serial No. 121 | Kubitza 21 | F |
| DTX-1023 | BAYX-00016925 | 6/17/2004 | Letter from Bayer to FDA re Information Amendment: Clinical, IND #64,892, Serial No. 121 | Kubitza 22 | F |
| DTX-1024 | BAYX218-0009944 | | Kubitza, et al., "Single Dose Escalation Study Investigating the Pharmacodynamics, Safety, and Pharmacokinetics of Bay 59-7939 an Oral, Direct Factor Xa Inhibitor in Healthy Male Subjects," Poster | Kubitza 23 | R, U, F, H |
| DTX-1025 | BAYX218-0009942 | | Harder, et al., "Effects of BAY 59-7939, an Oral, Direct Factor Xa Inhibitor, on Thrombin Generation in Healthy Volunteers" Poster | Kubitza 24 | R, U, F, H |
| DTX-1026 | BAYX218-0009942 | | Harder, et al., "Effects of BAY 59-7939, an Oral, Direct Factor Xa Inhibitor, on Thrombin Generation in Healthy Volunteers," Poster | Kubitza 24A | R, U, F, H |
| DTX-1027 | BAYX-00016978 | 10/26/2004 | Letter from Bayer to FDA re Information Amendment: Clinical, IND #64,892, Serial No. 176 | Kubitza 25 | F |
| DTX-1028 | BAYX-00017292 | 11/6/2003 | Bayer Healthcare Product Report No. PH-32998/1, "Randomized, non-blind, non-controlled, 3-way crossover study to assess the pharmacodynamics, pharmacokinetics, safety, and tolerability of an extended release formulation of BAY 59-7939 (E 209) with and without food in comparison to the immediate release formulation in health male subjects" | Kubitza 26 | F, R, U |
| DTX-1029 | BAYX-00017292 | | Section 16.1.4, "List of investigator(s) and other persons whose participation materially affected the conduct of the study" | Kubitza 26A | F, R, U |
| DTX-1030 | BAYX-00017292 | | Bayer Healthcare Product Report No. PH-33107/1, "Randomized, non-blind, non-controlled, 3-way crossover study to assess the pharmacodynamics, pharmacokinetics, safety, and tolerability of an extended release formulation of BAY 59-7939 (E 203) with and without food in comparison to the immediate release formulation in healthy male subjects" | Kubitza 27 | F, R, U |
| DTX-1031 | BAYX-00017292 | | Section 16.1.4, "List of investigator(s) and other persons whose participation materially affected the conduct of the study" | Kubitza 27A | F, R, U |
| DTX-1032 | | | Document identifying Topic Nos. 9 and 10 | Kubitza 28 | R, F |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1033 | BAYX218-0152067 - BAYX218-0152085 | 8/8/2003 | Email from F. Misselwitz re Experts meeting on BAY 59-7939 in VTE Prevention, July 11th, Stratford-upon-Avon, attaching Meeting minutes | Kubitza 29 | H, F |
| DTX-1034 | BAYX218-0204479 - BAYX218-0204494 | 12/4/2003 | "Expert Meeting, BAY 59-7939 Factor Xa Inhibitor in VTE Prevention," San Diego, CA USA | Kubitza 30 | H, F |
| DTX-1035 | BAYX218-0000343 - BAYX218-0000346 | 7/16/2008 | "Response to Notification of Missing Requirements Under 35 U.S.C. 371 in the United States Designated/Elected Office (DO.EO/US)," in Application No. 11/883,218 | Kubitza 31 | F |
| DTX-1036 | | 7/18/2018 | Defendants' Notice of Deposition to Plaintiffs Bayer Intellectual Property GmbH, Bayer AG, and Janssen Pharmaceuticals, Inc., Pursuant to Fed. R. Civ. P. 30(b)(6) | Misselwitz 1 | H, F, R, U |
| DTX-1037 | BAYX218-0111299 - BAYX218-0111357 | 10/9/2002 | Bayer Clinical Study Protocol, "Oral Direct Factor Xa Inhibitor BAY 59-7939 in the Prevention of VTE in Patients Undergoing Total Hip Replacement" | Misselwitz 3 | I, F |
| DTX-1038 | BAYX218-0185016 - BAYX218-0185047 | 2/6/2003 | Bayer Clinical Study Protocol, "Oral Direct Factor Xa Inhibitor BAY 59-7939 in the Prevention of VTE in Patients Undergoing Total Hip Replacement," Amendment 1, Version 1.2 | Misselwitz 4 | F |
| DTX-1039 | BAYX218-0047777 - BAYX218-0047791 | 3/17/2003 | Bayer Clinical Study Protocol, "Oral Direct Factor Xa Inhibitor BAY 59-7939 in the Prevention of VTE in Patients Undergoing Total Hip Replacement," Amendment 2, Version 1.3 | Misselwitz 5 | F, I |
| DTX-1040 | BAYX218-0184897 - BAYX218-0184914 | 5/23/2003 | Bayer Clinical Study Protocol, "Oral Direct Factor Xa Inhibitor BAY 59-7939 in the Prevention of VTE in Patients Undergoing Total Hip Replacement," Amendment 3, Version 1.2 | Misselwitz 6 | F, I |
| DTX-1041 | BAYX218-0022132 - BAYX218-0022148 | 1/10/2017 | Scan of Physical Copy of U.S. Patent No. 9,539,218 B2 | Misselwitz 8 | U |
| DTX-1042 | BAYX218-0012223 - BAYX218-0012228 | 6/20/2004 | Pathophysiology of Haemostasis and Thrombosis, 18th International Congress on Thrombosis Abstracts, 33(suppl2):24, 76, 91, 97-98 (2003) | Misselwitz 10 | H |
| DTX-1043 | BAYX218-0241764 | | Kubitza, et al., "Multiple dose escalation study investigating BAY 59-7939 - an oral, direct Factor Xa inhibitor - in healthy, male subjects," Poster | Misselwitz 11 | R, U, F, H, A |
| DTX-1044 | BAYX218-0241765 | | Kubitza, et al., "Single dose escalation study of BAY 59-7939 - an oral, direct Factor Xa inhibitor - in health male subjects," Poster | Misselwitz 12 | R, U, F, H, A |
| DTX-1045 | BAYX218-0012417 - BAYX218-0012470 | | "7.2 Clinical Pharmacology Studies" | Misselwitz 13 | F |
| DTX-1046 | | 11/16/2016 | "Cross-reference table for opponents' document numbering," Annex A | Misselwitz Exp. 14 | F, R, H |
| DTX-1047 | BAYX-03586774 - BAYX-03586777; XARELTO_00130449 - XARELTO_00130470 | 9/12/2012 - 8/25/2014 | Amendment Nos. 6-10 to Collaborative Development and License Agreement | Stec 5 | R |
| DTX-1048 | XARELTO_00130314 - XARELTO_00130420 | 10/1/2005 | Collaborative Development and License Agreement by and between Bayer Healthcare AG and Othro-McNeil Pharmaceutical, Inc. | Stec 6 | R |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1049 | JOINT_RIV0000209 | 00/00/2003 | Kubitza, et al., "Multiple dose escalation study investigating BAY 59-7939 – an oral, direct factor Xa inhibitor – in healthy male subjects," Pathophysiol. Haemost. Thromb., 33(suppl2):98, Abstr. No. PO080 (2003) | Weitz 13 | H |
| DTX-1050 | BAYX218-0244136 - BAYX218-0244144 | 00/00/2005 | Kubitza, et al., "Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939 - an oral, direct Factor Xa inhibitor - after multiple dosing in healthy male subjects," Eur. J. Clin. Pharmacol., 61:873-880 (2005) | Weitz 14 | H, R |
| DTX-1051 | | | Curriculum Vitae of Leslie Z. Benet | | H, R for DTX 1086 (Materials Considered by Leslie Z. Benet) |
| DTX-1052 | | | Materials Considered by Leslie Z. Benet, Ph.D. | | H for DTX 1087 (Curriculum Vitae of Leslie Z. Benet) |
| DTX-1053 | BAYX-03462548 – BAYX-03462549 | 6/20/2004 - 6/23/2004 | "BAY 59-7939 presentations at ICT 2004" | | F, R, U |
| DTX-1054 | BAYX-00579724 – BAYX-00579795 | 5/13/2008 | Bayer HealthCare Research Report No. PH-35369, "Formulation Development of BAY 59-7939 (Rivaroxaban) Immediate Release Tablets for Clinical Studies Phase I and Phase II" | | F, R, U |
| DTX-1055 | JOINT_RIV0000128 – JOINT_RIV0000173 | 00/00/2002 | Alderborn, G., "Tablets and compaction" Pharmaceutics: The Science of Dosage Form Design," Second Edition (M.E. Aulton Ed., Churchill Livingstone), Ch. 27 (2002) | | H |
| DTX-1056 | MYL_RIV_218_00019553 – MYL_RIV_218_00019571 | 00/00/1985 | Benet, L.Z. & L.B. Sheiner, "Pharmacokinetics: The Dynamics of Drug Absorption, Distribution, and Elimination," Goodman & Gilman's The Pharmacological Basis of Therapeutics, 7th Ed. (Macmillan), Ch. 1 (1985) | | H |
| DTX-1057 | JOINT_RIV0000726 - JOINT_RIV0000730 | 00/00/1996 | Carville, et al., "Thrombus precursor protein (TpP™): marker of thrombosis early in the pathogenesis of myocardial infarction," Clin. Chem., 42(9):1537-1541 (1996) | | H, R |
| DTX-1058 | | 6/23/2005 | DE 103 55 461 | | R, U, F, N, H |
| DTX-1059 | MYL_RIV_218_00019617 – MYL_RIV_218_00019630 (English Translation) | 6/23/2005 | DE 103 55 461 (English Translation) | | R, U, F, N, H, I |
| DTX-1060 | MYL_RIV_218_00019535 – MYL_RIV_218_00019552 | 3/30/1999 | Fragmin® (Pharmacia and Upjohn) 03/30/1999 Supplemental Approval [Prophylaxis of Deep Vein Thrombosis]: S8 Approval Letter; Final Labeling– FOI Document #5243139A (1999) | | H |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1061 | JOINT_RIV0000191 – JOINT_RIV0000204 | 00/00/2002 | Gao, et al., "Fluid bed granulation of a poorly water soluble, low density, micronized drug: comparison with high shear granulation," Int. J. Pharm., 237:1-14 (2002) | | H, R |
| DTX-1062 | JOINT_RIV0000770 – JOINT_RIV0000780 | 4/17/2004 | Goldhaber, S.Z., "Pulmonary embolism," Lancet, 363:1295-1305 (Apr. 2004) | | H |
| DTX-1063 | JOINT_RIV0000781 – JOINT_RIV0000786 | 00/00/1986 | Golub, et al., "Physiologic considerations in drug absorption from the gastrointestinal tract," J. Allergy Clin. Immunol., 78:689-694 (1986) | | H, R |
| DTX-1064 | BAYX-03465509 | | Kubitza, et al., "Multiple dose escalation study investigating BAY 59-7393 – an oral, direct Factor Xa inhibitor – in healthy male subjects," Poster | | R, U, F, H, A |
| DTX-1065 | BAYX-03465510 | | Kubitza, et al., "Single dose escalation study of BAY 57-7939 – an oral, direct Factor Xa inhibitor – in healthy male subjects," Poster | | R, U, F, H, A |
| DTX-1066 | JOINT_RIV0000210 – JOINT_RIV0000218 | 00/00/2001 | Leadley, Jr., R.J., "Coagulation Factor Xa Inhibition: Biological Background and Rationale," Current Topics in Medicinal Chem., 1(2):151-159 (2001) | | H |
| DTX-1067 | MYL_RIV_218_00019572 – MYL_RIV_218_00019605 | 11/27/2000 | Lovenox® Injection (Aventis) 11/27/2000 Supplemental Approval [New Indication], S36 Approval Letter; Approvable Letter; Final Labeling – FOI Document #5243106A (2000) | | H |
| DTX-1068 | JOINT_RIV0000219 - JOINT_RIV0000244 | 00/00/2005 | Perzborn, et al., "In vitro and in vivo studies of the novel antithrombotic agent BAY 59-7939—an oral, direct Factor Xa inhibitor," J. Thromb. Haemostasis, 3(3):514-521 (2005) | | H |
| DTX-1069 | JOINT_RIV0000346 – JOINT_RIV0000423 | 1/2/2007 | U.S. Patent No. 7,157,456 | | H, R |
| DTX-1070 | JOINT_RIV0000424 – JOINT_RIV0000493 | 9/22/2009 | U.S. Patent No. 7,592,339 | | H, R |
| DTX-1071 | JOINT_RIV0000494 – JOINT_RIV0000504 | 8/2/2016 | U.S. Patent No. 9,402,851 B2 | | H, R |
| DTX-1072 | JOINT_RIV0000505 – JOINT_RIV0000515 | 8/16/2016 | U.S. Patent No. 9,415,053 B2 | | H, R |
| DTX-1073 | MYL_RIV_218_00019606 – MYL_RIV_218_00019616 | | United States Pharmacopeia, General Chapters: <1088> In Vitro And In Vivo Evaluation of Dosage Forms, http://www.pharmacopeia.cn/v29240/usp29nf24s0_cl088.html | | H, R, A, F |
| DTX-1074 | JOINT_RIV0000001 – JOINT_RIV0000127 | 12/11/2003 | WO 03/101423 A1 | | H |
| DTX-1075 | | | Materials Considered by Leslie Z. Benet, Ph.D. | | R. H |
| DTX-1076 | JOINT_RIV0000655 – JOINT_RIV0000659 | 00/00/2000 | Ageno, W. & M.V. Huisman, "Low-molecular-weight heparins in the treatment of venous thromboembolism," Curr. Control Trials Cardiovasc. Med., 1:102-106 (2000) | | H |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1077 | JOINT_RIV0000660 – JOINT_RIV0000662 | 00/00/2005 | Al-Yaseen, et al., "The safety of dosing dalteparin based on actual body weight for the treatment of acute venous thromboembolism in obese patients," J. Thromb. Haeost., 3:100-102 (2005) | | H |
| DTX-1078 | JOINT_RIV0000692 – JOINT_RIV0000719 | 9/00/2004 | Bueller, et al., "Antithrombotic Therapy for Venous Thromboembolic Disease, The Seventh ACCP Conference on Antithrombotic and Thrombolytic Therapy," Chest, 126:401S-428S (2004) | | H |
| DTX-1079 | JOINT_RIV0000731 – JOINT_RIV0000738 | 4/22/2015 | EP 1 845 961 B1 | | H, R |
| DTX-1080 | BAYX-03384344 – BAYX-03384352 | 11/20/2006 | Eriksson, et al., "A Once-Daily, Oral, Direct Factor Xa Inhibitor, Rivaroxaban (BAY 59-7939), for Thromboprophylaxis After Total Hip Replacement," Circulation, 114:2374-2381 (2006) | | H |
| DTX-1081 | BAYX218-0008756 – BAYX218-0008923 | 11/16/2016 | Patentee's Response to the Notices of Oppositions re European Patent 1 854 961 | | R |
| DTX-1082 | JOINT_RIV0000620 – JOINT_RIV0000654 | 3/15/2018 | Revocation of European Patent No. EP-B-1 845 961 | | R, H |
| DTX-1083 | MYL_RIV_218_00019631 - MYL_RIV_218_00019633 | 00/00/1977 | Ronfeld, R.A. & L.Z. Benet, "Interpretation of Plasma Concentration-Time Curves after Oral Dosing," J. Pharma. Sci., 66(2):178-180 (1977) | | H |
| DTX-1084 | JOINT_RIV0001015 – JOINT_RIV0001022 | 00/00/2004 | Weitz, J.I., "New Anticoagulants for Treatment of Venous Thromboembolism," Circulation, 110[suppl I]:I-19-I-26 (2004) | | H |
| DTX-1085 | | | Curriculum Vitae of Neil E. Doherty III, M.D., F.A.C.C. | | H |
| DTX-1086 | | | Expert Witness Case History of Neil E. Doherty III, M.D., F.A.C.C. | | H, R |
| DTX-1087 | | | Materials Considered by Neil Doherty III, M.D., FACC | | H, R |
| DTX-1088 | MYL_RIV00074708 – MYL_RIV00074718 | 00/00/2000 | Angiomax® Label (2000) | | H, R |
| DTX-1089 | MYL_RIV00074719 – MYL_RIV00074756 | 8/00/2017 | Arixtra® Label (2017) | | H, R |
| DTX-1090 | MYL_RIV00074757 – MYL_RIV00074772 | 00/00/2002 | Bauer, et al., "Fondaparinux, a Synthetic Pentasaccharide: The First in a New Class of Antithrombotic Agents – The Selective Factor Xa Inhibitors," Cardiovascular Drug Reviews, 20(1): 37-52 (2002) | | H |
| DTX-1091 | MYL_RIV00075608 – MYL_RIV00075626 | 6/00/2017 | Bevyxxa® Label (2017) | | H, R |
| DTX-1092 | BAYX218-0008553 – BAYX218-0008562 | 6/3/2016 | Decision on Appeal for Appeal 2014-004087 | | F, H |
| DTX-1093 | MYL_RIV00074952 – MYL_RIV00074977 | 00/00/1997 | Herbert, et al., "SR 90107A/Org 31540, a Novel Anti-Factor Xa Antithrombotic Agent," Cardiovascular Drug Reviews, 15(1):1-26 (1997) | | H |
| DTX-1094 | MYL_RIV00074978 – MYL_RIV00074981 | 3/6/2017 | Kohli, P., "NOACs No Longer Novel," PatientCare (March 6, 2017) (available at http://www.patientcareonline.com/atrial-fibrillation/noacs-no-longer-novel) | | H, R |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1095 | MYL_RIV00074989 – MYL_RIV00074995 | 1/00/1993 | Lovenox® Label (1993) | | H |
| DTX-1096 | JOINT_RIV0000920 – JOINT_RIV0000926 | 00/00/2002 | Moonis, M. & M. Fisher, "Considering the Role of Heparin and Low Molecular Weight Heparins in Acute Ischemic Stroke," Stroke, 33:1927-1933 (2002) | | H |
| DTX-1097 | MYL_RIV00075132 – MYL_RIV00075136 | 3/6/1998 | Refludan® Approval Letter | | H |
| DTX-1098 | MYL_RIV00075137 – MYL_RIV00075158 | 10/00/2004 | Refludan® Label (2004) | | H |
| DTX-1099 | JOINT_RIV0000938 – JOINT_RIV0000963 | | Rudnic, E.M. & J.B. Schwartz, "Oral Solid Dosage Forms," Remington, The Science and Practice of Pharmacy, 21st Ed. (Lippincott Williams & Wikins), Ch. 45 (2005) | | H, R |
| DTX-1100 | JOINT_RIV0001033 – JOINT_RIV0001040 | 2/15/1999 | Yeager, B.F. & S.C. Matheny, "Low-Molecular-Weight Heparin in Outpatient Treatment of DVT," Am. Fam. Physician, 59(4):945-952 (Feb. 1999) | | H |
| DTX-1101 | | | Materials Considered by Neil Doherty III, M.D., FACC | | H, R |
| DTX-1102 | JOINT_RIV0000892 – JOINT_RIV0000896 | 00/00/2004 | Lowe, G.D.O., "Venous and arterial thrombosis: epidemiology and risk factors at various ages," Maturitas, 47:259-263 (2004) | | H |
| DTX-1103 | | | Curriculum Vitae of Alan F. Parr, Pharm. D., Ph.D. | | H |
| DTX-1104 | | | Materials Considered by Alan F. Parr, Pharm. D., Ph.D. | | H, R |
| DTX-1105 | MYL_RIV00001332 – MYL_RIV00001368 | 6/9/2015 – 6/18/2015 | "Dissolution Profiles and Certificates of Analysis" for Rivaroxaban and Xarelto 10 mg, 15 mg and 20 mg tablets | | |
| DTX-1106 | MYL_RIV_218_00019516 – MYL_RIV_218_00019534 | 12/00/2017 | "Waiver of In Vivo Bioavailability and Bioequivalence Studies for Immediate-Release Solid Oral Dosage Forms Based on a Biopharmaceutics Classification System, Guidance for Industry," U.S. Department of Health & Human Services | | H, R |
| DTX-1107 | XARELTO_00025672 [NATIVE] | | "Johnson & Johnson Pharmaceutical Research & Development Response to FDA Communication of 03 May 2011" re NDA 202439 | | |
| DTX-1108 | | | Curriculum Vitae of Jeffery A. Stec, Ph.D. | | H, R |
| DTX-1109 | | | Previous Testimony of Jeffery A. Stec, Ph.D. | | H, R |
| DTX-1110 | | | Documents Review and/or Relied Upon | | H, R |
| DTX-1111 | MYL_RIV_218_00019634 - MYL_RIV_218_00019977 | 00/00/2016 | Bayer Annual Report for 2016, Augmented Version | | H, R |
| DTX-1112 | MYL_RIV_218_00019978 - MYL_RIV_218_00020328 | 00/00/2017 | Bayer Annual Report for 2017, Augmented Version | | H, R |
| DTX-1113 | BAYX-03586827 - BAYX-03586923 | 10/1/2005 | Collaborative Development and License Agreement by and between Bayer Healthcare AG and Othro-McNeil Pharmaceutical, Inc., with Amendment Nos. 1-5 | | H, R |
| DTX-1114 | MYL_RIV_218_00020548 | | Company Overview of Ortho-McNeil Pharmaceutical, LLC (available at https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=767045) | | H, R |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates  Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1115 | MYL_RIV_218_00020329 - MYL_RIV_218_00020337 | 11/20/2018 | "Names, Facts, Figures about Bayer," Profile and Organization (available at https://www.bayer.com/en/profile-and-organization.aspx) | | H, R |
| DTX-1116 | MYL_RIV_218_00020625 - MYL_RIV_218_00020627 | | Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations, Product Details for NDA 022406 (available at https://www.accessdata.fda.gov/scripts/cder/ob/results_product.cfm?Appl_Type=N&Appl_No=022406#) | | |
| DTX-1117 | MYL_RIV_218_00020551 - MYL_RIV_218_00020552 | | Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations for NDA 022406, Product 1 - Rivaroxaban (Xarelto) Tablet 10mg (available at https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=022406&Appl_type=N) | | |
| DTX-1118 | MYL_RIV_218_00020553 - MYL_RIV_218_00020554 | | Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations for NDA 022406, Product 2 - Rivaroxaban (Xarelto) Tablet 15mg (available at https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=002&Appl_type=N) | | |
| DTX-1119 | MYL_RIV_218_00020555 - MYL_RIV_218_00020556 | | Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations for NDA 022406, Product 3 - Rivaroxaban (Xarelto) Tablet 20mg (available at https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=003&Appl_type=N) | | |
| DTX-1120 | MYL_RIV_218_00020549 - MYL_RIV_218_00020550 | | Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations for NDA 022406, Product 4 - Rivaroxaban (Xarelto) Tablet 2.5mg (available at https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=004&Appl_type=N) | | R |
| DTX-1121 | BAYX-03586924 - BAYX-03586941 | | Schedule 1.16, BHC Patent Rights | | R |
| DTX-1122 | BAYX-0010978 - BAYX-0011047 | | U.S. Patent No. 7,585,860 | | R |
| DTX-1123 | MYL_RIV_218_00020338 - MYL_RIV_218_00020339 | 12/21/2018 | "We Collaborate With the World for the Health of Everyone in It," Janssen, About our Services (available at https://www.janssen.com/us/about-us/overview) | | R, F |
| DTX-1124 | XARELTO_00175249 [NATIVE] | | "XARELTO® (rivaroxaban) Launch Readiness" powerpoint | | R, F |
| DTX-1125 | MYL_RIV_218_00020557 - MYL_RIV_218_00020575 | 10/00/2018 | Xarelto® Label (available at: https://www.accessdata.fda.gov/drugsatfda_docs/label/2018/022406s015lbl.pdf) | | |
| DTX-1126 | BAYX218-0243251R - BAYX218-0243276R | 1/15/2018 | Expert Opinion of Frank Misselwitz, Ph.D. for submission in opposition proceedings against EP 1 845 961 B1 | | F |
| DTX-1127 | BAYX218-0243338 - BAYX218-0243342 | 6/00/2004 | "Fachinformation" for Exanta® 24 mg Filmtabletten from AstraZeneca | | H, T, R |
| DTX-1128 | BAYX218-0243277R - BAYX218-0243288R | 6/13/2013 | Douxfils, et al., "Impact of apixaban on routine and specific coagulation assays: a practical laboratory guide," Thomb. Haemost., 110:283-294 (2013) | | H, T, R |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1129 | BAYX218-0243475 - BAYX218-0243483 | 3/27/2003 | Eriksson, et al., "Pharmacokinetics and pharmacodynamics of ximelagatran, a novel oral direct thrombin inhibitor, in young healthy male subjects," Eur. J. Clin. Pharmacol., 59:35-43 (2003) | | H, R |
| DTX-1130 | BAYX218-0243445 - BAYX218-0243450 | 12/4/2017 | Expert Opinion of Prof. Dr. med Dirk Peetz | | H, R, F, U |
| DTX-1131 | BAYX218-0243365 | 00/00/2003 | Fareed, et al., "Studies on the mechanism of action of BAY 59-7939 - an oral, direct Factor Xa inhibitor," Pathophysiol. Haemost. Thromb., 33(supp12):97, Abstr. No. PO077 (2003) | | H, R |
| DTX-1132 | BAYX218-0243415 - BAYX218-0243424 | 00/00/2007 | Graff, et al., "Effects of the Oral, Direct Factor Xa Inhibitor Rivaroxaban on Platelet-Induced Thrombin Generation and Prothrombinase Activity," J. Clin. Pharmacol. 47:1398-1407 (2007) | | H, R |
| DTX-1133 | BAYX218-0243392 - BAYX218-0243399 | 00/00/2005 | Kubitza, et al., "Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939 - an oral, direct Factor Xa inhibitor - after multiple dosing in healthy male subjects," Eur. J. Clin. Pharmacol., 61:873-880 (2005) | | H, R |
| DTX-1134 | BAYX218-0243425 - BAYX218-0243433 | 11/25/2013 | Kubitza, et al., "The discovery of rivaroxaban: translating preclinical assessments into clinical practice," Frontiers in Pharmcol., 4:1-9 (Article 145) (Nov. 2013) | | H, R |
| DTX-1135 | BAYX218-0243434 - BAYX218-0243444 | 00/00/2016 | Kubitza, et al., "Evidence-Based Development and Rationale for Once-Daily Rivaroxaban Dosing Regimens Across Multiple Indications," Clin. & Applied Thromb. Haemost., 22(5):412-422 (2016) | | H, R |
| DTX-1136 | BAYX218-0243383 - BAYX218-0243391 | 00/00/2007 | Laux, et al., "Preclinical and Clinical Characteristics of Rivaroxaban: A Novel, Oral, Direct Factor Xa Inhibitor," Seminars in Thromb. Haemost., 33(5):515-523 (2007) | | H, R |
| DTX-1137 | | 00/00/2005 | Linkins, L.A. & J.I. Weitz, "New Anticoagulant Therapy," Ann. Rev. Med., 56:63-77 (2006) | | |
| DTX-1138 | BAYX218-0243451 - BAYX218-0243474 | | Lovenox Label | | H |
| DTX-1139 | BAYX218-0243312R - BAYX218-0243321R | 7/4/2009 | Mega, et al., "Rivaroxaban versus placebo in patients with acute coronary syndromes (ATLAS ACS-TIMI 46): a randomised, double-blind, phase II trial," Lancet, 374:29-38 (June 2009) | | H, R |
| DTX-1140 | BAYX218-0243400 - BAYX218-0243414 | 12/10/2010 | Perzborn, et al., "The discovery and development of rivaroxaban, an oral, direct factor Xa inhibitor," Drug Disc., 10:61-75 (Jan. 2011) | | H, R |
| DTX-1141 | BAYX218-0243292 - BAYX218-0243294 | 00/00/2016 | Repplinger, et al., "Lack of significant bleeding despite large acute rivaroxaban overdose confirmed with whole blood concentrations," Clin. Toxicol., 54(8):647-649 (2016) | | H, R |
| DTX-1142 | BAYX218-0248298 - BAYX218-0248300 | 2/00/2004 | Swaminathan, et al., "Pharmacokinetic and Pharmacodynamic Characteristics in Healthy Volunteers of Razaxaban, an Orally-Active, Potent, Selective Inhibitor of Factor Xa," Clin. Pharmcol. & Therapeutics, p. 6, Abstr. No. PI-12 (Feb. 2004) | | H |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

| Final DTX No. | Bates Number | Date | Description | Depo Ex. | Pltf's Objections |
|---|---|---|---|---|---|
| DTX-1143 | BAYX218-0243374 - BAYX218-0243381 | 00/00/2005 | Turpie, et al., "BAY 59-7939: an oral, direct Factor Xa inhibitor for the prevention of venous thromboembolism in patient after total knee replacement. A phase II dose-ranging study," J. Thromb. Haemost., 3:2479-2486 (2005) | | H, R |
| DTX-1144 | | 5/22/2013 | Xarelto Label | | H, R |
| DTX-1145 | | 11/17/2004 | Email from Bayer re Antwort: 11527 study. Good news but… | | |
| DTX-1146 | | 6/4/2017 | Merriam-Webster definition of "no/not more than," available at: https://www.merriam-webster.com/dictionary/no/not more than | | H, R |
| DTX-1147 | | 4/12/2017 | "Dose-ranging Study of Once-daily Regiment of BAY 59-7939 in the Prevention of VTE in Patients Undergoing Elective Total Hip Replacement (ODIXaHIP-OP)," available at: https://clinicaltrials.gov/ct2/show?term=11527&rank2 | | H, R |
| DTX-1148 | | 7/4/2017 | "Questions and Answers for Cialis (tadalafil)," Postmarket Drug Study Information for Patients and Providers, available at: https://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformation | | H, R |
| DTX-1149 | | 11/00/2017 | Curriculum Vitae for Prof. Dr. med. Dirk Peetz | | H, R, F, U |
| DTX-1150 | | 7/3/2018 | Markman Order (D.I. 91), Case No. 17-462-RGA | | N, R, U |
| DTX-1151 | | 9/21/2018 | Letter to Honorable Richard G. Andrews From Bindu A. Palapura (D.I. 121), Case No. 17-462-RGA | | N, R, U |
| DTX-1152 | | 9/28/2018 | Order (D.I. 128), Case No. 17-462-RGA | | N, R, U |
| | | | | | |

*Bayer Intellectual Property GmbH, et al v. Taro Pharmaceutical Industries Ltd., et al.*

**Exhibit 8 - Defendant's Trial Exhibit List**

**Plaintiffs have used the following codes in the objections above:**

| Objection Code | Description | Basis |
|---|---|---|
| A | Lack of authenticity | FRE 901 |
| F | Lack of foundation or personal knowledge | FRE 602 |
| H | Hearsay | FRE 801, 802, 805 |
| N | Not produced in discovery | FRCP 37; FRE 403 |
| R | Lack of relevance | FRE 401, 402, 403 |
| U | Unduly prejudicial, confusing, wasteful, and/or cumulative | FRE 403 |
| I | Incomplete document | FRE 106, 403 |
| T | Not translated into English | FRE 403 |

# EXHIBIT 9

## **EXHIBIT 9**

## **PLAINTIFFS' LIST OF WITNESSES**
## **TO BE CALLED AT TRIAL LIVE OR BY DEPOSITION**

Plaintiffs hereby disclose the following list of witnesses that they intend to call at trial to testify live or by deposition.  The identification of a witness on this list is not an admission by Plaintiffs that the witness's testimony is admissible if called by Mylan, and Plaintiffs reserve the right to object to any objectionable or inadmissible witness or testimony.  Plaintiffs reserve the right to call additional witnesses live or by deposition (or to offer additional deposition designations from witnesses identified herein) in rebuttal to unanticipated issues raised in Mylan's case-in-chief or rebuttal presentations.  Plaintiffs further reserve the right to call additional witnesses live or by deposition to respond to issues raised after the preparation and submission of this list, including any changes by Mylan to its arguments, witness lists, or other positions.  Plaintiffs further reserve the right to call additional witnesses live or by deposition (or to offer additional deposition designations from witnesses identified herein) to the extent necessary to provide foundational testimony if Mylan contests the authenticity or admissibility of any materials to be offered as evidence at trial.  Plaintiffs further reserve the right to substitute witnesses for the listed witnesses should any witness become no longer able, available, or willing to testify at trial.  If a witness listed as a person whom Plaintiffs intend to call to testify in person is unavailable, Plaintiffs reserve the right to offer deposition testimony from such witness.

Plaintiffs may call the following witnesses to provide live testimony.  Witnesses are listed in alphabetical order.

1. Frank Misselwitz (fact and expert testimony)

2. Allan S. Myerson, Ph.D. (expert testimony)

3. Jeffrey I. Weitz, M.D. F.R.C.P.(C), F.A.C.P. (expert testimony)

Plaintiffs may call the following witness to provide testimony by deposition:

1. Beth Britton

2. Dr. John David Kirsch

# EXHIBIT 10

### EXHIBIT 10

### MYLAN'S LIST OF WITNESSES
### TO BE CALLED AT TRIAL LIVE OR BY DEPOSITION

Mylan hereby discloses the following list of witnesses that it will or may call at trial to testify live or by deposition.  The identification of a witness on this list is not an admission by Mylan that the witness's testimony is admissible if called by Plaintiffs, and Mylan reserves the right to object to any objectionable or inadmissible witness or testimony.  Mylan reserves the right to revise or supplement this list consistent with the Pretrial Order or as otherwise permitted by the Court.  Mylan further reserves the right to call additional witnesses live or by deposition (or to offer additional deposition designations from witnesses identified herein) in rebuttal to issues raised in Plaintiffs' case-in-chief or rebuttal presentations.  Mylan further reserves the right to call additional witnesses live or by deposition to respond to issues raised after the preparation and submission of this list, including any changes by Plaintiffs to their arguments, witness lists, or other positions.  Mylan further reserves the right to call any witness live or by deposition for purposes of impeachment.  Mylan further reserves the right to call additional witnesses live or by deposition (or to offer additional deposition designations from witnesses identified herein) to the extent necessary to provide foundational testimony if Plaintiffs contest the authenticity or admissibility of any materials to be offered as evidence at trial.  Mylan further reserve the right to substitute witnesses for the listed witnesses should any witness become no longer able, available, or willing to testify at trial.  If a witness listed as a person whom Mylan intends to call to testify in person is unavailable, Mylan reserves the right to offer deposition testimony from such witness. Mylan further reserves the right to call anyone appearing on Plaintiffs' witness list. Mylan further reserves the right to call live or by deposition any expert witness that submitted an expert report on behalf of Plaintiffs in this action even if Plaintiffs elect not to call that expert witness at trial.

**I.**      **WITNESSES WHOM MYLAN WILL OR MAY CALL TO TESTIFY LIVE**

Subject to the availability of each expert witness at the time of trial and any future stipulations entered into by the parties, Mylan will call the following expert witnesses in person:

1.      Dr. Leslie Z. Benet, Ph.D.

2.      Dr. Neil Doherty

3.      Dr. Alan F. Parr, Pharm.D., Ph.D.

4.      Dr. Jeffrey A. Stec, Ph.D.

**II.**      **WITNESSES WHOM MYLAN MAY CALL TO TESTIFY BY DEPOSITION**

1.      Klaus Benke

2.      Gabriele Handke-Ergueden

3.      Dr. Dagmar Kubitza

4.      Dr. Frank Misselwitz

EXHIBIT 11

## EXHIBIT 11

## PLAINTIFFS' DEPOSITION DESIGNATIONS

Plaintiffs hereby make the following deposition designations.  Plaintiffs reserve the right to amend these designations and to respond to any designations made by Mylan.

1. Beth Britton

| Start | End | Mylan's Objections | Mylan's Counter Designations | Plaintiffs' Objections to Mylan's Counters |
|-------|-----|--------------------|------------------------------|--------------------------------------------|
| 6:2 | 6:7 | | | |
| 6:12 | 6:14 | | | |
| 6:18 | 6:19 | | | |
| 12:17 | 12:21 | | | |
| 13:3 | 13:11 | | | |
| 13:20 | 14:1 | | | |
| 14:16 | 15:15 | | | |
| 37:4 | 37:13 | | | |
| 46:20 | 46:22 | V | | |
| 47:5 | 47:7 | | | |
| 55:12 | 55:17 | | | |
| 61:18 | 62:2 | | | |
| 71:15 | 71:19 | | | |
| 77:4 | 77:13 | | | |
| 78:1 | 78:19 | | | |
| 94:18 | 95:4 | I | 186:10-18;  187:1-24 | |
| 102:17 | 102:22 | SC | | |
| 103:3 | 103:12 | SC | | |
| 104:10 | 105:8 | | | |
| 105:9 | 106:11 | | | |
| 108:11 | 109:7 | NSW | | |
| 111:17 | 112:10 | I | 111:14-16; 112:11-16 | 112:11-16 should not be counter designated because of stipulation at 184:9-185:8. |
| 113:7 | 114:1 | | | |
| 114:18 | 114:22 | | | |
| 115:3 | 115:10 | | | |

| Start | End | Mylan's Objections | Mylan's Counter Designations | Plaintiffs' Objections to Mylan's Counters |
|---|---|---|---|---|
| 116:10 | 117:1 | V | | |
| 118:16 | 119:11 | V | | |
| 119:16 | 120:12 | V | | |
| 120:19 | 122:21 | V | | |
| 127:16 | 130:8 | V | | |
| 130:22 | 131:8 | V | | |
| 131:20 | 134:18 | V | | |
| 135:4 | 136:23 | NSW, V | | |
| 138:1 | 138:13 | V | | |
| 140:15 | 141:13 | I, AU | | |
| 150:5 | 150:24 | | | |
| 152:15 | 153:17 | | | |
| 157:12 | 158:14 | | | |
| 160:14 | 161:16 | SC | | |
| 163:14 | 164:15 | | | |
| 165:23 | 166:7 | | | |
| 167:1 | 167:16 | | | |
| 168:1 | 168:6 | | | |
| 168:16 | 168:23 | | | |
| 174:6 | 175:6 | | | |
| 177:10 | 178:5 | | | |
| 178:20 | 181:17 | | | |

2.  Dr. John David Kirsch

| Start | End | Mylan Objections | Mylan Counter Designations | Plaintiffs' Objections to Mylan's Counters |
|-------|-----|------------------|----------------------------|--------------------------------------------|
| 6:2 | 6:7 | | | |
| 6:16 | 6:18 | | | |
| 6:22 | 6:24 | | | |
| 16:15 | 16:18 | | | |
| 17:2 | 18:23 | I; F; | | |
| 37:19 | 37:22 | | | |
| 89:8 | 90:17 | I | | |
| 95:12 | 95:15 | | | |
| 115:15 | 115:23 | I; | | |
| 122:9 | 123:1 | AU, I | 123:2-5 | |
| 123:6 | 123:23 | | | |
| 126:17 | 127:20 | | | |
| 129:19 | 130:6 | | | |
| 136:2 | 136:5 | F, I, V | | |
| 139:2 | 141:15 | F, V | | |
| 143:7 | 144:6 | | | |
| 144:16 | 146:4 | | | |
| 153:8 | 153:14 | | | |
| 156:14 | 157:13 | | | |
| 174:23 | 175:23 | | | |
| 176:17 | 176:23 | AU, NSW | | |
| 177:3 | 178:5 | | | |
| 193:7 | 194:6 | AU, NSW | | |
| 196:2 | 196:23 | | | |
| 218:17 | 220:16 | S | | |
| 221:11 | 222:9 | | | |
| 223:24 | 224:9 | | | |
| 224:13 | 228:8 | | | |
| 229:6 | 229:16 | | | |
| 229:17 | 232:19 | AT, F, V, S | | |
| 237:10 | 238:12 | | | |
| 245:4 | 245:11 | F, I, AU, NE, V | | |
| 252:4 | 253:9 | AU, NSW | | |
| 254:7 | 254:19 | | | |
| 259:15 | 260:18 | AU, NSW | | |
| 263:19 | 264:13 | | | |
| 264:19 | 266:3 | AU, NSW, V | | |

| Start | End | Mylan Objections | Mylan Counter Designations | Plaintiffs' Objections to Mylan's Counters |
|---|---|---|---|---|
| 272:13 | 273:4 | | | |

**OBJECTIONS KEY**

| Code | Objection |
|---|---|
| A | Argumentative |
| AT | Attorney objections not removed |
| AU | Authenticity or Identification (FRE 901) |
| B | Violates Best Evidence Rule (FRE 1002-1004) |
| C | Compound |
| D | Duplicative/Cumulative |
| F | Lack of Foundation (FRE 602) |
| H | Hearsay/Improper Use of Deposition (FRE 801-802: FRCP 32) |
| I | Improper/Incomplete Designation (FRE 106: FRCP 32(a)(6)) |
| IC | Improper Counter-Designation (FRE 106: FRCP 32(a)(6)) |
| ID | Improper Designation of a Witness To Be Called Live (FRCP 32) |
| IO | Improper Lay or Expert Opinion (FRE 701-703) |
| K | Lack of Personal Knowledge/Incompetent (FRE 602) |
| L | Leading Objection in Redirects |
| LC | Improper Legal Conclusion (FRE 403) |
| M | Misleading/Mischaracterizes Prior Testimony |
| MD | Mischaracterizes Underlying Document (FRE 401-403) |
| N | Not previously produced, lacks production numbers, or illegible |
| NE | Assumes Facts Not In Evidence (FRE 103) |
| NR | Nonresponsive |
| NSW | No Sponsoring Witness |

| Code | Objection |
|------|-----------|
| **OS** | Oversized document in terms of page length, rendering meaningful objections impossible until Defendant knows the purpose for which the document is being offered |
| **P** | Prejudice/Confusion/Delay/Waste of Time (FRE 403) |
| **R** | Relevance (FRE 401/402) |
| **RRW** | Writing or recorded statement cannot be introduced without other writing or recorded statement (FRE 106) |
| **S** | Calls for Speculation (FRE 602) |
| **SC** | Beyond the Scope of the Witness's Testimony as a Corporate Representative |
| **U** | Improper Use Against Other Parties or For Other Purposes (FRE 105) |
| **V** | Vague/Ambiguous/Overbroad |
| **X** | Incomplete Document (FRE 106) |
| **Y** | Wrong Document or Incorrectly Described |
| **Z** | Reserved Because Exhibit Has Not Been Provided, the Copy Provided is Illegible, and/or the Entry Includes Multiple Documents |

# EXHIBIT 12

**EXHIBIT 12**

**MYLAN'S DEPOSITION DESIGNATIONS, PLAINTIFFS' OBJECTIONS AND COUNTER-DESIGNATIONS, AND MYLAN'S OBJECTIONS AND COUNTER-COUNTER DESIGNATIONS**

1.    **DAGMAR KUBITZA, August 10, 2018**

| Mylan's Designations | Plaintiffs' Objections | Plaintiffs' Counter-designations | Mylan's Objections to Counter-designations | Mylan's Counter-counter designations |
|---|---|---|---|---|
| 10:25-11:2 | | | | |
| 25:5-6 | | | | |
| 25:23-26:9 | | | | |
| 26:17-27:1 | | | | |
| 41:11-21 | | | | |
| 42:12-18 | | | | |
| 44:6-21 | | 44:22-45:4 | | |
| 50:8-9 | | | | |
| 50:12-21 | | | | |
| 55:13-19 | | | | |
| 55:22-25 | | 56:2-5 | Relevance (FRE 401/402); Confusion/Prejudice (FRE 403) | |
| 60:18-23 | | 60:24-61:16, 62:2-11 | Relevance (FRE 401/402); Confusion/Prejudice (FRE 403) | 62:12-25 |
| 71:18-72:1 | | | | |
| 77:16-19 | Relevance (FRE | | | |

| Mylan's Designations | Plaintiffs' Objections | Plaintiffs' Counter-designations | Mylan's Objections to Counter-designations | Mylan's Counter-counter designations |
|---|---|---|---|---|
| | 401/402); Confusion/Prejudice (FRE 403) | | | |
| 78:15-18 | Relevance; Confusion/Prejudice | | | |
| 78:20-25 | Relevance; Confusion/Prejudice | | | |
| 81:1-4 | Vague (FRE 401); Relevance; Confusion/Prejudice | | | |
| 81:7-8 | Vague; Relevance; Confusion/Prejudice | | | |
| 98:1-3 | | | | |
| 98:8-13 | | | | |
| 100:11-15 | | | | |
| 100:18-22 | | | | |
| 100:24-101:10 | | | | |
| 140:2-4 | Relevance; Confusion/Prejudice | | | |
| 140:22-141:2 | Relevance; Confusion/Prejudice | | | |
| 141:10-12 | Vague; Relevance; Confusion/Prejudice | | | |
| 141:14-142:15 | Vague; Relevance; Confusion/Prejudice | 142:16-143:14 | AT; Relevance (FRE 401/402) | |
| 145:12-19 | Relevance; Confusion/Prejudice | 145:20-146:8 | Relevance (FRE 401/402) | |

| Mylan's Designations | Plaintiffs' Objections | Plaintiffs' Counter-designations | Mylan's Objections to Counter-designations | Mylan's Counter-counter designations |
|---|---|---|---|---|
| 173:1-4 | Relevance; Confusion/Prejudice | | | |
| 173:19-23 | Relevance; Confusion/Prejudice | | | |
| 174:5-7 | Vague; Relevance; Confusion/Prejudice | | | |
| 174:9-12 | Vague; Relevance; Confusion/Prejudice | | | |
| 179:10-12 | Relevance; Confusion/Prejudice | | | |
| 179:22-24 | Relevance; Confusion/Prejudice | | | |
| 212:12-20 | | | | |
| 212:25-213:3 | | | | |
| 213:9-14 | | | | |
| 216:6-17 | | | | |

2.      **GABRIELE HANDKE-ERGUEDEN, August 23, 2018**

| Mylan's Designations | Plaintiffs' Objections | Plaintiffs' Counter-designations | Mylan's Objections to Counter-designations | Mylan's Counter-counter designations |
|---|---|---|---|---|
| 9:21-24 | | | | |
| 17:21-18:9 | | | | |
| 34:2-13 | | | | |
| 36:1-4 | | | | |
| 36:6-9 | | | | |
| 40:10-13 | | | | |
| 45:16-46:3 | | | | |
| 85:10-17 | | | | |
| 124:19-125:25 | | | | |
| 126:3-14 | | | | |
| 126:21-23 | | | | |

### 3.    KLAUS BENKE., November 9, 2018

| Mylan's Designations | Plaintiffs' Objections | Plaintiffs' Counter-designations | Mylan's Objections to Counter-designations | Mylan's Counter-counter designations |
|---|---|---|---|---|
| 7:17-19 | | | | |
| 14:17-24 | | | | |
| 18:25-19:2 | | | | |
| 19:5-6 | | | | |
| 19:12-14 | | | | |
| 22:2-5 | | 19:17-20:24; 53:20-54:24 | AT, L | 21:19-22:1 |
| 31:13-17 | | 30:23-31:12 | | |
| 31:19-32:4 | | 30:23-31:12 | | |
| 34:6-9 | | | | |
| 34:14-19 | | | | |
| 39:14-40:22 | | | | |
| 43:13-15 | | | | |
| 43:20-21 | | | | |
| 56:7-9 | | 53:20-54:24 | AT, L | 21:19-22:1 |
| 56:12-15 | | 53:20-54:24 | AT, L | 21:19-22:1 |

## DEFENDANT'S OBJECTIONS KEY

| Code | Objection |
|------|-----------|
| A | Argumentative |
| AT | Attorney objections not removed |
| AU | Authenticity or Identification (FRE 901) |
| B | Violates Best Evidence Rule (FRE 1002-1004) |
| C | Compound |
| D | Duplicative/Cumulative |
| F | Lack of Foundation (FRE 602) |
| H | Hearsay/Improper Use of Deposition (FRE 801-802: FRCP 32) |
| I | Improper/Incomplete Designation (FRE 106: FRCP 32(a)(6)) |
| IC | Improper Counter-Designation (FRE 106: FRCP 32(a)(6)) |
| ID | Improper Designation of a Witness To Be Called Live (FRCP 32) |
| IO | Improper Lay or Expert Opinion (FRE 701-703) |
| K | Lack of Personal Knowledge/Incompetent (FRE 602) |
| L | Leading Objection in Redirects |
| LC | Improper Legal Conclusion (FRE 403) |
| M | Misleading/Mischaracterizes Prior Testimony |
| MD | Mischaracterizes Underlying Document (FRE 401-403) |
| N | Not previously produced, lacks production numbers, or illegible |
| NE | Assumes Facts Not In Evidence (FRE 103) |
| NR | Nonresponsive |
| NSW | No Sponsoring Witness |
| OS | Oversized document in terms of page length, rendering meaningful objections impossible until Defendant knows the purpose for which the document is being offered |
| P | Prejudice/Confusion/Delay/Waste of Time (FRE 403) |

| Code | Objection |
|------|-----------|
| **R** | Relevance (FRE 401/402) |
| **RRW** | Writing or recorded statement cannot be introduced without other writing or recorded statement (FRE 106) |
| **S** | Calls for Speculation (FRE 602) |
| **SC** | Beyond the Scope of the Witness's Testimony as a Corporate Representative |
| **U** | Improper Use Against Other Parties or For Other Purposes (FRE 105) |
| **V** | Vague/Ambiguous/Overbroad |
| **X** | Incomplete Document (FRE 106) |
| **Y** | Wrong Document or Incorrectly Described |
| **Z** | Reserved Because Exhibit Has Not Been Provided, the Copy Provided is Illegible, and/or the Entry Includes Multiple Documents |

## <u>PLAINTIFFS' OBJECTION KEY</u>

| Objection Code | Description | Basis |
|---|---|---|
| A | Lack of authenticity | FRE 901 |
| F | Lack of foundation or personal knowledge | FRE 602 |
| H | Hearsay | FRE 801, 802, 805 |
| N | Not produced in discovery | FRCP 37; FRE 403 |
| R | Lack of relevance | FRE 401, 402, 403 |
| U | Unduly prejudicial, confusing, wasteful, and/or cumulative | FRE 403 |
| I | Incomplete document | FRE 106, 403 |
| T | Not translated into English | FRE 403 |

EXHIBIT 13

## EXHIBIT 13

## PLAINTIFFS' BRIEF STATEMENT OF INTENDED PROOFS

**I.     INFRINGEMENT**

Plaintiffs intend to establish that:

1.     Mylan's submission to the FDA of ANDA 208561 was an act of infringement of the '218 patent.

2.     The use of Mylan's ANDA Products in accordance with their labeling would infringe each claim of the '218 patent, both literally and under the doctrine of equivalents.

3.     The tablets that are Mylan's ANDA Products satisfy the "rapid-release tablet" limitation of the claims of the '218 patent, both literally and under the doctrine of equivalents.

4.     Mylan's proposed labeling for its ANDA Products directs and encourages the use of Mylan's ANDA Products in a manner that meets each limitation of each claim of the '218 patent.

5.     By providing such direction and encouragement, Mylan's proposed labeling for Mylan's ANDA Products induces the use of Mylan's ANDA Products in a manner that satisfies each limitation of each claim of the '218 patent.

6.     Mylan's offer for sale, sale, marketing, and/or distribution of Mylan's ANDA Products (which will include their labeling) will induce infringement of each claim of the '218 patent.

7.     Mylan's offer for sale, sale, marketing, and/or distribution of Mylan's ANDA Products (which will include their labeling) will contribute to infringement of each claim of the '218 patent.

8.      Mylan's ANDA Products are not staple articles of commerce suitable for substantial non-infringing use.

9.      Any difference between the tablets that are Mylan's ANDA Products and the "rapid-release tablet" limitation of the claims of the '218 patent is a minor and insubstantial difference.

10.     Any difference between the use of Mylan's ANDA Products in accordance with their proposed labeling and the claims of the '218 patent is a minor and insubstantial difference.

11.     The tablets that are Mylan's ANDA Products perform substantially the same (if not the identical) function, in substantially the same (if not the identical) way, to achieve substantially the same (if not the identical) result as the "rapid-release tablet" limitation of the asserted claims of the '218 patent.

12.     The use of Mylan's ANDA Products in accordance with their proposed labeling performs substantially the same (if not the identical) function, in substantially the same (if not the identical) way, to achieve substantially the same (if not the identical) result as the invention claimed in the '218 patent.

## II.     OBVIOUSNESS

Plaintiffs do not bear the burden of proof on obviousness.  To the extent necessary, Plaintiffs intend to establish sufficient grounds to defeat Mylan's allegations of obviousness with respect to the '218 patent, including that:

13.     Mylan has not proven by clear-and-convincing evidence that the invention claimed in the '218 patent would have been obvious to the person of ordinary skill in the art as of January 31, 2005 priority date, in light of the scope and content of the prior art, the differences

between each asserted claim and the prior art, the level of ordinary skill in the art at that time, and objective indicia of nonobviousness.

14.     The claims of the '218 patent are not invalid for obviousness.

15.     The claims of the '218 patent are not *prima facie* obvious in light of the art on which Mylan relies.

16.     The person of ordinary skill in the art would not have had reason or motivation, as of January 31, 2005, to use rivaroxaban in a rapid-release tablet once daily for five consecutive days for the treatment and/or prevention of thromboembolic disorders, nor would the person of ordinary skill in the art have had a reasonable expectation of success in doing so.

17.     The person of ordinary skill in the art would not have had a reason or motivation, as of January 31, 2006, to select the references identified by Mylan, or to modify or combine them in the manner described by Mylan, or have had a reasonable expectation of success in doing so.

18.     Mylan's assertion that the '218 patent is obvious in light of the prior art is based on the application of an improper hindsight bias.

19.     The prior art taught away from the invention claimed in the '218 patent.

20.     Objective evidence of nonobviousness supports the patentability of the invention claimed in the '218 patent.

21.     The invention claimed in the '218 patent exhibits surprising and unexpected results as compared to the closest prior art.

22.     Physicians and regulatory agencies expressed skepticism regarding the invention claimed in the '218 patent.

23.     There is a nexus between the unexpected properties of rivaroxaban's once-daily dosing regimen in a rapid-release tablet and the invention claimed in the '218 patent.

24.     There is a nexus between the skepticism expressed in the industry regarding rivaroxaban's once-daily dosing regimen in a rapid-release tablet and the invention claimed in the '218 patent.

## III.    WRITTEN DESCRIPTION

Plaintiffs do not bear the burden of proof on Mylan's written description defenses under 35 U.S.C. § 112.  To the extent necessary, Plaintiffs intend to establish sufficient grounds to defeat Mylan's allegations that the claims of the patents in suit lack adequate written description, including that:

25.     The '218 patent conveys to the person of ordinary skill in the art that the inventors had possession of the methods of treatment claimed in the '218 patent.

## IV.    RELIEF

Plaintiffs intend to establish that:

26.     A judgment should be entered ordering that the approval date of Mylan's ANDA Products be a date not earlier than the expiration of the '218 patent, inclusive of any extension(s) and additional period(s) of exclusivity.

27.     Plaintiffs should be awarded such further relief as the court deems proper.

EXHIBIT 14

## EXHIBIT 14

## MYLAN'S STATEMENT OF INTENDED PROOFS

Mylan respectfully submits this brief statement of intended proofs.  This statement is not exhaustive, and Mylan reserves the right to prove any matters identified in the pleadings, discovery responses, expert reports, and in the accompanying statements of the facts and legal issues to be litigated at trial.  Mylan incorporates by reference the reports of Mylan's expert witnesses with respect to matters to be proved in part or entirely by expert testimony.  Mylan may also provide additional proofs to rebut any proof offered by Plaintiffs before and during trial, in response to rulings by the Court, or for other good cause.

### I.   ISSUES ON WHICH MYLAN BEARS THE BURDEN OF PROOF

#### A.   Invalidity

##### 1.   Obviousness

1.   Mylan will prove by clear and convincing evidence that all claims of the '218 patent are invalid as obvious/obvious to try over certain combinations of prior art references.  Each asserted claim is obvious at least over a combination of Straub, Kubitza 1-4, Forsman, Harder (PO078), Abrahmsen, and/or Goldhaber.

2.   In addition, Mylan may rely on additional references to show the scope and content of the prior art or to rebut non-obviousness arguments raised by Plaintiffs.  Mylan will prove by clear and convincing evidence that the combinations of references above disclose every limitation of the asserted claims, that a person of ordinary skill in the art would have had a reason or motivation to combine the teachings of the references to obtain the subject matter of the asserted claim, and that a person of ordinary skill on the art would have had a reasonable expectation of success.  Plaintiffs contend that secondary considerations indicate non-obviousness of the asserted claims of the '218 patent.  Mylan will introduce, to the extent

necessary, evidence rebutting any secondary considerations asserted by Plaintiffs.  Among other things, Mylan will show that there is no nexus between the asserted secondary considerations and the alleged invention of the '218 patent.

### 3.    Lack of Written Description

3.    Mylan will prove by clear and convincing evidence the claims of the '218 patent are invalid for lack of written description.  Mylan will show that the patent lacks sufficient written description support to convey to a person of ordinary skill in the art that the inventors were in possession of the claimed invention at the time the application was filed.

### B.    Relief

4.    Mylan will prove it is entitled to a declaration that the claims of the '218 patent are invalid.

5.    Mylan will prove it is entitled to an award of its costs and attorneys' fees and any further relief as the Court may deem proper.

## II.    ISSUES ON WHICH PLAINTIFFS BEAR THE BURDEN OF PROOF

6.    Mylan will, to the extent necessary, introduce evidence to rebut each of Plaintiffs' claims in this case.  The following is a brief statement of certain contentions Plaintiffs make on which Plaintiffs bear the burden of proof.

### A.    Infringement

7.    Plaintiffs contend that Mylan is infringing each claim of the '218 patent by submitting ANDA No. 208561 to the FDA in order to seek approval of its proposed rivaroxaban products.  Plaintiffs contend that the manufacture, use, sale and/or offer to sell in the United States, of Mylan's ANDA Products will infringe claims 1-4 of the '218 patent, as construed by the Court's *Markman* Order (D.I. 91, 128).

8.      Plaintiffs bear the burden of proving its infringement contentions by a preponderance of the evidence.  Mylan will introduce evidence rebutting Plaintiffs' contentions. Mylan will show that its ANDA Products do not meet all of the limitations of the asserted claims and thus does not infringe, literally or under the doctrine of equivalents.  Because there is no direct infringement, Mylan does not contribute to or induce infringement.  Plaintiffs have not and cannot meet their burden of proving Mylan's ANDA Products meet the rapid-release tablets limitation of the asserted claims, as construed by the Court's *Markman* Order (D.I. 91, 128).

**B.      Remedies**

9.      Mylan expects to introduce evidence rebutting Plaintiffs' assertion that they are entitled to a judgment that Mylan has infringed the '218 patent.  Mylan will rebut any assertion by Plaintiffs that they are entitled a judgment of infringement.

10.     Plaintiffs request that the Court order that the effective date of any approval of Mylan's ANDA No. 208561 be not earlier than the expiration of the '218 patent, as well as any extensions thereto.  Mylan will show that Plaintiffs are not entitled to such relief because Mylan's ANDA Products do not infringe any valid claim of the '218 patent.

11.     Plaintiffs contend that they are entitled to injunctive relief against any infringement of the '218 patent by Mylan, its officers, agents, servants, and employees from engaging in the manufacture, use, sale, offering for sale, or importation within the United States of Mylan's ANDA products before the expiration of the '218 patent, as well as any extensions thereto.  Mylan will show that Plaintiffs are not entitled to such relief because Mylan's ANDA Products do not infringe any valid claim of the '218 patent.

12.     Plaintiffs request attorney's fees pursuant to 35 U.S.C. § 285.  Mylan will show that Plaintiffs are not entitled to such relief.